UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/3/15
```

-----------------------------------------------------------------X
                                                                 :
UNITED STATES                                                    :
                                                                 :
                          -v-                                    :
                                                                 :
BEKIM FISEKU and SEFEDIN JAJAGA,                                 :
                                                                 :
                          Defendants.                            :
                                                                 :
-----------------------------------------------------------------X

15 Cr. 384 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to suppress evidence obtained by police officers during an early-hours stop on September 20, 2014, in Bedford, New York. Defendants Bekim Fiseku and Sefedin Jajaga claim that their Fourth and Fifth Amendment rights were violated when the officers, suspecting a potential burglary or home invasion, detained and questioned them and then searched a car driven by Jajaga, finding, *inter alia*, police apparel, fake guns, and a stun gun.

For the reasons that follow, the Court denies the defendants' suppression motion to the extent based on the Fourth Amendment. But, the Court holds, the defendants' Fifth Amendment rights were violated when the officers engaged in custodial questioning of them without having given *Miranda* warnings. This holding requires the suppression of some statements made by the defendants, but it does not require the suppression of physical evidence.

I.    **Overview and Procedural History**

On June 18, 2015, Fiseku and Jajaga were indicted on one count of conspiracy to commit Hobbs Act robbery, in violation of § 18 U.S.C. 1951. Dkt. 2. As developed below, these charges arose out of a police investigation initiated in the early hours of September 20, 2014, when Detective Sergeant Vincent Gruppuso of the Bedford Police Department encountered the

defendants and an apparent confederate under circumstances that suggested an ongoing or just completed plot to burglarize or rob a home in the rural Bedford community.  Gruppuso stopped the three men and separately questioned them, obtaining inconsistent explanations for their presence and activities in Bedford.  Eventually, with Jajaga's consent, Gruppuso searched the car he had been driving, and uncovered physical evidence indicative of a robbery plot.

On September 3, 2015, following Rule 16 discovery, Fiseku moved to suppress the items found in the car and his statements to Gruppuso, Dkt. 21,[1] submitting, in support, an affidavit, Dkt. 26 ("Fiseku Aff."), and a memorandum of law, Dkt. 27 ("Def. Br.").  Fiseku specifically claimed that his Fourth Amendment rights had been violated, and in a brief footnote, claimed in the alternative that his statements could also be suppressed on Fifth Amendment grounds.  On September 8, 2010, Jajaga filed a letter requesting to join in Fiseku's motion, which the Court granted the next day.  Dkts. 23, 24.  On September 17, 2015, the Government submitted a memorandum of law in opposition.  Dkt. 27 ("Gov't Opp. Br.").

On October 21, 2015, the Court held a suppression hearing, at which Gruppuso testified and the Court received documentary and photographic evidence.  In a post-hearing colloquy, the Court raised, and counsel addressed, whether the absence of a *Miranda* warning during the stop gave rise to a suppression claim under the Fifth Amendment.  The Court invited post-hearing memoranda, including on that issue.

On October 28, 2015, Fiseku, Jajaga, and the Government submitted post-hearing memoranda.  Dkts. 37 ("Fiseku Ltr. Br."), 35 ("Jajaga Ltr. Br."), 36 ("Gov't Ltr. Br.").  On

---

[1] As a result of a docketing error, the motion was re-filed on September 10, 2015.  Dkt. 25.  The docket entries for the affidavit and memorandum of law are those that correspond to the motion filed on September 10, 2015.

November 2, 2015, the Court issued an order seeking additional briefing, including further

briefing on Fifth Amendment issues, Dkt. 38, which the parties filed on November 5, 2015, Dkts.

43 ("Fiseku Second Ltr. Br."), 42 ("Jajaga Second Ltr. Br."), 40 ("Gov't Second Ltr. Br.").

On November 10, 2015, the Court heard argument.  At the hearing, the Court invited the

parties to reopen the factual record if they believed that it was inadequate to address the Fifth

Amendment claims that had crystallized late.  Arg. Tr. 46–57.[2]  Fiseku and Jajaga stated that

they were not seeking additional testimony, Arg. Tr. at 46–51, and on November 11, 2015, the

Government submitted a letter to the same effect, Dkt. 44.

## II.    Factual Findings

### A.    Evidence Considered

The facts found by the Court are based on the evidence adduced at the suppression

hearing, which consisted of the testimony of Gruppuso, a 16-year veteran of the Bedford Police

Department, who, as of September 20, 2014, held the position of Sergeant.  Tr. 6–8.  The Court

also received maps and photographs of the area where the stop of the defendants took place,

GX1–3; photos of the physical evidence obtained during the search of the car driven by Jajaga,

GX4A–K; and a log of Gruppuso's relevant radio runs (or transmissions) that night, GX5, which

were automatically and contemporaneously recorded, Tr. 32–33.  The defendants also offered,

and the Court received, Gruppuso's Incident Report, Def. Ex. A ("Incident Report"), which was

prepared the day of the stop, Tr. 40–41.[3]  Although Fiseku did not testify, the Court also received

and considered his affidavit, recounting the events in question.

---

[2] "Tr." refers to the transcript of the October 21, 2015 suppression hearing; "Arg. Tr." refers to
the transcript of the November 10, 2015 argument.

[3] Although the Incident Report contains hearsay, it was offered and received without limitations
on its use.  Tr. 41.  In any event, "the rules of evidence normally applicable in criminal trials do

3

B.      **Facts Established**[4]

1.      **Initial Encounter with Jajaga**

On September 20, 2014, at approximately 1:15 a.m., Detective Sergeant Gruppuso was on duty, patrolling alone in his marked patrol car when he saw a white Nissan Pathfinder stopped on a dirt pull-off near the intersection of Guard Hill Road and Christopher Road in rural Bedford. Tr. 7–9.  Gruppuso pulled up to the car and spoke briefly with the driver, later identified as Jajaga, to ask if he needed assistance.  Tr. 9, 38.  Jajaga was alone in the car at that time.  Tr. 12.

During the brief conversation, Jajaga told Gruppuso that he was from Staten Island and was going to visit a friend on Guard Hill Road; he said he was having transmission trouble but that he did not need assistance because he had another friend coming with a tow truck from Brooklyn.  Tr. 11–12.  The interaction with Jajaga lasted approximately two to three minutes, after which Gruppuso left.  Tr. 12.  At some point during or after the interaction, Gruppuso conducted a registration check.  It revealed that there was a valid registration for the car, which was registered to a Kujtime Fiseku.  Tr. 43; Incident Report at 1.

Gruppuso testified that Jajaga's presence at that early morning hour, coupled with his explanation for why he was there, raised his suspicions: Jajaga was not from the area, the tow truck was improbably coming to Bedford from Brooklyn, and Gruppuso knew that there was a vacant house for sale in the area that would be a prime target for burglary.  Tr. 12–13.  Gruppuso therefore resolved to return to the dirt pull-off where he first encountered the car to check on it. Tr. 13–15.  At 1:19 a.m., Gruppuso radioed to fellow officers that there was "a DV [disabled

---

not operate with full force at hearings before the judge to determine admissibility of evidence."
*United States v. Matlock*, 415 U.S. 164, 172–73 (1974).

[4] On a suppression motion, the Government bears the burden of proof by a preponderance of the evidence.  *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).

vehicle] [on] Guard Hill [Road] by Christopher [Road]," that it was a white Pathfinder "waiting on a tow truck from the city," and that Grupposo would "check back on him in a little while." GX5; Tr. 33.

### 2.  Stop at the Park-n-Ride

#### a.  *Before the search of the car*

Approximately two to four minutes later, while on his way to return to the spot of the disabled vehicle to check on it, Grupposo spotted the same white Nissan Pathfinder turning onto South Bedford Road. Tr. 15–16. This heightened his suspicions, Grupposo testified, because a vehicle that had purportedly been broken down and awaiting assistance was operational and in a new location minutes later, and even if roadside assistance had arrived shortly after he had left, transmission trouble is not typically remedied on the spot. Tr. 16–17. Upon seeing the car, Grupposo, who was travelling in the opposite direction, turned around and began to follow it. *Id.*

While following the car, Grupposo saw it turn into a park-n-ride just east of Interstate 684. Tr. 17. The car parked in a spot in the back-right part of the park-n-ride (relative to the entrance); Grupposo parked his vehicle diagonally off the driver's side rear corner of the car. Tr. 18–19. When he arrived, Grupposo saw that the driver (Jajaga) whom he had previously encountered was seated in the driver's seat. In addition, there was now a male passenger in the passenger side, later identified as a Mr. Hughes, and a third man, later identified as Fiseku, who was walking outside around the rear of the car from the passenger side towards the driver's side. It was not clear whether Fiseku had come from the car or elsewhere. Tr. 20, 27.

