

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 1, 2017

BY CM/ECF

The Honorable Paul A. Engelmayer
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re:     United States **v.** Bekim Fiseku,
        **15 Cr. 384 (PAE)**

Dear Judge Engelmayer:

The defendant in this matter, Bekim Fiseku, is scheduled to be sentenced on April 12, 2017, at 2:30 p.m.  The Government submits this memorandum in connection with the defendant's sentencing and in response to the defendant's submission.  For the reasons set forth below, the Government respectfully submits that a sentence within the applicable Guidelines range is appropriate.

## BACKGROUND

### I.     Offense Conduct

The defendant and a second individual, Sedefin Jajaga, were charged in Indictment 15 Cr. 384 (PAE) with conspiring to commit Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951(a).  Fiseku organized and planned the robbery, recruiting Jajaga and a third person ("CC-1") to help.  *See* March 8, 2017 Presentence Report ("PSR") ¶ 9.

In September 2014, Fiseku, Jajaga, and CC-1 drove to the vicinity of Guard Hill and Christopher Road in Westchester County, New York, in order to commit the robbery.  *Id.* ¶¶ 9-10.  Fiseku and CC-1 exited their vehicle and walked towards their victim's residence, with Jajaga remaining behind.  Fiseku and CC-1 were carrying blank pistols and a stun gun, and were wearing clothing and accessories with New York City Police Department ("NYPD") logos.  *See id.* ¶ 12.  Their plan was to pose as police officers conducting a raid of the victim's residence, restraining the victim while they did so.  Fiseku and CC-1 also had walkie-talkies, a screwdriver, and flashlights—equipment intended to help break into a house.

While Jajaga was waiting for Fiseku and CC-1 to return, a police officer ("Officer-1") fortuitously noticed his vehicle by the side of the road. Thinking that Jajaga's car had broken down, Officer-1 stopped and asked Jajaga if he needed help. *Id.* Jajaga lied to Officer-1, telling him that help was already on the way. *Id.* Officer-1 drove away, and Jajaga, using a walkie-talkie, told Fiseku what had happened. Spooked, the three abandoned the robbery. Fiskeu and CC-1 returned to the vehicle, and the three drove to a nearby parking facility where they had met and left another car. *See id.* ¶ 10.

Officer-1, however, happened to see Jajaga's vehicle driving towards the parking lot. *Id.* Figuring that Jajaga had lied about his car being disabled, Officer-1 followed him, and after Jajaga entered the lot, saw Fiseku and CC-1. *Id.* During the course of that encounter, Officer-1 conducted a search of Jajaga's vehicle, resulting in the recovery of backpack containing, among other things, two flashlights, a walkie-talkie, a screwdriver, two hats with NYPD logos, a hooded sweatshirt with an NYPD logo, a neck lanyard with a gold badge, a pair of gloves, a stun gun, a bb gun replicating what appeared to be a Colt .45 caliber pistol, and a blank gun replicating what appeared to be a .25 caliber pistol. *Id.* Fiseku, Jajaga, and CC-1 were taken to a police precinct but subsequently released. *Id.* ¶ 12.

Fiseku and Jajaga were both charged in Indictment 15 Cr. 384 (PAE) for their role in the above-referenced robbery conspiracy. Jajaga subsequently pled guilty pursuant to a plea agreement with the Government in which he given a minor role adjustment. On January 28, 2016, Jajaga was sentenced by Your Honor to 14 months' imprisonment.

## II.    Procedural History and Applicable Guidelines Range

Fiseku pled guilty pursuant to a plea agreement with the Government that preserved his ability to appeal Your Honor's ruling on his suppression motion. In the plea agreement, the parties stipulated that the defendant would be considered a career offender under the Guidelines, resulting in an offense level of 29, a criminal history category of VI, and a Guidelines range of 151 to 188 months' imprisonment. Both parties were allowed, however, to argue for a variance from the Guidelines range based on factors in Title 18, United States Code, Section 3553(a).

Although Fiseku now asks for the Court to find that he is not a career offender, the plea agreement plainly states that he is, and that his crime of conspiracy to commit Hobbs Act robbery was "is a crime of violence." It states the following:

> The defendant [] is a career offender pursuant to U.S.S.G. § 4B 1.1 because he was at least eighteen years old at the time he committed the instant offense; because the instant offense is a crime of violence, as that term is used in Section 4B 1.1 of the Guidelines; and because the defendant has at least two prior felony convictions for either a crime of violence or a controlled substance offense.