Upon entering the park-n-ride, Grupposo, at 1:25 a.m., radioed for another unit to respond. Tr. 21, 33–34; GX5. Two other units responded; an Officer Moylan arrived quickly because he had been nearby, and an Officer Henderson arrived within minutes. Tr. 21–22.

Henderson parked his patrol vehicle behind and to the left of Gruppuso's; Moylan parked his behind and to the right.  Tr. 23.

A disputed issue of fact is whether the positioning of the police cars blocked the car from leaving.  The Court credits Gruppuso's testimony that the police vehicles, parked behind and to the left of Jajaga's car, did not block in Jajaga's car:  As he explained, the park-n-ride was deserted, with only a few parked cars present, and Jajaga's car had room to maneuver out to the right.  Tr. 50–52.  Relatedly, the parties dispute whether the officers pulled their guns.  Fiseku attests in his affidavit that all three officers surrounded the car with guns drawn and ordered the occupants of the car to get out.  Fiseku Aff. ¶¶ 2–3.  The Court again credits Gruppuso, whose testimony was measured and believable throughout, that he did not draw his weapon or see the other officers draw theirs.  Tr. 21, 25.  Gruppuso credibly explained that he "didn't feel [he] needed to pull [his] gun.  There was no threat of deadly force at the time."  Tr. 56; *see also* Tr. 21 (explaining that he would draw his firearm in situations where he "perceived a threat to [his] safety," but "didn't feel it was necessary [here].  I didn't see those elements.").  Cross-examination did not disturb this testimony.  In contrast, Fiseku's contrary claim that guns were drawn, made in his affidavit, was not subject to adversarial testing.  *See United States v. Medina*, 19 F. Supp. 3d 518, 535 n.13 (S.D.N.Y. 2014) (court may give defendant's claim in an affidavit less weight where he did not testify) (collecting cases).

By the time Moylan and Henderson arrived, Gruppuso had begun to interact with Fiseku, who was standing outside the car.  Tr. 22.  Gruppuso identified Fiseku by looking at his driver's license, and then conducted a pat-down of Fiseku, finding no weapons or contraband; Gruppuso placed Fiseku in handcuffs.  Tr. 23–25, 52–53.  Gruppuso and the other two officers then directed Jajaga to exit the car, which he did.  The officers reviewed his driver's license, and

conducted a pat-down, which revealed no weapons or contraband; the officers also placed Jajaga in handcuffs.  Tr. 23–25, 53–54.  Finally, Moylan directed Hughes to exit the car.  Hughes had no identification but identified himself by name; Moylan frisked Hughes, who had no weapons or contraband on his person, and placed him, too, in handcuffs.  Tr. 23–25, 54.  Gruppuso testified that three men had been handcuffed for officer safety, which, he testified, was not an unusual practice for him during investigative detentions.  Tr. 24, 56.  Gruppuso acknowledged that, while handcuffed, the three men were not free to leave.  Tr. 53–54.

Fiseku, Jajaga, and Hughes were then separated for individual questioning; Fiseku remained outside the car; Jajaga and Hughes were placed in Henderson's and Moylan's patrol cars, respectively.  Tr. 23–24.  Gruppuso explained to all three individuals that they were being detained while the officers were investigating; he did not tell them that they were under arrest. Tr. 24–25, 57–58.  The officers did not give any of the three men *Miranda* warnings prior to or during the questioning.  Tr. 55.

Jajaga was interviewed first, then Fiseku and Hughes.  Incident Report at 2.[5]  The questioning focused on why the three men were present in Bedford at that hour.  Gruppuso told Jajaga that he did not believe Jajaga's earlier story, and asked Jajaga why he had previously claimed that his car was disabled, and when the other passengers had gotten into the car with him.  Tr. 26; Incident Report at 2.  Jajaga initially said that the three men were on their way to his cousin's bachelor party in Waterbury, Connecticut, and that he had met up with the other two men at the park-n-ride.  Incident Report at 2.  Gruppuso confronted Jajaga about the brief time that had passed between when Jajaga and Gruppuso arrived at the park-n-ride; Jajaga "had no

---

[5] There is a small discrepancy between the Incident Report and Gruppuso's testimony, Tr. 26–27, about the order of the interviews.  The distinction is irrelevant to the disposition of the motions, and does not, in the Court's view, reflect on Gruppuso's credibility.

response." *Id.* Changing his story, Jajaga then stated that he was on Guard Hill Road to cheat on his wife, but when asked, said he did not know the name or address of the woman he was to meet, that they had met on the Internet, and that the woman had told him to meet her on Guard Hill Road near Darlington Road. *Id.*; Tr. 26.

During Gruppuso's interview of Fiseku, Fiseku stated that the three men "were traveling to Waterbury when they stopped at the park and ride to stretch their legs and smoke a cigarette." Incident Report at 2. Fiseku "had no explanation as to why [Jajaga had been] on Guard Hill Rd. and stated he had just left them there." Incident Report at 2.

Moylan interviewed Hughes. Hughes stated that the other two men had called him to go to a party in Waterbury; he stated that they stopped in the park-n-ride to stretch, and that the three had just gotten back into the car. *Id.* Hughes stated that they had been travelling in separate vehicles, but got separated and reconvened at the park-n-ride. Tr. 27.

Gruppuso then returned to speak again with Jajaga. He told Jajaga that he did not believe the men's stories, and asked Jajaga whether there was anything in the car that should not be there. Jajaga responded, "no, you can look." Tr. 28; Incident Report at 2. Gruppuso did not ask any of the other individuals for consent to search the vehicle. Tr. 28.

>b.     *The vehicle search and its aftermath*

The officers then searched the vehicle. In the rear seat, Gruppuso found a bag containing two flashlights, a walkie talkie, two NYPD baseball caps, a hooded NYPD sweatshirt, a pair of gloves, a stun gun, a bb gun replicating a Colt .45, and a blank pistol replicating a .25 automatic, a screwdriver, and a gold badge of a repo/recovery agent on a neck lanyard. Under the driver's seat, Henderson found a screw driver, a single glove, and a walkie talkie; on the middle console

was a roll of duct tape.  Incident Report at 2–3; Tr. 29; GX4A–K.  The search lasted five to 10 minutes.  Tr. 37.

Gruppuso then began walking back towards Jajaga.  Before Gruppuso spoke, Jajaga volunteered:  "[T]he stuff in the bag is mine, its [sic] all mine."  Incident Report at 3; Tr. 29–30. Gruppuso then asked where Jajaga had gotten the stun gun; Jajaga responded that he got it in Pennsylvania.  Incident Report at 3.  Gruppuso asked if that was because stun guns are illegal in New York; Jajaga responded, "yes."  *Id.*

Shortly thereafter, Gruppuso told Jajaga that he was under arrest.  Tr. 37; *see also* Tr. 30. Jajaga was not, however, given *Miranda* warnings at any point on the scene.  Nor were such warnings given to Fiseku or, it appears, Hughes.  *See* Tr. 55.

Following the vehicle search, Gruppuso, concerned about the possibility of a home invasion, directed two patrol officers to canvass the immediate area.  Tr. 30.  The canvass did not reveal any criminal activity.  Incident Report at 3.

The record of Gruppuso's radio runs reflects that the search of the car was concluded by 1:35 a.m., some 10 minutes after the initial stop.  That is because it was on the basis of the search that Gruppuso determined that a canvass would be necessary, Tr. 36, 59–61, and at 1:35 a.m., Gruppuso radioed headquarters stating that he would be "detaining three [individuals] until we can figure out what's going on," and that "3-7 [another officer] is going to canvass some of those homes."  GX5; Tr. 34.[6]  At 1:37 a.m., Gruppuso radioed to have another unit call his cell phone,

---

[6] Gruppuso's testimony during the suppression hearing varied in pinpointing the time by which the search was completed, starting with the latest time by which it would have occurred and then, upon questioning by the Court, narrowing the timeframe between the initial stop and the search. *See* Tr. 59–61.  The Court finds that the progression of the testimony at the hearing reflects favorably on Gruppuso's credibility, rather than the opposite, because it was clear that Gruppuso was trying to be cautious and not overstate matters.