PSR ¶ 4(5). A footnote to this sentence, moreover, in the plea agreement clarifies that the defendant has three prior convictions that would qualify as the predicate "crime of violence or [] controlled substance offense" for purpose of Section 4B1.1's career offender guideline. These convictions are described in greater detail below and in the PSR.

Probation agrees with the parties' calculations of the defendant's offense level, criminal history category, and guidelines range. *See* PSR at 24 (sentencing recommendation).

## DISCUSSION

As the Court knows, the Sentencing Guidelines still provide important guidance following *United States* v. *Booker*, 543 U.S. 220 (2005). Courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall* v. *United States*, 552 U.S. 38, 49 (2007). After calculating the appropriate Guidelines range, a sentencing judge must then consider the factors outlined in Title 18, United States Code, Section 3553(a), which include, among other things, the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to deter criminal conduct and promote respect for the law. *Id*. at 49-50 & n.6.[1] For the reasons set forth below, a sentence within the agreed-upon Guidelines range would not be unreasonable in light of these factors.

## I.    The Defendant Is a Career Offender

As an initial matter, Fiseku claims that the plea agreement and Probation incorrectly found him to be a career offender under the Sentencing Guidelines. This claim is meritless. Fiseku relies on out-of-circuit cases holding that conspiracy to commit Hobbs Act robbery cannot qualify as a "crime of violence" under different provisions, such as the Armed Career Criminal Act ("ACCA"). Whether the defendant qualifies as a career offender for purposes of the Sentencing Guidelines is a different question. The Guidelines contain a broader definition of the term that plainly includes conspiring to commit Hobbs Act robbery, especially after the Supreme Court's recent decision in *Beckles* v. *United States*, 137 S. Ct. 886, 890 (2017).

### A. Applicable Law

The parties' plea agreement stipulated that the November 2015 edition of the Sentencing Guidelines applies to this case. That edition of the Guidelines provides that an individual is a career offender

> [I]f (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and

---

[1]  The full set of factors outlined in Section 3553(a) are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, namely the need (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (b) "to afford adequate deterrence to criminal conduct," (c) "to protect the public from further crimes of the defendant," and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7).

(3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1(a) (2015 ed.). The term "crime of violence," moreover, is defined as the following:

[A]ny offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—

(1) Has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a) (2015 ed.).[2]

This definition of "crime of violence" parallels the definition of "violent felony" under ACCA, but there are two important differences in how the respective provisions operate. First, although ACCA's residual clause—that is, the analogue to subparagraph 4B1.2(a)(2) above— was held to be unconstitutionally vague in *Johnson* v. *United States*, 135 S. Ct. 2551 (2015), the Supreme Court has recently clarified that this ruling does not apply to the Sentencing Guidelines. Thus, a crime may still be considered a crime of violence under the 2015 edition of the Sentencing Guidelines to the extent it "involves conduct that presents a serious potential risk of physical injury to another." *See Beckles*, 137 S. Ct. at 890 (holding that "that the advisory Guidelines are not subject to vagueness challenges under the Due Process Clause").

Second, and critically, the Guidelines include commentary clarifying the meaning of the term "crime of violence" that ACCA lacks. And here, that commentary straightforwardly provides that the term "crime of violence" includes "the offenses of aiding and abetting, conspiring, and attempting to commit such offenses." U.S.S.G. § 4B1.2 n.1. This commentary codified longstanding precedent treating substantive and inchoate offenses equivalently in determining whether they were "crimes of violence." *See, e.g.*, *United States* v. *Patino*, 962 F.2d 263, 267 (2d Cir. 1992) (holding that conspiracy to kidnap was a crime of violence); *United States* v. *Chimurenga*, 760 F.2d 400, 404 (2d Cir. 1985) (holding that conspiracy to commit armed robbery was a crime of violence for purposes of the Bail Reform Act).

---

[2] The November 2016 edition of the Guidelines amended Section 4B1.2(a)(2) to read as follows: "is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c)." Although the 2016 editions of the Guidelines eliminates the residual clause, this does not make a difference since it still considers "robbery" to be a "crime of violence," and, as discussed in greater detail in the text, the commentary to both the 2015 and 2016 editions clarifies that the term "crime of violence" includes "the offenses of … conspiring … to commit such offenses." U.S.S.G. § 4B1.2 n.1 (2016 ed.).