during which call he explained what they had discovered and provided instructions for which areas to canvass.  GX5; Tr. 35.  At 1:40 a.m., Gruppuso radioed other units to have them "meet up" because "We have to canvass."  GX5.  At 1:54 a.m., Gruppuso called for a detective to come to the scene.  GX5, Tr. 31.  The detective, Michael Roche, arrived less than an hour later.  Tr. 31.

While the canvass of the area was conducted, Jajaga, Fiseku, and Hughes remained detained on the scene, and in handcuffs.  *See* Tr. 31.  During that time, Gruppuso interviewed Hughes, asking "how they ended up at the park and ride."  Incident Report at 3.  Hughes stated that he and Fiseku had been trying to find Jajaga, but they had made a wrong turn and gotten lost, and then met up at the park-n-ride to stretch their legs.  *Id.*  Gruppuso also interviewed Fiseku anew, and "asked how he had gotten to the park-n-ride."  Fiseku "stated they had all come together in the Pathfinder," which, he said, was registered to his mother.  *Id.*  Gruppuso asked Fiseku if he knew why Hughes had stated that the men had come in separate cars, but Fiseku did not answer.  *Id.*  Gruppuso also asked Hughes what other vehicles they had with them.  Hughes indicated a BMW that was parked next to the Pathfinder.  *Id.*  A registration check revealed it was registered to Jajaga's father.  *Id.*  Gruppuso asked Fiseku if he knew whose car it was; Fiseku responded that he did not know; when asked if one of the three men had driven it to the park-n-ride, Fiseku did not respond.  *Id.*  Gruppuso then asked Jajaga to whom the BMW belonged; Jajaga responded that it was his father's.  *Id.*  Henderson then "checked the hood of the BMW and stated it was cold to the touch."  *Id.*

When Detective Roche arrived, he briefly re-interviewed all three men on the scene.  *Id.*; Tr. 31.  All three defendants remained in handcuffs at all times on the scene.

Jajaga, being under arrest, was brought to police headquarters;  Hughes was also detained and brought to headquarters for fingerprinting, because he could not produce identification, but

he was not placed under arrest.  Incident Report at 3; Tr. 37–38.  Fiseku was not placed under

arrest, but followed the officers back to headquarters voluntarily.  Tr. 38–39.  All three men were

re-interviewed at police headquarters.  Incident Report at 4.[7]

## III.  Discussion

### A.    Overview

Defendants' motions to suppress implicate multiple issues under the Fourth and Fifth

Amendments.  A threshold issue, under the Fourth Amendment, is whether the detention of

Fiseku and Jajaga at the park-n-ride was justified.  This issue turns on whether the detention is

properly classified as a "*Terry* stop," requiring justification in the form of reasonable suspicion

of criminal activity, or a *de facto* arrest, requiring justification in the form of probable cause.  *See*

*United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995).  The Court has no difficulty holding—

and defendants do not seriously dispute—that the officers reasonably suspected criminal activity

on the part of the men they detained at the park-n-ride.  But if the stop became a *de facto* arrest,

then the stop was unlawful—as all agree that probable cause to arrest the defendants was lacking

until the search of the vehicle yielded evidence of a robbery plot—and its fruits, including the

defendants' statements and the physical evidence seized from the vehicle, must be suppressed.

*See Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963); *Brown v. Illinois*, 422 U.S. 590,

601–04 (1975).

---

[7] The record is unclear whether, or at what point, *Miranda* warnings were given to any of the three men back at police headquarters.  There is no need to resolve that factual issue, however, because the Government has stated that it does not intend to offer any statements made by Fiseku or Jajaga after the search of the vehicle, including those made at police headquarters, with the exception of Jajaga's statement immediately after the search that the contents of the bag were his.  Arg. Tr. 38–39.

Assuming that the stop complied with the Fourth Amendment, the Court must address other issues to determine whether the defendants' statements or the evidence seized from the vehicle must be suppressed.

As to the statements, the Second Circuit has held that even where an investigative detention falls short of a *de facto* arrest, a suspect may nevertheless be in custody, requiring, under the Fifth Amendment, that *Miranda* warnings be given prior to interrogation, unless excused by a *Miranda* exception such as that for public safety.  *See United States v. Newton*, 369 F.3d 659, 673, 677 (2d Cir. 2004).  The Government has conceded that for purposes of *Miranda*, Fiseku and Jajaga were in custody once handcuffed at the start of the detention at the park-n-ride, and that they were not given *Miranda* warnings.[8]  Therefore, the defendants' statements must be suppressed as the product of a *Miranda* violation, unless either (1) the interrogation in response to which they were made is covered by the public safety exception to *Miranda*, *see New York v. Quarles*, 467 U.S. 649 (1984), or (2) a statement was not the product of interrogation (*i.e.*, it was volunteered), so as to fall outside the *Miranda* framework.

As to the physical evidence seized from the vehicle following Jajaga's consent to search, two issues are presented.  The first is whether Jajaga's consent was voluntary, or whether the overall circumstances surrounding that consent, including the lack of a *Miranda* warning, rendered it involuntary.  *See United States v. Patane*, 542 U.S. 630 (2004) (physical evidence deriving from un-*Mirandized* statement may be admitted); *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (standards for consent to search under Fourth Amendment).  The second is whether Jajaga had actual or apparent authority to consent to the search of the car.  *See United States v. McGee*, 564 F.3d 136, 139 (2d Cir. 2009).

---

[8] *See* Gov't Second Ltr. Br. 1–2; Tr. 55.

B.      **Fourth Amendment and the Reasonableness of the Stop**

1.      **Applicable Legal Principles**

Under *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may conduct an investigative stop

consistent with the Fourth Amendment when the officer has "a particularized and objective basis

for suspecting the particular person stopped of criminal activity," *Navarette v. California*, 134 S.

Ct. 1683, 1687 (2014) (internal quotation marks and citations omitted), and the stop is

"reasonable," *see United States v. Sharpe*, 470 U.S. 675, 682 (1985).  A stop's reasonableness is

determined by "whether the officer's action was [1] justified at its inception, and [2] whether it

was reasonably related in scope to the circumstances which justified the interference in the first

place."  *Id.* (quoting *Terry*, 392 U.S. at 20) (internal quotation marks omitted).

As to the first prong of the test, a stop is justified at its inception when the officer has a

"reasonable, articulable suspicion" of criminal activity.  *Illinois v. Wardlow*, 528 U.S. 119, 123

(2000); *see Sharpe*, 470 U.S. at 682.

As to the second prong, a *Terry* stop may ripen into an arrest, which to be valid must be

supported by probable cause, if "the officers unreasonably used means of detention that were

more intrusive than necessary."  *United States v. Parea*, 986 F.2d 633, 645 (2d Cir. 1993).

> In determining whether an investigatory stop is sufficiently intrusive to ripen into
> a *de facto* arrest, the Second Circuit considers the "amount of force used by the
> police, the need for such force, and the extent to which an individual's freedom of
> movement was restrained, and in particular such factors as the number of agents
> involved, whether the target of the stop was suspected of being armed, the duration
> of the stop, and the physical treatment of the suspect, including whether or not
> handcuffs were used."

*United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (quoting *Perea*, 986 F.2d at 645).  "No

one of these factors is determinative," *Newton*, 369 F.3d at 674, and "the reasonableness of the

level of intrusion [depends on] the totality of the circumstances."  *Posr v. Doherty*, 944 F.2d 91,

98 (2d Cir. 1991). The circumstances and actions taken must be considered from the perspective of a reasonable officer. *Newton*, 369 F.3d at 673–74 ("A Fourth Amendment reasonableness inquiry asks 'would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?'" (quoting *Terry*, 392 U.S. at 21) (internal quotation marks omitted)). The Supreme Court has admonished lower courts, in conducting this inquiry, "not [to] indulge in unrealistic second guessing." *Sharpe*, 470 U.S. at 686.