## B. Discussion

Conspiring to commit Hobbs Act robbery is plainly a "crime of violence" for purposes of the Guidelines. The Second Circuit has already held that conspiracy to commit Hobbs Act robbery is a "crime of violence" under the Bail Reform Act, which defines that term similarly to the Guidelines. *United States* v. *DiSomma*, 951 F.2d 494, 496 (2d Cir. 1991) (citing 18 U.S.C. § 1951(b)(1)); *see also United States* v. *Santos*, 449 F.3d 93, 99 (2d Cir. 2005) (noting that conspiracy to commit Hobbs Act robbery requires an intent to take personal property "by force"); *Chimurenga*, 760 F.2d at 404 ("We therefore conclude that a conspiracy to commit armed robbery is a 'crime of violence' within the meaning of this statute.").

Fiseku claims that conspiracy to commit Hobbs Act robbery does not qualify as a "crime of violence" because the elements of conspiracy (as opposed to the substantive offense) do not "entail[] the use, attempted use, or threatened use of [] force." Def. Submission at 3. This argument, however, is incorrect for several reasons.

First, commentary to the Guidelines expressly states that a conspiracy to commit an offense (or aiding and abetting or attempting to commit an offense) should be treated the same as the substantive version of the offense for purposes of determining whether an offense qualifies as a crime of violence. *See* U.S.S.G. § 4B1.2 n.1. This commentary, moreover, codifies preexisting case law reflecting the commonsense idea that conspiracies create significant risks of the use of force, and that a defendant should not benefit by virtue of the fact that some external event may have prevented the consummation of a conspiracy (or rendered his crime merely an attempt). *See, e.g.*, *Patino*, 962 F.2d at 267; *Chimurenga*, 760 F.2d at 404.

Second, even setting aside the equivalence of substantive offenses and conspiracies under the Guidelines, the offense of conspiring to commit Hobbs Act robbery would separately qualify under the residual clause of Section 4B1.2(a)(2) since it "involves conduct that presents a serious potential risk of physical injury to another." Fiseku's argument to the contrary, *see* Def. Submission at 5 (arguing that "no robbery ever took place[,] [s]o[] there was no risk of physical injury to another"), is meritless: there is of course a risk of injury with conduct like what occurred here. Had police not fortuitously stopped them, Fiseku and CC-1 would have broken into another person's house, restrained him, and stolen money and drugs from him. If their victim was armed or resisted, there is no telling how the encounter might have ended.[3]

Fiseku cites a number of cases holding that conspiracy to commit Hobbs Act robbery does not qualify as a predicate crime of violence for purposes of Title 18, United States Code, Section 924(c) or ACCA. But the cases he cites are all outside of this District and therefore not controlling. And they are inapplicable, since the question of whether an offense qualifies as a "crime of violence" for purposes of the Sentencing Guidelines is different than the question of whether it qualifies as the same for Section 924(c) or ACCA given the presence of additional commentary to the Guidelines and the survival of the residual clause.

---

[3] As discussed above in footnote 2, the 2016 editions of the Sentencing Guidelines have amended the residual clause.

Fiseku also claims that he should not be considered a career offender because the relevant prior convictions all involve the same narcotics offense. *See* Def. Submission at 6. But Fiseku admits that, however calculated in past cases, his prior convictions are correctly counted as separate offenses under Section 4A1.2(a)(2) of the Guidelines since they were neither contained in the same charging instrument nor imposed on the same day. Fiseku also claims it would be unfair to count the offenses separately, which appears to be an argument under Section 3553(a) that his criminal history is overstated rather than a challenge to the PSR's calculation of his Guidelines range. In any event, Fiseku has been convicted not just of the narcotics offenses that he claims are "related," but also RICO offenses with separate robberies as predicate acts. In light of the criminal history described below, it is entirely "fair" and "fitting," *id.*, that he considered a career offender under the Guidelines.

## II.    A Sentencing within the Applicable Guidelines Range Would Be Appropriate

The Government respectfully submits that a sentence within the applicable Guidelines range would be appropriate in this case. Admittedly, there are certain 3553(a) factors that would support, and with considerable strength, a sentence below the Guidelines range. The defendant, for example, appears to be a loving husband and father with a strong family and a strong support network. His incarceration has certainly taken a toll on them. And his crime, while serious, was never consummated (although due in large part to fortuitous circumstances rather than, for example, the defendant's withdrawal from the conspiracy). That said, the defendant's extremely troubling criminal history nonetheless suggests that a significant term of imprisonment is necessary to provide specific and general deterrence.