2. **Discussion**

The first prong of the inquiry is easily met here, as various specific and objective facts known to Gruppuso supplied reasonable suspicion that Fiseku and Jajaga were engaged in criminal activity, justifying their investigative detention at the park-n-ride. Most significant, Gruppuso's observation of the driver of the car (Jajaga) in a new location revealed that Jajaga had clearly lied to him in their conversation minutes earlier, when Jajaga had claimed that the car was disabled by transmission trouble and that he was awaiting assistance from Brooklyn. Jajaga's presence late at night in a neighborhood where he did not live and in the vicinity of a particular vacant house for sale in the rural Bedford area, which was an inviting target for burglary, added to Gruppuso's reasonable suspicion. Finally, upon entering the park-n-ride, Gruppuso observed additional individuals in (Hughes) or around (Fiseku) the car who had not been present when he first spoke with Jajaga at the dirt pull-off. The meeting up of these people in the wee hours of the morning reinforced Gruppuso's reasonable suspicion that the men were engaged in some form of criminal conduct, potentially, a burglary or home robbery. Tellingly, defendants do not seriously contest that these facts, viewed in combination, justified

14

investigative detention. *See* Def. Br. 9 (not addressing reasonable suspicion); Fiseku Ltr. Br. 1–2 (briefly raising the issue).

Defendants' principal challenge to the stop is, therefore, based on the second prong. They argue that the stop was unreasonable in the manner of its execution and its duration, and thereby ripened into a full arrest before the officers' search of the vehicle developed probable cause to support an arrest. This issue presents a close question. In particular, Gruppuso's handcuffing of Fiseku and Jajaga during his brief questioning of them is a fact that, ordinarily, would signify an arrest, not a *Terry* stop. However, viewing in totality the circumstances of the defendants' detention, and considering the use of handcuffs in the context of the challenges presented to the three officers by the wee-hours remote encounter with the three suspects, the Court, narrowly, finds that the detention was reasonable in its manner and duration and not more intrusive than reasonably necessary.

To begin with, the officers did not use or display force in initiating the stop. They did not draw their weapons. Nor did they block the car from leaving. Such measures have sometimes contributed to a finding of a *de facto* arrest, *see Oliveira v. Mayer*, 23 F.3d 642, 646 (2d Cir. 1994); *United States v. Ceballos*, 654 F.2d 177, 181–84 (2d Cir. 1981), although by no means always, *see Newton*, 369 F.3d at 674 (collecting cases regarding the use of firearms in investigative stops); *Parea*, 986 F.2d at 644 (indicating that a stop in which patrol cars blocked a vehicle and officers approached with weapons drawn was not an arrest) (collecting cases). The size of the police presence on the scene also does not support the finding of a *de facto* arrest. Initially, only one officer (Gruppuso) was present; eventually, there were three; but at no point did the number of officers exceed the number (three) of detained suspects. The police presence, far from conveying intimidation, was arguably the minimum necessary to realistically maintain

15

control of the situation.  *See Vargas*, 369 F.3d at 100, 102 (four officers detaining single suspect did not convert stop into an arrest); *Newton*, 369 F.3d at 675 (six officers detaining single suspect was not unreasonable).

The officers were also well within the bounds of reasonableness in conducting pat-downs of Fiseku and Jajaga.  At its core, *Terry* permits a pat-down based on a reasonable suspicion of criminal activity—in *Terry*, as here, of a burglary or robbery—and that the suspects "may be armed and presently dangerous."  392 U.S. at 30; *see also United States v. Oates*, 560 F.2d 45, 62–63 (2d Cir. 1977) (explaining that inference that a suspect was armed and dangerous may derive from nature of the crime suspected, and that "the standard of suspicion necessary to allow a frisk for weapons is not a difficult one to satisfy," *id.* at 63).  Having encountered the three suspects in the middle of the night, under circumstances that suggested that a burglary or robbery plot might be underway, the officers had every reason to fear that the suspects were armed, and to pat them down to assure their own safety during the stop.

The handcuffing of the suspects from early in the detention through the search of the vehicle, however, is of a different nature.  It effectively prevented Jajaga and Fiseku from leaving the scene (and thereby made virtually irrelevant the fact that the car was not blocked in).  "Under ordinary circumstances," the Second Circuit has explained, "drawing weapons and using handcuffs are not part of a *Terry* stop"; instead, for such "intrusive and aggressive police conduct" to be justified in the course of a *Terry* stop, they must be "a reasonable response to legitimate safety concerns on the part of the investigating officers."  *Vargas*, 369 F.3d at 102 (quoting *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001)) (internal quotation marks omitted) (finding use of handcuffs in that case reasonable).  The Second Circuit put the point this way in its 2004 decision in *Newton*, in which it found the use of handcuffs reasonable during the

16

course of a *Terry* stop:  "[W]here an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a *de facto* arrest."  369 F.3d at 674 (quoting *Terry*, 392 U.S. at 24); *see also id.* at 674–75 (collecting cases from other circuits approving use of handcuffs in *Terry* stops).

Last year, the Second Circuit again had occasion to consider this practice in *United States v. Bailey*, where it found that the use of handcuffs during a stop of two men suspected of narcotics trafficking and unlawful firearm possession was unreasonable.  743 F.3d 322, 339–41 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 705 (2014).  In *Bailey*, the police had obtained a search warrant for a basement apartment, based on an affidavit from a confidential informant who had purchased narcotics in that apartment and reported seeing a handgun inside.  *Id.* at 226–27.  Just before the warrant was to be executed, two officers saw two men (one matching the description of the suspected narcotics trafficker) leaving the basement apartment and driving away in a car. *Id.* at 327.  The officers followed the car and pulled the men over into the parking lot of a fire station about a mile away from the apartment, so as to identify the men and ascertain why they had been in the apartment.  *Id.*  The officers ordered the men out of the car, patted them down, and after identifying them, placed them in handcuffs, explaining that they were being detained while the search warrant at the apartment was executed.  *Id.*  The men were then driven back to the apartment, where the officers learned that the search had uncovered a firearm and drugs, and formally arrested the men.  *Id.* at 328.

The Second Circuit held the use of handcuffs unreasonable under the circumstances. Reviewing the case law, it recognized that "not every use of handcuffs automatically renders a stop an arrest requiring probable cause," and that the "relevant inquiry is whether police have a

reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat." *Id.* at 340.  However, the Circuit held, no such threat was present, because the pat-downs had "confirmed that neither man was armed," and by having "both men exit the stopped vehicle, the officers had eliminated the risk that the men might obtain any weapon from therein." *Id.*  Although recognizing that "drug trafficking and unlawful firearm possession [are] crimes frequently associated with violence," the Circuit stated, a reasonable suspicion of such offenses will not invariably justify the use of handcuffs on grounds of officer safety.  *Id.*  Rather, "just as the law does not categorically assume that handcuffing transforms every stop into an arrest, so the law does not categorically assume that every investigatory stop related to particular crimes requires handcuffing, particularly when a pat-down outside a vehicle reveals the detainee to be unarmed." *Id.*  The Circuit, however, pointedly did not "foreclose the possibility that, in other cases, the government may be able to point to circumstances supporting a reasonable basis to think that even an unarmed person poses a present physical threat or flight risk warranting handcuffing." *Id.*

A number of features of this case parallel *Bailey*:  Like the two suspects in *Bailey*, Fiseku and Jajaga were suspected of an offense associated with violence, ordered out (Jajaga) or kept out (Fiseku) of their vehicle, and patted down and shown to have no arms on their persons before being placed in handcuffs.  These similarities make the claim of a *de facto* arrest colorable and defendants' suppression claim on this ground substantial.  But, on a close comparison, there are also a number of features of the stop here that were not present in *Bailey* that, in the Court's view, made it reasonable, in context, for the officers to handcuff the suspects during their interrogation at the park-n-ride.

18

To begin with, the stop in this case took place in an isolated rural spot in the middle of a deserted area of the suspects', not the officers', choosing.  In *Bailey*, the officers initiated the stop at the officers' chosen location, following the suspects as they traveled more than a mile away from the location of the suspected criminal activity.  Under those circumstances, once the suspects had been patted down, there was no realistic scenario presented that they might have access to weapons or confederates.  By contrast, here, it was Jajaga who chose to pull into the park-n-ride, in an act of apparent pre-arrangement:  Gruppuso, following Jajaga into the park-n-ride, saw two other individuals, one (Hughes) in the passenger seat of the car and another (Fiseku) outside the car.  Neither had been present when Gruppuso first encountered Jajaga several minutes earlier; and it was not clear whether Fiseku had been in the car or had joined Jajaga at the park-n-ride.  A reasonable officer encountering the suspects at this site could therefore reasonably have been concerned that other confederates were in the vicinity with whom Jajaga, Hughes, and Fiseku were intending to rendezvous at the park-n-ride, and/or that weapons were stashed somewhere nearby.