Fiseku has made a career of burglaries and robberies, some of which have been linked to organized crime. On August 30, 2000, for example, he was convicted of racketeering in the Eastern District of New York, for which he was sentenced to 84 months' imprisonment. As described in the PSR, "Fiseku was the organizer of a group of individuals who distributed 249 kilograms of marijuana in New York metropolitan area, and committed a series of bank burglaries by dismantling night deposit boxes ...." PSR ¶ 38.

On December 10, 2001, Fiseku was convicted of a second racketeering offense, for which he later received a concurrent sentence of 87 months' imprisonment. PSR ¶ 39. The predicates in this case included bank robbery, a home invasion robbery, and marijuana distribution. As explained in the Government's sentencing submission in connection with a violation of supervised release, Fiseku and his associates' "racketeering predicates ... include[d] numerous acts of violence, including robberies with guns." July 12, 2009 Sentencing Submission, *United States* v. *Fiseku*, No. 01 Cr. 1336 (ERK) [Dkt. 218] at 4. Specifically:

> Fiseku, as part of his prior federal conviction admitted to a "smash and grab" robbery of a Citibank branch, in which $165,000 was stolen. Fiseku also admitted to conspiring to rob the owner of a Staten Island restaurant in which Fiseku and two other members of the New Springville Boys entered the victim's home, placed a gun to the head of the victim, beat him, and restrained him with duct tape. No money was taken only because the victim was able to break free and

retrieve a weapon from inside his house, thus scaring away his assailants. Fiseku also admitted to robbing a National Westminster Bank. In that robbery, Fiseku brandished a pellet gun while wearing a mask, handcuffed two bank employees, and stole more than $880,000. Fiseku also admitted to participating in a marijuana distribution conspiracy.

*Id.* at 5 (citations omitted); *see also* PSR ¶ 39 ("On one occasion, Fiseku and his co-conspirators conspired to rob the home of the successful owner of The Roadhouse Cafe. Fiseku and his co-conspirators arrived at the owner's home posing as deliverymen with flowers and a fruit basket. When the owner answered the door, he was pushed into the home, a gun was placed on his head, and he was beaten while Fiseku and his conspirators made demands for money.").

These convictions, moreover, reveal only part of Fiseku's lengthy criminal history. On May 23, 1997, he was convicted of criminal possession of a weapon after having been found with a stolen .357 Smith and Wesson revolver. PSR ¶ 36. And on November 27, 2008, while still on supervised release in the Eastern District of New York, and after having just completed a string of sentences for his Illinois drug offense and two racketeering offenses, he was apprehended trying to burglarize a bank. PSR ¶ 40. He was sentenced to 30 months' imprisonment for that offense and an additional 18 months' imprisonment for having violated his supervised release in the Eastern District of New York. PSR ¶ 40.

Fiseku was released from parole on November 25, 2013. *Id.* Less than a year later, in September 2014, Fiseku committed the instant offense—an offense in which, again, Fiseku intended to impersonate law enforcement agents and brought a stun gun and fake pistols, meaning he contemplated the use, or at minimum the threat, of force. *See* PSR ¶ 9-10.

This is track record that demonstrates a significant need for deterrence. Fiseku has received significant terms of imprisonment in the past, but they have not worked. And the behavior here is particularly worthy of deterrence. Robbery carries an inherent and unavoidable risk of escalation and violence. Taking a door with guns drawn (real or fake) can provoke violence if the victim is armed or resists. For these reasons, courts around the country typically impose serious sentences for robbery offenses. *See* United States Sentencing Commission, *Quick Facts*, *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick_Facts_Robbery_FY14.pdf ("[T]he average sentence length for robbery offenders without a conviction under section 924(c) was 79 months") (last accessed May 2, 2016). The Court obviously cannot and should not impose a sentence based on what other courts have done to other defendants; but these statistics nonetheless show that the significantly below-Guidelines sentence Fiseku requests would be anomalous and create disparities with similarly situated individuals.

## CONCLUSION

For the aforementioned reasons, the Government respectfully submits that a sentence within the Guidelines range is appropriate in this case.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By:    /s/ Robert Allen_____
ROBERT ALLEN
Assistant United States Attorney
(212) 637-2216

cc:    James Froccaro, Esq.