Furthermore, the park-n-ride, as shown in the aerial photographs entered into evidence, GX2–3, is surrounded by trees, far from any evident residences, and in an isolated rural area.  During the early morning hours when the stop took place (beginning around 1:15 a.m.), the area was presumably dark (there is no street lighting apparent from the aerial photographs) and difficult if not impossible to protectively sweep.  The officers therefore lacked effective control over their surroundings, in pointed contrast to the officers in *Bailey*.  In these circumstances, handcuffing Jajaga, Hughes, and Fiseku during their questioning and the ensuing consented search of the vehicle mitigated the risk of harm to the officers that would be presented if

confederates emerged.  It also eliminated the risk that one of the three men could make a break for a secreted weapon.

That there were more suspects here (three) known to be present than in *Bailey* (two) also magnified the risk that any one suspect would fight back or break away, or otherwise act to unsettle what, without handcuffs, was the officers' less-than-secure control over the situation. Notably, based on the information known to Gruppuso, the suspects appeared likely to have been suddenly intercepted in the act of carrying out a crime—Gruppuso suspected a home robbery or burglary.  An officer, under the circumstances known to him, could reasonably fear that a suspect would defy the officers' authority and try to elude capture.

Finally, the purpose of the stop, and manner in which it would need to be conducted to be effective, differed from the stop in *Bailey*.  There, the officers' goal in connection with the stop was primarily to identify the men who had left the apartment that other officers were about to search and to confirm if either of them was the drug trafficker whom the confidential informant had described.  Handcuffing was not reasonably necessary for this purpose.

Here, in contrast, Gruppuso and his fellow officers had good reason to believe that they had happened upon a crime in progress.  Jajaga had just been revealed to have blatantly lied to Gruppuso about his car trouble and his purpose for being in Bedford in the early morning hours; now he was joined by two men in a suspicious rendezvous.  Under these circumstances, the officers' paramount investigative goal had to be to determine whether a crime was afoot and whether a danger was presented to the community.  Perhaps a robbery or burglary had just been carried out, with unknown consequences for the occupants.  Or perhaps the three men (maybe with confederates) were poised to commit such an offense.  To determine whether the men were engaged in a crime or whether there was a benign explanation for their presence, the three

officers needed to separate the three men while they were questioned.  Yet doing so left each officer vulnerable, insofar as either one or more suspects would have to be left unaccompanied or each officer would have to be situated, one-on-one, with each subject.  *See United States v. Critterdon*, 883 F.2d 326, 329 (4th Cir. 1989) (officer reasonably handcuffed burglary suspect where officer "could reasonably anticipate that he might be required to go to the aid of his fellow officers").  This situation created a risk that one or more subjects might attempt to take an officer by surprise, including by attempting to overpower them or access a weapon (whether a hidden weapon or an officer's).

Under these circumstances, the Court's judgment is that the Bedford police officers here made a reasonable, on-the-spot judgment that handcuffing was necessary to protect themselves and to effectuate the valid investigative purposes of the detention.  This was, thus, a far cry from a situation in which the officers, with a flimsy basis for suspicion, used unjustifiable, unreasonable, intrusive, and forceful tactics.  *Compare Oliveira*, 23 F.3d at 644, 646 (stop unreasonable where officers used "felony stop" procedures, involving issuing orders to suspects using a loud speaker and with guns drawn from behind their patrol cars, and then searched and handcuffed suspects, based on no more than a report of dark-skinned males seen in a run-down car with an expensive video camera); *with* Tr. 24 (Gruppuso's testimony that felony stop procedures were not employed).  As in *Newton*, here "handcuffing was a less intimidating—and less dangerous—means of ensuring the safety of everyone . . . than holding [the individuals] at gunpoint."  369 F.3d at 675.

For similar reasons, the officers' use of police cruisers here during questioning was reasonable.  The officers placed Jajaga and Hughes, but not Fiseku, in police cruisers.  This separation was reasonable to effectively question the suspects and get to the truth behind Jajaga's

apparent lie to Gruppuso about his car trouble and his presence in the neighborhood.  While

placement in police cruisers may contribute to a finding that a detention ripened into an arrest,

*see Oliveira*, 23 F.3d at 646, the decision to place some, but not all, of the suspects in the

cruisers, without violence or excessive force, after informing them that they were being

"detained" while the officers investigated, was a reasonable measure tailored to the needs of this

particular stop.  *See Cardona v. Connolly*, 361 F. Supp. 2d 25, 31–32 (D. Conn. 2005) (officer's

placing suspect in handcuffs and leading her to police cruiser after she fled did not turn *Terry*

stop into an arrest); *cf. United States v. McCargo*, 464 F.3d 192, 197–202 (2d Cir. 2006) (*Terry*

permitted officers to pat down burglary suspect and place him in police cruiser to be transported

to scene of crime for identification).

   Accordingly, considering the totality of the circumstances, the degree of force used, the

restraints imposed on the suspects' liberty, and the officers' treatment of the suspects, the Court

finds that the restraints used were reasonable and not more intrusive than necessary.

   The second prong of the *Terry* analysis also requires the Court to evaluate the duration of

the detention, including "whether the police diligently pursued a means of investigation that was

likely to confirm or dispel their suspicions quickly."  *Sharpe*, 470 U.S. at 686.  The relevant time

span here is between the initial stop and the vehicle search that revealed an array of robbery

tools, at which point probable cause justifying an arrest undisputedly existed.

   As helpfully demonstrated by the Bedford police's radio runs, which supply the best

evidence of when the various events occurred, the vehicle search took place within 10 minutes of

the initial stop.  During that period, all three suspects were serially interviewed as to what they

were doing in Bedford.  There is no basis to believe that the officers were at all dilatory in

questioning the three men and attempting thereby to gauge whether Gruppuso's suspicions were

warranted (as they proved to be).  As Gruppuso explained in response to questions put by the Court, the 10-minute window was necessary in order to question each suspect separately, and, once Jajaga had given consent, to search the vehicle.  Tr. 58.  The search of the vehicle followed shortly upon the officers' having received initial, inconsistent, and implausible answers to the officers' inquiries, responses which "enhanced [the] suspicion" rather than dispelled it.  *Bailey*, 743 F.3d at 332.  The Court finds the 10-minute detention reasonable here under the circumstances, as it enabled the officers to efficiently investigate whether a crime was in progress.  *See Sharpe*, 470 U.S. at 686–87 (finding a 20-minute stop reasonable).  An alternative holding would require the Court to second-guess a reasonable decision made in the field by officers under the pressure of trying to determine whether the subjects presented an imminent risk of a potentially dangerous crime such as a robbery of a home.  Notably, although irrelevant to the Fourth Amendment analysis, the consented search of the vehicle ultimately confirmed Gruppuso's instinct that a robbery scheme might be afoot.

Therefore, considering the stop in totality, including its scope and duration and the restraints to which the defendants were subjected, and considering the officers' reasonable suspicion that criminal activity was afoot, the Court finds that the stop was reasonable, and did not ripen into a *de facto* arrest before the point at which probable cause to arrest was secured. The Court therefore denies defendants' suppression motion to the extent based on a claim that the stop breached their Fourth Amendment rights.

### C.    Fifth Amendment and the Defendants' Statements

Where a *Terry* stop is justified as reasonable in nature and duration so as to comport with the Fourth Amendment, the subject of the stop may nevertheless be in custody for the purposes of the Fifth Amendment and afforded the protections of the *Miranda* doctrine.  *Newton*, 369 F.3d

at 673, 676–77.  Here, the Government has appropriately conceded that Fiseku and Jajaga were each in custody for *Miranda* purposes once the officers placed them in handcuffs at the park-n-ride.  *See* Gov't Second Ltr. Br. 1; *Newton*, 369 F.3d at 676 ("Handcuffs are generally recognized as a hallmark of a formal arrest," notwithstanding that suspect was told he was not being placed under arrest).  The Government argues that the defendants' statements made before the search of the car, and Jajaga's statements immediately afterwards, are nonetheless admissible.  As to the statements before the search, the Government argues that these fall within the public safety exception to the *Miranda* requirement recognized in *Quarles*.  As to Jajaga's statement immediately afterwards, the Government argues that it is admissible because it was made voluntarily, and not as the result of custodial interrogation.  The Court addresses these issues in turn.

### 1.    The Public Safety Exception to *Miranda*

#### a.    Second Circuit case law

The public safety exception to the *Miranda* rule is a "narrow exception," *Newton*, 369 F.3d at 677, designed "to allow officers 'to follow their legitimate instincts when confronting situations presenting a danger to the public safety." *United States v. Reyes*, 353 F.3d 148, 152 (2d Cir. 2003) (quoting *Quarles*, 467 U.S. at 659).  The Second Circuit has articulated three "principles" for determining when the exception applies:

> First, we have observed that "Miranda warnings need not precede questions reasonably prompted by a concern for the public safety or for the safety of the arresting officers," "so long as the questioning relate[s] to an *objectively* reasonable need to protect the police or the public from any immediate danger." . . . Second, the exception is limited by the fact that pre-*Miranda* questions, while "framed spontaneously in dangerous situations," may not be investigatory in nature or "designed solely to elicit testimonial evidence from a suspect." As we acknowledged in *Newton*, however, a question need not be posed as narrowly as possible, because "[p]recision crafting cannot be expected" in the circumstances of a tense and dangerous arrest. Thus, a question that plainly encompasses safety

24

concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety. Third, we expressly have not condoned the pre-*Miranda* questioning of suspects as a routine matter. Rather, recognizing the need for "flexibility in situations where the safety of the public and the officers are at risk," we have described the public safety exception as "a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case."

*United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005) (alterations in brackets in original) (internal quotation marks and citations omitted); *see also United States v. Ferguson*, 702 F.3d 89, 94 (2d Cir. 2012) (citing the three "factors"), *cert. denied*, 134 S. Ct. 56 (2013). As the above discussion reveals, whether the public safety exception applies is determined by the objective reasonableness of the inquiry, not by the subjective intentions of the officers involved. *Quarles*, 467 U.S. at 656 ("[T]he availability of [the public safety] exception does not depend upon the motivation of the individual officers involved.").

Several cases, beginning with *Quarles*, helpfully illustrate the nature, and narrow scope, of the exception. In *Quarles*, a man suspected of raping a woman at gunpoint was pursued into a supermarket. *Id.* at 651–52. The police officer, with weapon drawn, ordered the suspect to stop and frisked him, revealing an empty gun holster; he then handcuffed the suspect and asked where the gun was. *Id.* at 652. The suspect responded, "the gun is over there," nodding towards empty cartons, where the police recovered the gun. *Id.* In recognizing a public safety exception to *Miranda* and finding it applicable, the Supreme Court emphasized that the officers "were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." *Id.* at 657. "So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown," the Supreme Court noted, "it obviously posed more than

25

one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it." *Id.*

The Second Circuit has found the public safety exception applicable in situations where the presence of a missing weapon created a safety risk, whether the weapon was believed to be in public or not.  In *Ferguson*, the Circuit applied the public safety exception to officers' questioning a suspect about the location of a firearm even though the questioning occurred an hour or more after the suspect's arrest.  702 F.3d at 90.  The Circuit held that there was "an immediate and objectively reasonable need to protect the public from a realistic threat" because there had been reports of shots fired, the reported events took place outside, suggesting the gun may have been left in a public place, and the officers had corroborating information that the suspect possessed a firearm.  *Id.* at 90, 94–95.  In *Newton*, the Circuit held the public safety exception applied where the officers asked a suspect, who was handcuffed, in his underwear, and in his apartment, whether he had any "contraband" in the apartment, to which the suspect responded, "only what is in the box," referring to a .22 caliber automatic firearm.  369 F.3d at 663–64.  The Circuit held that the public safety exception applied to this query because the officers had "an objectively reasonable belief that Newton was dangerous, that he and his family were involved in a volatile domestic dispute [based on a report from Newton's mother that he possessed a firearm in their home and had threatened to kill her and her husband], and that, until the gun was found, there was a serious and immediate risk of harm to anyone in the apartment." *Id.* at 678.

The public safety exception is not limited to colloquy about a specific missing weapon. The Second Circuit has applied the exception to more general questions and answers about the existence of weapons or other dangerous items during the course of an arrest.  *See Reyes*, 353

F.3d at 150, 153–55 (exception covered statements made by suspect, whom a confidential informant reported sold narcotics and carried a firearm, in response to a question by officers whether he had "anything on him that [could] hurt [the officer] or anyone on [the] field team," *id.* at 150 (internal quotation mark omitted)); *Estrada*, 430 F.3d at 609, 612–13 (exception covered suspect's statement in response to officers' questions during his arrest about whether he had any weapons in the apartment); *see also United States v. Jones*, 154 F. Supp. 2d 617, 626–27 (S.D.N.Y. 2001) (Lynch, J.) (collecting cases outside the Second Circuit beyond the "loose weapon" paradigm).

Questions and statements, finally, may fall within the public safety exception even where the safety issue is not presented by accessible weapons.  In *United States v. Simmons*, 661 F.3d 151 (2d Cir. 2011), the Second Circuit held that the exception covered more general questions. There, a suspect's roommate reported to police that the suspect had displayed a firearm during a dispute several days earlier.  After officers ordered the suspect out of his bedroom, with guns drawn, they questioned him about the dispute, the presence of the firearm, its location, and whether he had a license.  *Id.* at 153–54.  The suspect answered these questions, and the officers recovered the firearm.  *Id.*  The court held that the officers' more general questions about the dispute "had the potential to shed light on the volatility of the situation and the extent to which Simmons harbored potentially violent resentment toward [the roommate]," and thus, in addition to the specific questions directed to the location of the weapon, were based on "objectively reasonable safety concerns" under the circumstances.  *Id.* at 156.

27

> b.  *Application to pre-search questions about why the suspects were in the park-n-ride and how they got there*

After the officers frisked and handcuffed Jajaga and Fiseku, they questioned the men separately about their purpose for being at the park-n-ride and how they had gotten there.[9]  These questions were tailored to the officers' reasonable suspicions.  They were intended to shed light on whether Jajaga's earlier claim of transmission trouble had been untrue (as strongly appeared to be the case) and, more broadly, whether the three men had committed or were in the processing of committing a crime, such as a robbery or burglary.  Insofar as the officers' queries were aimed at determining whether criminal activity was afoot, they resembled the questions the officers in *Simmons* had posed as to the nature of the dispute between the roommates, in that they were aimed at sizing up a dynamic situation involving a potential crime in progress, and were not "a subterfuge for collecting testimonial evidence."  *Simmons*, 661 F.3d at 156 (citing *Estrada*, 430 F.3d at 612–13).

The custodial questioning at the park-n-ride, however, was conducted in the absence of a feature present in all the above cases in which the public safety exception was held to apply.  In those cases, there was an objectively reasonable basis for believing not merely that criminal activity was afoot, but that there was a "need to protect the police or the public from any *immediate* danger."  *Estrada*, 430 F.3d at 612 (emphasis added) (quoting *Newton*, 369 F.3d at 677) (internal quotation marks omitted); *see also Ferguson*, 702 F.3d at 90 (finding the "officers had an immediate and objectively reasonable need to protect the public from a realistic threat"); *United States v. Gonzalez*, 864 F. Supp. 375, 382 (S.D.N.Y. 1994) (questioning impermissible

---

[9] The discussion that follows does not apply to the officers' pre-search questions about Jajaga's and Fiseku's identities, as "routine questions" posed to a suspect aimed at collecting information about his "identity and background" do not fall within the concerns of *Miranda*.  *See United States v. Gotchis*, 803 F.2d 74, 78–79 (2d Cir. 1986).

under public safety exception once it became clear that further questions would not "assist in the immediate apprehension" of another known, armed suspect). To be sure, Gruppuso had ample reason to believe that criminal activity of some sort was afoot—Jajaga's false statement and the attendant circumstances gave the officers every reason for suspicion. Their inference that a burglary or robbery, specifically, might have occurred or be in progress was reasonable (indeed, prescient). And individuals, not just loose weapons, can pose imminent threats to public or officer safety. *See Estrada*, 430 F.3d at 613. But the information known to Gruppuso and his colleagues fell short of showing an *immediate* danger to the public or to them. The officers did not have any information, before the search, to the effect that any of the defendants possessed a weapon. They had no specific information on which to conclude that they had committed, or were poised to commit, a burglary or robbery or other crime of violence. The defendants could easily have been present for another unlawful purpose—for example, to buy drugs or commercial contraband—which, though unlawful, would not, by its nature, pose an immediate threat to public safety.

Revealingly, the Government has not pointed the Court to any case in which the public safety exception has been held to cover non-*Mirandized* investigative questioning in which the basis to perceive a threat to the public safety was attenuated to the extent here. That there was reasonable suspicion to believe that some crime was afoot, under the case law, is not tantamount to a finding that the public safety was endangered so as to justify non-*Mirandized* custodial interrogation. To permit the defendants' answers to these questions to be admitted in the absence of more concrete proof of a threat to safety would come unacceptably close to permitting such interrogation of potential criminality as a "routine matter," *Estrada,* 430 F.3d at 612, whereas

*Quarles* teaches that the questioning must be "circumscribed by the exigency which justifies it," *Quarles*, 467 U.S. at 658.

The Court, therefore, holds that *Miranda*'s narrow public safety exception does not cover Gruppuso's questions, well-intentioned as they were and effective as his police work was on the night in question. Had Jajaga and Fiseku not been handcuffed, their interrogation during the stop likely would not have been custodial, so as to trigger *Miranda*; had their questioning been preceded by *Miranda* warnings, there would be no basis to suppress the defendants' responses. But on the circumstances here, where the defendants were interrogated while in handcuffs, under *Newton*, the defendants were unavoidably in custody, requiring the suppression of non-*Mirandized* statements absent a public safety exigency commensurate with those recognized in *Quarles* and its progeny. The facts known to the officers at the park-n-ride before their search of the vehicle did not establish such an exigency.

c.      *Gruppuso's question about the contents of the vehicle*

After initially questioning Jajaga, Fiseku, and Hughes, Gruppuso returned to speak with Jajaga, and asked him if there was anything in the vehicle that should not be. Jajaga responded, "no, you can look."

The application of the public safety exception to this exchange presents a closer question than the balance of Gruppuso's questioning, in that his query to Jajaga more closely resembles the questions addressing the existence of dangerous weapons approved in such cases as *Quarles*, *Ferguson*, and *Newton*. To be sure, Gruppuso's question about the vehicle, as worded, was not tailored to addressing the existence of weapons or other sources of danger in the car. But this imprecision would not be disqualifying if there were otherwise a genuine public safety exigency. As the Second Circuit has explained, "[p]recision crafting cannot be expected' in the

30

circumstances of a tense and dangerous" encounter, *Estrada*, 430 F.3d at 612 (alteration in original) (quoting *Newton*, 369 F.3d at 678), and on this basis the courts have declined to suppress statements whose literal bounds exceeded issues of public safety.  *See Reyes*, 353 F.3d at 152–53 (citing with approval *United States v. Williams*, 181 F.3d 945, 953–54 (8th Cir. 1999) (admitting statement in response to question, "is there anything we need to be aware of?") (internal quotation marks omitted)); *Newton*, 369 F.3d at 678–79 (officer's question about existence of "contraband" was not too broad in scope).

Nonetheless, notwithstanding that Gruppuso's question about the car was more targeted to the possible presence of physical tools or fruits of a crime than his other questions, Jajaga's response denying that there was anything there that should not be and inviting Gruppuso to look for himself, must be suppressed.  As with the balance of Gruppuso's custodial questioning of Jajaga, there was no objectively reasonable basis for the officers' belief of an immediate danger to themselves or the public.  And crucially, there was no specific indication of the existence of a weapon that would pose such a danger.  *See Jones*, 154 F. Supp. 2d at 629 ("In the context of searches for weapons, [the public safety] doctrine requires, at a minimum, that the authorities have some real basis to believe that weapons are present, and some specific reason to believe that the weapon's undetected presence poses a danger to the police or to the public.").  At the time Gruppuso posed that question, his suspicions that some crime was afoot had been heightened by the suspects' inconsistent and implausible answers, but Gruppuso had no more particular information pointing to any exigency or threat to safety.  And the three suspects, far from evincing dangerous behavior, had been peaceable throughout.

The Court is, therefore, constrained to hold that Gruppuso's questions about the car's contents fell outside the scope of the public safety exception.  *See United States v. Wilson*, 914 F.

Supp. 2d 550, 558 (S.D.N.Y. 2012) (exception did not apply to questioning of suspect, who was

frisked, handcuffed, and placed in a police vehicle, after officers learned that the gun he recently

brandished was located in his locked bedroom to which only he had access, because "the officers

no longer had a reasonable basis to believe they faced a dangerous or volatile situation" (internal

quotation marks and citations omitted)); *see also Reyes*, 353 F.3d at 153 (distinguishing *United*

*States v. Raborn*, 872 F.2d 589, 595 (5th Cir. 1989), involving questions about the location of a

weapon in suspect's vehicle, because "the suspect and the surrounding area had been secured and

any threat to the officer or to the public effectively eliminated prior to the unwarned

questioning").  The question to Jajaga, and the content of his response, therefore must be

suppressed.[10]

### 2.    Statement Made Outside of Custodial Interrogation

Immediately after the search, as Gruppuso was walking towards him, Jajaga volunteered

that all of the items found inside the car were his.  There is no basis under *Miranda* to suppress

this statement, because *Miranda*'s protections apply only to statements made under custodial

interrogation.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Although Jajaga was still in

custody at the time he made this statement, he was not being subjected to interrogation.  Time

had passed since he had answered Gruppuso's prior question—whether there was anything in the

---

[10] After the search was complete, supplying probable cause for an arrest, Gruppuso, and later a detective, continued to question Jajaga and the other suspects, still without having given them *Miranda* warnings.  The Government has stated that, save for the one statement addressed in the immediately following section, it does not intend to offer at trial Jajaga's and Fiseku's responses to such questions.  Nor could it properly:  Upon the search of the car and Jajaga's arrest, any threat to the public safety that may previously have been said to have existed before the search had realistically been neutralized.  *See Newton*, 369 F.3d at 679 (government conceded, "as it must," that officer's question as to why the suspect possessed the gun recovered by the police was outside the public safety exception).

vehicle—and, in between, Gruppuso had searched the car and had not put further questions to Jajaga.  Such a spontaneous or volunteered utterance by a suspect, even though in custody and having been subjected to prior questioning, is not the product of custodial interrogation, and is thus not subject to suppression under *Miranda*.  *See United States v. Colon*, 835 F.2d 27, 28, 30 (2d Cir. 1987) ("*Miranda* is [not] applicable when . . . the inculpatory statement is spontaneous and did not result from interrogation or its functional equivalent."  *Id.* at 28.); *United States v. Gonzalez*, No. 14 Cr. 705 (PAE), 2015 WL 2452405, at *14 n.16 (S.D.N.Y. May 22, 2015); *United States v. Gonzalez*, 864 F. Supp. 375, 381 (S.D.N.Y. 1994).  Jajaga's admission that the materials found during the search of the car were his is, therefore, properly admitted.

### D.    The Physical Evidence Gathered From the Search of the Car Need Not Be Suppressed

Defendants also seek to suppress the physical evidence collected by the officers as a result of the search of the car.  Gruppuso conducted the search after asking Jajaga whether there was anything in the car that should not be, and Jajaga responded, "no, you can look."

Two issues are presented by the suppression motion.  First, because the Court has held that Jajaga's statement, "no, you can look," must be suppressed as a violation of *Miranda*, the Court must inquire whether the physical fruits of that statement must also be suppressed.  Second, assuming that suppression is not required on that ground, the Court must determine whether Jajaga's consent to search was valid.  These inquiries each turn on whether Jajaga's statement inviting the search was voluntarily given.  For the reasons that follow, the Court finds that it was.  Accordingly, the Court then evaluates whether Jajaga was authorized to consent to the search of the vehicle.

### 1.   Legal Standards Governing Admissibility of Physical Evidence Collected as a Result of a Non-*Mirandized* Statement

Although Jajaga's statement consenting to a search of the car, "no, you can look," is inadmissible, under settled doctrine, the physical evidence that was obtained as a result of that consent nonetheless may be received at trial.  The "failure to give *Miranda* warnings does not require suppression of physical evidence discovered as a consequence of unwarned statements that are voluntary and uncoerced."  *United States v. McCoy*, 407 F. App'x 514, 516 (2d Cir. 2010) (summary order) (citing *Patane*, 542 U.S. at 637–44).  In *Patane*, a plurality of the Supreme Court explained that, while "the *Miranda* rule is a prophylactic employed to protect against violations of the Self–Incrimination Clause[,] [the] Clause . . . is not implicated by the admission into evidence of the physical fruit of a voluntary statement.  Accordingly, there is no justification for extending the *Miranda* rule to this context."  542 U.S. at 636 (plurality opinion); *see also id.* at 644–45 (Kennedy, J., concurring) (physical evidence collected as a result of an unwarned statement is admissible).  In *United States v. McCoy*, following *Patane*, the Second Circuit reversed a decision to suppress physical evidence obtained as a result of defendant's consent to search made before *Miranda* warnings were given.  407 F. App'x at 515–16.

Accordingly, under *Patane*, the physical evidence gathered as a result of Jajaga's statement that the officers could search the vehicle may be received in evidence provided that the statement was made voluntarily.

### 2.   Legal Standards Governing Consent to a Search

Because the officers lacked probable cause to search the vehicle, consent to the search was necessary to render the search permissible under the Fourth Amendment.  *See Garcia*, 56 F.3d at 422 ("[W]hile a warrantless search . . . is generally unreasonable and therefore violates

the Fourth Amendment, which proscribes unreasonable searches, an individual may consent to a search, thereby rendering it reasonable." (internal quotation marks and citations omitted)).

"To ascertain whether consent is valid, courts examine the 'totality of all the circumstances' to determine whether the consent was 'a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority.'" *Id.* (quoting *United States v. Wilson,* 11 F.3d 346, 351 (2d Cir. 1993)) (internal quotation marks omitted). Courts consider a number of factors to determine voluntariness, including "age, education, intelligence, length of detention, use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights." *United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir. 1986) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Whether an individual is in custody is also relevant, but not determinative; in that context, the Second Circuit has also found relevant but not determinative "whether guns were drawn or the consenting individual was frisked, or whether the consenting individual was threatened, was in a public area, or was informed that he had the option of refusing consent to the search." *Id.* at 243–44 (citations omitted).

### 3.      Jajaga's Statement Consenting to the Search Was Voluntary

Upon careful consideration of the totality of the circumstances, the Court finds that Jajaga's consent to search was voluntarily and freely given.

To be sure, there are factors pointing in both directions.  In support of Jajaga's position that the consent was involuntary, the police restrained him in handcuffs and placed him in a police cruiser.  He was also was not informed by the police of his *Miranda* rights before he consented to the search.  *See United States v. Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990) (fact that suspect was given *Miranda* warnings favored finding of voluntariness).  The absence of *Miranda*

warning suggests that Jajaga may not have been aware of his right not to speak to the officers.
"*Miranda* warnings, however, are not a prerequisite to obtaining a valid consent to search."
*United States v. Moreno*, 701 F.3d 64, 77 (2d Cir. 2012) (citing *United States v. Faruolo*, 506
F.2d 490, 495 (2d Cir. 1974)).  Jajaga was also not notified of his right to refuse to give consent
to a search.  Of course, notification of a right to refuse is not in itself determinative, *Garcia*, 56
F.3d at 422 ("[K]nowledge of the right to refuse consent is not a requirement to a finding of
voluntariness" (citing *Schneckloth*, 412 U.S. at 231–33)), and the lack of such notification is a
less significant concern here, because the police never explicitly requested or sought consent to
search the vehicle.

Nonetheless, considered in totality, the circumstances here favor a finding that Jajaga's
consent was voluntary and uncoerced.[11]  The most compelling evidence of the voluntariness of
the consent is the manner in which it was given.  The police at no point asked Jajaga for consent
to search the vehicle; rather, Gruppuso asked whether there was anything in the vehicle that
should not have been there.  Jajaga first responded directly to the question, answering, falsely as
it later turned out, "no."  In answering no, Jajaga demonstrated that he was fully able to resist
telling the police about the existence of items about which he did not want them to know.
Moreover, Jajaga went beyond the scope of the actual question asked, and offered, of his own
accord, the police the opportunity to have a look for themselves.

Tellingly, Jajaga does not allege that the police made any direct attempt to get his consent
to search the vehicle, much less coerce or pressure him into doing so.  (Jajaga did not submit an

---

[11] Testimony at the suppression hearing did not reveal information about Jajaga's age, education,
and intelligence, and therefore the Court does not place weight on these factors.  Nevertheless, it
bears noting that Jajaga appeared to be in his late twenties or thirties, and Gruppuso's account of
his interactions with Jajaga at the dirt pull-off and the park-n-ride did not suggest that there was
any difficulty in communicating and understanding each other.

affidavit in connection with the suppression motion.)  Nor did the evidence at the suppression hearing supply any basis to find such coercion or pressure.  The steps the police had taken toward Jajaga up to that point of the encounter—frisking him, handcuffing him, and placing him in a police cruiser during questioning, but never drawing a weapon—entailed less use of force and a significantly less dramatic show of authority than in other cases in which the Second Circuit has held consent to have been validly given.  *See, e.g.*, *Yu-Leung*, 910 F.2d at 41 ("Nor does a finding of coercion follow from the fact that [the individual] was handcuffed."); *United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2014) (consent voluntary even though consenting individual was handcuffed and arrested by five or six officers with their weapons drawn).  Furthermore, Gruppuso never indicated that Jajaga was being placed under arrest, but rather explained to him that he was being detained while the officers investigated.  Tr. 24–25.  And Jajaga had only been briefly detained, up to 10 minutes, prior to giving his consent.

Therefore, the Court finds that Jajaga's consent to search the vehicle was voluntarily and freely given.

### 4.    Actual or Apparent Authority

Finally, defendants challenge Jajaga's authority to consent to the search of the car. Consent can validate a search if the consenting individual had actual or apparent authority to consent.  *McGee*, 564 F.3d at 139.  Apparent authority is assessed by whether "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises."  *Id.* (alteration in original) (quoting *Illinois v. Rodriguez*, 497 US. 177, 188–89 (1990)).

Jajaga had at least apparent authority to consent to the search of the car.  On the night in question, Jajaga was sitting in the driver's seat of the car at both times Gruppuso encountered it.

37

On the first occasion, Jajaga was the sole person in the car at the dirt pull-off.  On the second occasion, at the park-n-ride, Hughes, in the front passenger seat, sat alongside Jajaga.  Based on these observations, Gruppuso could reasonably—indeed, he could only—infer that Jajaga had driven the car into the park-n-ride.  While defendants are correct that Jajaga never affirmatively stated that he was the owner of the car, his control over it in each instance in which Gruppuso encountered it makes it reasonable for Gruppuso to have believed that Jajaga had authority to consent to a search, and to search the vehicle on that basis.  *See United States v. Sparks*, 287 F. App'x 918, 920 (2d Cir. 2008) (summary order) (driver of car had apparent authority to consent to search of bag inside the car).

The fact that Gruppuso knew that the car was registered to another person, Kujtime Fiseku, who shared a last name with another individual at the park-n-ride, Bekim Fiseku, does not undermine Jajaga's apparent authority over the car at that moment.  Multiple individuals may have authority to consent to a search.  *See McGee*, 564 F.3d at 138–41.  The possibility that others could also consent does not detract from Gruppuso's reasonable basis for believing that Jajaga, who possessed and operated the car throughout the events at issue, had authority to consent to the search.[12]

Accordingly, the physical evidence obtained as a result of Jajaga's non-*Mirandized* statement may be admitted without violating the Fifth Amendment, and his voluntary consent as a person with apparent authority to provide such consent made the search reasonable under the Fourth Amendment.  The physical evidence collected by the officers during their search of the vehicle is, therefore, admissible.

---

[12] Because the Court finds that Jajaga had apparent authority to consent to the search, the Court has no occasion to consider whether Fiseku has standing to challenge the search of the vehicle, which was registered to his mother.  The Court assumes so *arguendo*.

## CONCLUSION

For the foregoing reasons, the Court denies (1) the motion of defendants Fiseku and Jajaga to suppress the physical evidence obtained during the search of the car driven by Jajaga, and (2) the motion by Jajaga to suppress his post-search statement to the effect that the items found in the car were his.  The Court, however, grants the defendants' motions to suppress the statements each made in response to custodial interrogation prior to the search.  The Clerk of Court is directed to close the motions pending at dockets 25, 37, and 43.

The Court hereby schedules the next conference in this matter for Monday, December 7, 2015, at 9:30 a.m.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: December 3, 2015
New York, New York

39