UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

BEKIM FISEKU,

                              Defendant.

---

15-CR-384-01 (PAE)

<u>ORDER</u>

PAUL A. ENGELMAYER, District Judge:

The Court has received the attached letter from defendant Bekim Fiseku, which the Court treats as a motion for compassionate release. The Court reappoints Mr. Fiseku's trial counsel, James Froccaro, Jr., Esq. for the purpose of submitting a letter memorandum in support of Mr. Fiseku's motion. That memorandum is due November 30, 2020. The Government's response is due December 7, 2020.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: November 10, 2020
        New York, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,
      Respondent,

                  :

                               NOTICE OF MOTION

      V.                               Crim. Case No.  15 Cr. 384 (PAE)

                  :

BEKIM FISEKU,
      Defendant/Movant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      PLEASE TAKE NOTICE that, upon the accompanying memorandum of law and upon all prior

pleadings and proceedings herein, the Defendant Bekim Fiseku, hereby moves this Court for a reduction

in Defendant's sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), and for such other and further relief as

the Court may deem just and proper.

Dated:  October 1, 2020
         Minersville, Pennsylvania

                             Respectfully submitted,

                             Bekim Fiseku, pro se
                             Defendant-Movant
                             Fed. Reg. No. 59080-053
                             F.C.I. Schuylkill
                             P.O. Box 759
                             Minersville, PA   17954

To:  Honorable Paul A. Engelmayer
     Southern District of New York
     United States Attorney for the
     Southern District of New York
     Clerk of the Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,
                 Respondent,

                              :

        V.                          Case No. 15 Cr. 384 (PAE)
                              :

BEKIM FISEKU,
          Defendant/Movant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## MEMORANDUM IN SUPPORT

Defendant, Bekim Fiseku, pro-se, respectfully submits this Memorandum in Support of his motion for an order reducing his sentence to time served based on "extraordinary and compelling reasons" discussed below, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). If counsel is appointed Mr. Fiseku requests oral argument on this matter.

Bekim Fiseku respectfully moves this Court, under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to begin his already-imposed three-year term of supervised release.

Bekim Fiseku was sentenced on April 12, 2017 for conspiracy to commit Hobbs Act robbery pursuant to 18 U.S.C. § 1951(a), and was sentenced by this Court to 108 months imprisonment and three years of supervised release upon his release of imprisonment. He was considered a career offender under the Guidelines, and the law at the time based this conviction as a "violent offense" along with his two prior convictions for possession of marijuana with intent to distribute in 1999, and for RICO Conspiracy in the Eastern District of New York in 2001. His resulting Guideline range was 151-188 months and the Court sentenced him to 108 months.

Based upon United States v. Davis, 139 S. Ct. 2319 (2019), and other issues presented below, Mr. Fiseku's offense of conviction in the case, conspiracy to commit Hobbs Act robbery, and his prior convictions are no longer a basis for a career offender finding. Had Mr. Fiseku's Guidelines range been

2

determined without the career offender section or was calculated now, his offense level would be 21, and his Criminal History Category V, with a Guideline range of 70-87 months. Though the law had changed as to violent offenses and career offender, Mr. Fiseku is not eligible on that basis alone to be resentenced because the change just effected Guidelines calculations. Since Davis and United States v. Barrett, 937 F.3d 126 (2nd Cir. 2019) are not retroactive as to Guidelines calculations, for Bekim Fiseku to be resentenced, another means is required. That Mr. Fiseku will not be released until February 2023 because he did not plead to a § 924(c) count that would have entitled him to be resentenced not as a career offender is simply not just. Fortunately, 18 U.S.C. § 3582(c)(1)(A)(i) of the First Step Act, now permits him to be resentenced and released.

On April 6, 2020, Mr. Fiseku submitted a written application for compassionate release to Warden Scott Finley asking that the BOP move this Court for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i). (See Exhibit "A"). On April 14, 2020, Warden Finley denied Mr. Fiseku's request for compassionate release. (See Exhibit "B"). On June 1, 2020 a reconsideration request for compassionate release was mailed to Warden Finley at FCI Schuylkill which was received on June 4, 2020. (See Exhibit "C"). On July 1, 2020, Warden Finley informed Mr. Fiseku that he was declining to file a motion with the Court. (See Exhibit "D"). More than 30 days have passed since Warden Finley received Mr. Fiseku's initial request, and the Director of the BOP has not filed a motion with this Court. The Court is now empowered to bring a measure of justice to Mr. Fiseku's sentence, and he asks the Court to do just that for the reasons set forth below. P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018).

Responding to concerns that the BOP was not making adequate use of its legal authority to seek sentence reductions for qualified defendants, Congress recently vested Federal judges with the power to do what they were previously prohibited from doing absent a motion from the Director of the BOP. Specifically changes to 18 U.S.C. § 3582(c)(1)(A) contained in the First Step Act (which was signed into law on December 21, 2018) authorized courts (after a defendant exhausted his/her administrative remedies) to reduce the prison term - even to time served - of any defendant if it finds that extraordinary and compelling reasons" warrant such a reduction. In other words, Federal judges are now empowered to

3

take a "second look" at the sentences imposed on defendants who are deserving and worthy of a "second look."

Bekim Fiseku - who has served over five years of a nine-year sentence - is deserving and worthy of just such a "second look." And as set forth below, "extraordinary and compelling reasons" warrant a reduction of his 108-month sentence to time served. Accordingly, and for all the reasons detailed below, Mr. Fiseku respectfully requests that this Court Order, pursuant to 18 U.S.C. § 3582(c)(1)(A), reducing his 108-month sentence to time served (or, alternatively, to a term short of 108 months that this Court finds is consistent with the dictates of 18 U.S.C. § 3553(a)).

Amidst the rampant spread of COVID-19 within many BOP facilities and the inability of the BOP to provide adequate medical attention to inmates which can be seen by the amount of inmates and prison staff infected, and the daily growing numbers of prisoners who have so far died does constitute extraordinary and compelling reasons to warrant not only a reduction in Mr. Fiseku's sentence, but to time served. See United States v. Perez, 2020 U.S. Dist. LEXIS 57265, at *4 (S.D.N.Y. April 1, 2020)(granting application for compassionate release under 18 U.S.C. § 3582(c)(1)(A); United States v. Jepsen, No. 19-CV-00071 (VLB), 2020 U.S. Dist. LEXIS 57007, 2020 WL 1640232, at *4 (D. Conn. Apr. 1, 2020)(granting release based on COVID-19 when a defendant is obese).

As a general matter, given the rapidly expanding health crisis brought on by the COVID-19 pandemic, extraordinary and compelling circumstances exist. In United States v. Jepsen, supra, the court noted the reality of these circumstances as follows:

> On March 13, 2020, the President of the United States declared a national state of emergency to slow down the infectivity rate and treat those infected by the novel coronavirus known as SARS Cov 2 ("COVID-19"). Presidential Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease ("COVID-19") Outbreak, March 13, 2020. COVID-19 is an emerging, rapidly evolving public health crisis. In response to public health officials' warnings about the infectivity of the virus and the risk of severe complications, dramatic and widespread "social distancing" measures have been imposed by all levels of governmental branches nationwide.

Jepsen, 2020 U.S. Dist. LEXIS 57007, *7-8.

Further evidencing the broad acknowledgment that extraordinary and compelling circumstances exists, the unprecedented threat of COVID-19 could not have been foreseen by this Court at the 2017 sentencing, and poses extraordinary risks to Mr. Fiseku's health.  The virus thrives in densely packed populations, and the FCI Schuylkill Federal Correctional Institute is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence to Mr. Fiseku.

Because of the recent COVID-19 pandemic numerous motions have been filed under this section especially for those inmates at greater risk of death or other serious medical conditions should they contract the virus.  While those with enumerated medical conditions are at greater risk should they contract the virus, recent studies have shown that there are many other dangerous effects of the virus to even younger and relatively healthy people.

Bekim Fiseku is a 49-year-old man suffering from obesity which makes him especially vulnerable to the deadly risks of COVID-19.  Attached for this Court's consideration in connection with this motion is an expert's affidavit, that generally addresses the increased public health risks for keeping at-risk inmates incarcerated during the pandemic (Affidavit of Dr. Brie Williams - Exhibit "E").  Mr. Fiseku has been in prison for more than 60 months with less than 24 months to serve.  He has served approximately 70% of his sentence imposed by the Court for a 2015 conspiracy to commit Hobbs Act robbery and applying career offender status.  If the sentence is corrected and the Court determines Mr. Fiseku no longer qualifies as a career offender he will have served all of the time.

Mr. Fiseku's medical condition, coupled with the pandemic and the virus' rapid spread in the prison setting, place his life in grave danger.  "[E]xtraordinary and compelling reasons" therefore exist to warrant reducing his sentence to time served pursuant to the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i), so that he can seek safety in his mother's three bedroom apartment with his two sons. Additional reasons supporting release include Mr. Fiseku's rehabilitation and an erroneous adjudication as a "career offender."  His prison disciplinary record and release plan are exemplary.

I. The First Step Act

Under the First Step Act, a reduced sentence may be granted if warranted by extraordinary and compelling reasons.  18 U.S.C. § 3582(c)(1)(A)(i).  "Three points bear noting . . . . First . . . Congress empowered district courts, not the U.S. Parole Commission, as previously, to decide individual cases if "there is a justification for reducing a term of imprisonment.' See S. Rep. No. 98-225, at 56 (1983) . . . Congress envisioned 18 U.S.C. § 3582(c)(1)(A) acting as a 'safety valve[] for [the] modification of sentences' . . . Id. at 121.  Lawmakers further noted that the foregoing approach would keep 'the sentencing power in the judiciary where it belongs,' rather than with the U.S. Parole Commission . . . This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to employ on an individualized basis to correct sentences when 'extraordinary and compelling reasons' indicate that the sentence initially imposed on any individual defendant no longer served legislative objectives.  Second, although the power to reduce sentences provided for by 18 U.S.C. § 3582(c)(1)(A) has most often been used to reduce prison terms of elderly and/or terminally ill defendants, nothing in the statutory language or legislative history . . . indicates Congress intended to limit its application to elderly defendants or defendants with compelling medical circumstances . . . Third, . . . district courts - until the recently enacted First Step Act - were only authorized to reduce a sentence based on 'extraordinary and compelling reasons' if asked to do so by the Director of the BOP."  United States v. Millan, 2020 U.S. Dist. LEXIS 59955, at *16 -*18 (S.D.N.Y. April 6, 2020)(granting reduction of life sentence to time served where Millan served over 28 years).

In Millan, the Hon. Loretta A. Preska gives a good chronology of how the Sentencing Commission drafted U.S.S.G. § 1B1.13 in 2007, pursuant to the Comprehensive Crime Control Act of 1984, and subsequently drafted Application Note 1(A) to U.S.S.G. § 1B1.13 in response to a 2013 report from the Office of the Inspector General of the D.O.J. finding that the BOP rarely filed motions for sentence reductions.  2020 U.S. Dist. LEXIS 5955, *18-*20.  Millan then goes on to discuss a number of cases that illustrate that since Congress passed the First Step Act in 2018, courts can (and have) granted motions for

Compassionate Release based on extraordinary and compelling circumstances even where those circumstances would not fit within the parameters of the Application Note[1], as discussed below.

II. Extraordinary and Compelling Reasons Support Compassionate Release

Although the BOP often uses language in Application Note 1 to U.S.S.G. § 1B1.13 to deny an inmate's request that the BOP bring a motion for Compassionate Release, courts can decide what constitutes extraordinary and compelling reasons for Compassionate Release without being constrained by Application Note. "'[C]ourts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement,'" Millan, 2020 U.S. Dist. LEXIS 59955, at *22 (quoting United States v. Beck, 2019 U.S. Dist. Lexis 108542, 2019 WL 2716505, at *6 [W.D. N.C. June 28, 2019]). And, courts have utilized that power. United States v. Cantu-Rivera, 2019 U.S. Dist. LEXIS 105271, 2019 WL 2578272 (S.D. Tex. June 124, 2-19), is instructive with regard to court's newfound authority to reduce sentences based on 'extraordinary and compelling reasons' (even if those reasons do not relate to medical condition, age or family circumstances). Millan, 2020 U.S. Dist. LEXIS 59955, at *22-*23.

As explained in Cantu-Rivera, 2019 U.S. Dist. LEXIS 105271, 2019 WL 2578272, at *2 n.1 (reducing sentence of life imprisonment to time served where Cantu-Rivera served more than 30 years), "Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect." See also United States v, Asaro, 2020 U.S. Dist. LEXIS 68044, at *12 (E.D.N.Y. April 17, 2020)(granting reduction of 96 month sentence to time served plus supervised release with a condition of home confinement, where Asaro had served approximately 58 months)(citing United States v. Ebbers, 2020 U.S. Dist. LEXIS 3746. 2020 WL 91399, at *4 [S.D.N.Y. Jan. 8, 2020][Compassionate Release motion granted where Ebbers had served more than 13 years of a 25 year

---

[1] Id. at *22-25 (discussing United States v. Cantu-Rivera, 2019 U.S. Dist. LEXIS 105271, 2019 WL 2578272 [S.D. Tex. June 17, 2019]; United States v. Cantu, 2019 U.S. Dist. LEXIS 100923 [S.D. Tex. June 17, 2019]; and, United States v. McGraw, 2019 U.S. Dist. LEXIS 78370 [S.D. Ind. May 9, 2019][reducing life sentence to time-served where McGraw had served over 17 years]).

sentence]) ("This Policy Statement is 'anachronistic' because it pre-dates the First Step Act itself.");

United States v. Cantu, 423 F.Supp. 3d 345, 352 (S.D. Tex. June 17, 2019)("when a defendant brings a

motion for a sentence reduction under the amended provision, the Court can determine whether any

extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)

warrant granting relief")(reducing 201 month sentence to time served plus supervised release with a

period of home confinement where Cantu had served over 14 years);  United States v. Fox, 2019 U.S.

Dist. LEXIS 115388, 2019 WL 3046086, at *3 (D. Me. July 11, 2019)("I treat the previous BOP

discretion to identify other extraordinary and compelling reasons as assigned now to courts")(motion,

which pre-dated the pandemic and, hence, was unrelated to Coronavirus, was denied without prejudice);

Beck, 2019 WL 2716505, at *6 (holding that Application Note 1(D) is "inconsistent with the First

Act, which was enacted to further increase the use of compassionate release and which explicitly allows

courts to grant such motions even when the BOP finds they are not appropriate," and courts thus may

"consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than

those specifically identified in the application notes to the old policy statement")(granting reduction of

sentence form 165 months to time served where Beck had served approximately 76 months).

   The "commentary" to U.S.S.G. § 1B1.13 includes five "Application Notes."  Application Note 1 lists

the circumstances that qualify as "extraordinary and compelling."  Subdivision (A) through (C) of that

Note list the defendant's medical condition, age and family circumstances.  Subdivision (D), however,

titled "Other Reasons," provides as follows:  "As determined by the Director of the Bureau of Prisons,

there exists in the defendant's case an extraordinary and compelling reason other than, or in connection

with the reasons described in subdivision (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1.

   Application Notes 2 and 3 (part of the same commentary) address other substantive standards,

providing that "an extraordinary and compelling reason need not have been unforeseen at the time of

sentencing" in order to qualify (Note 2), and that rehabilitation of the defendant standing alone, does not

qualify as extraordinary and compelling (Note 3).  Application Note 4 and 5, however, both speak plainly

to the BOP's exclusive gate-keeping authority pre-FSA.  Note 4 states that, "[a] reduction under this

policy statement may be granted only upon motion by the Director of the [BOP] pursuant to 18 U.S.C. § 3582(c)(1)(A),"[2] and Note 5 provides that "[a]ny reduction made pursuant to a motion by the Director of the Bureau of Prisons for the reasons set forth in [Application Notes] (1) and (2) is consistent with this policy statement."

Circling back to § 3582(c) itself - as quoted above, although the FSA amended the statute to allow prisoners to seek relief without the BOP's blessing, it continues to provide that the court may grant a sentence reduction "if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).  The heart of the matter before the Court is that many of these policy statements, as just described, not only pre-date the FSA amendment of § 3582(c) but also continue to reference expressly BOP's pre-FSA role as exclusive gatekeeper, which of course the FSA eliminated.  See, e.g., U.S.S.G. §1B1.13 ("Upon motion of the Director of the [BOP] . . .); App. Note 1 par. D ("Other Reasons . . . [a]s determined by the Director of [BOP]").

Mr. Fiseku asks this Court to find that, on the facts presented herein, the FSA's dramatic amendments, is nevertheless an "extraordinary and compelling" circumstances for purposes of relief under FSA amended compassionate release statute, 18 U.S.C. § 3582(c).  On the subject of the authority to make this finding, Mr. Fiseku urges the Court both to follow some of the language in the pre-FSA compassionate release framework and to disregard other language as no longer binding in the face of the FSA's elimination of BOP's gatekeeping role and the Congressional objective of increasing the availability of such relief that the statutory change effects.

Thus, pointing to Amendment Note 1 to Guideline § 1B1.13, Mr. Fiseku argues that the Sentencing Commission, in exercising its Congressionally - delegated authority to expound upon "extraordinary and compelling" by specifically listing age, health and family circumstances ((A) through (C)), also chose to

---

[2] Application Note 4 further states that it "encourages BOP to file a § 3582 motion if the required circumstances are present and notes that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction . . ." U.S.S.G. § 1B1.13 App. Note 4.

include a catch-all forth category, "Other Reasons" (Subdivision (D)) - which could include either reasons "in combination with" or "other than" age, health and family. "Other reasons," he says, can include the reasons he advances here.

In United States v. Cantu, 423 F.Supp. 3d 345 (S.D. Tex. June 17, 2019) the Court concluded that "the correct interpretation of § 3582(c)(1)(A) - based on the text, statutory history and structure, and consideration of Congress's ability to override any of the Commission's policy statements "at any time" - is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1 (A)-(C) warrant granting relief." Id. at 352 (quoting Mistretta v. United States, 488 U.S. 361, 364 (1989)).

Since Cantu was issued in June 2019, numerous other federal courts have considered the relationship between the FSA - amended compassionate release statute and Application Note 1(D) and have reached essentially the same conclusion as Cantu. See United States v. Brown, 411 F.Supp. 3d 466, 450 (S.D. Iowa Oct. 8, 2019)("The Court concluded [that] the Cantu, Fox and Beck court's reading of § 3582 better comports with the FSA's purpose, congressional intent with amending of § 3582(c), and the most natural reading of the statutory scheme.");  United States v. Urkevich, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019), app. docketed, No. 20-1603 (Mar. 23, 2020)("[T]his Court may use Application Note 1(D) as a basis for finding extraordinary and compelling reasons to reduce a sentence citing Beck, Fox, Cantu and Brown);  United States v. Schmitt, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8, 2020);  United States v. Maumau, 2020 WL 806121, at *4 (D. Utah Feb. 18, 2020);  United States v. O'Bryan, 2020 WL 869475, at *2 (D. Kansas Feb. 21 2020); United States v. Young, 2020 WL 1047815, at *6 (M.D. Tenn Mar. 4, 2020); United States v. Redd, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020); United States v. Owens, 97-cr-2546, ECF No. 93 at *4, (S.D. Cal. Mar. 23, 2020); United States v. Decatur, 2020 WL 1676259, at *2-3 (D. Md. Apr. 6, 2020); United States v. Adeyemi, WL 3642478, at *15 (E.D. Pa. July 6, 2020); United States v. Quinn, 2020 WL 3275736, at *4 (S.D. Cal. June 17, 2020); United States v. Marks, 2020 WL 1908911, at *17 (W.D. N.Y. Apr. 20, 2020).

These decisions reflect, to borrow a term, the right side of history on the crucial legal questions they consider, which Mr. Fiseku's motion also presents, and so he asks the Court to join them in concluding that it too, has the authority to grant relief sought in this case - namely to determine that "other reasons" (as the term is used in Application Note 1(D)) qualifies as "extraordinary and compelling" regardless of BOP's view on the matter.

Recently the Second Circuit panel ruled unanimously that district courts have broad discretion to consider "any extraordinary and compelling reason for release a defendant might raise." United States v. Zullo, No. 19-3218-CR (2nd Cir. September 25, 2020).

1. Mr. Fiseku's Current Conviction of Conspiracy to Commit Hobbs Act
   Robbery Is No Longer A Crime of Violence and Could Not Be Used To
   Enhance the Penalty and Determine Mr. Fiseku Is A Career Offender

In addition, the Probation Office, Government and Court considered Mr. Fiseku's current conviction for conspiracy to commit Hobbs Act robbery as a "crime of violence." At the time of Mr. Fiseku's sentence this may have been the law in this Circuit, but in 2019 the Supreme Court determined that conspiracy to commit Hobbs Act robbery is not a "crime of violence." It cannot qualify under the definition of § 924(c)(3)(B), which is unconstitutionally vague." United States v. Davis, 139 S. Ct. 2319, 2336 (2019). And conspiracy does not qualify under the remaining part of the "crime of violence" definition, as it does not have "as an element the use, attempted use, or threatened use of physical force against the person or property of another." § 924(c)(3)(A). See, e.g., Sessions v. Dimaya, 138 S. Ct. 1204, 1219 (2018)("[C]onspiracy's elements are met as soon as the participants have made an agreement."); United States v. Barrett, 937 F.3d 126, 128 (2d Cir. 2019)(The "conviction for using a firearm in committing Hobbs Act robbery conspiracy must be vacated because the identification of that crime as one of violence depends on the § 924(c)(3)(B) residual clause definition, which Davis has now pronounced unconstitutionally vague.")(emphasis in original). Considering that the Supreme Court has now ruled that conspiracy to commit Hobbs Act robbery is no longer a "crime of violence" establishes that the Court's determination using this conviction as a crime for enhancing the penalty at sentencing making Mr. Fiseku a career offender was wrong.

During sentencing, Mr. Fiseku had "argued he is not a career offender." (Sent. pg. 5).  However, the Court found that "[t]he crime [] qualifies [as] a crime of violence." (Sent. pg. 6).  The Court also mentioned that "the government's helpful sentencing notes, the guidelines commentary clearly provides that conspiracy to commit and aiding and abetting another in committing such an offense qualifies as a crime of violence." (Sent. pg. 6).  The Court found that "the offense level [was] 29 based on the career offender provision, the criminal history category [was] VI, and the Guideline range [was] between 151-188 months imprisonment."  (Sent. Pg. 5).

Considering, since sentencing in this case, the Supreme Court has now determined conspiracy to commit Hobbs Act robbery is not a "crime of violence," and the "residual clause" was removed from the Guidelines, Mr. Fiseku's past conduct does not qualify him as a "career offender" and in the interest of justice, Mr. Fiseku's PSR and sentence must be corrected.

2. Utilizing an Amended Guideline § 4A1.2(c)(2)(2007) For
   Conditions Which Occurred Years Before the Amended
   Guideline Went into Effect Violated The Ex Post Facto Clause

Mr. Fiseku was arrested in the State of Illinois on February 10, 1999, when a motor home he was a passenger in was stopped by the police and a substantial amount of marijuana was found.  He pled guilty to a felony for possession of marijuana with intent to distribute and was sentenced for this crime on May 28, 1999. See Prior PSR at para. 121.  This is the "controlled substance" offense referred to by the PSR.

The racketeering conspiracy referred to by the Probation Office as the "crime of violence," related to Mr. Fiseku's arrest in the Eastern District of New York on December 12, 2001.  As set forth in the PSR, one of the predicate acts Mr. Fiseku was charged with and pled guilty to was in furtherance of this RICO conspiracy charge related to his prior conviction for marijuana trafficking in the State of Illinois.  See Prior PSR at paragraphs 27, 28 and 121.

The sentences for these offenses were not separated by any intervening arrest.  Mr. Fiseku was never released from custody after his arrest in Illinois in February 1999.  Notably, when Mr. Fiseku was sentenced for this racketeering conspiracy charge in February of 2003, these two sentences were calculated by Judge Korman to be a single sentence or conviction under the Guidelines because they were

each related to one another and part of the offense conduct of the other. Significantly, section 4A1.2(a)(2) of the Guidelines than provided that "[p]rior sentences imposed in related cases are to be treated as one sentence under 4A1.1(a), (b) and (c)."

According to the Application Note 3 of the Commentary to Section 4A1.2 (1993)(amended 2007)(Definitions and Instructions for Computing Criminal History) sentences were considered "related" when they were part of a "single common scheme or plan," and so long as they were not for offenses that were separated by an intervening arrest. There is no question but that the Illinois marijuana case was related to the RICO conspiracy case because the conduct was specifically charged as part of the RICO conspiracy offense and there was no intervening arrest or subsequent act.

As this Court is aware, years later, after that sentence occurred, this Guideline was changed by the Sentencing Commission. Now Section 4A1.2 (a)(2) provides that prior sentences can only be counted as a single sentence if there is no intervening arrest, and "(a) the sentences result from offenses contained in the same charging instrument, or (b) the sentences were imposed on the same day." Thus, due to this Guideline change promulgated long after Mr. Fiseku was sentenced for these prior offenses, the Government was now allowed to consider Mr. Fiseku a Career Offender because these "two felony prior convictions" are computed differently than they were before. Even though well over a decade ago they were considered a single conviction by the Court under the same Guideline, 4A1.2(a)(2)(1993). Now, in 2017, this Court concluded that Mr. Fiseku's prior 1999 and 2003 convictions were not part of a single common scheme and therefore should not be consolidated as "related cases" for the purpose of calculating his criminal history category and career offender enhancement.

The difference is very significant because in order to meet the criteria for the career offender provisions, the two prior felony convictions of either a crime of violence or a controlled substance offense must be for sentences that "are counted separately under the provision of 4A1.1(a). See Section 4B1.2(c).

The unfairness of this subsequent amendment to the Guidelines goes beyond the Career Offender determination alone, this change also affected the manner in which Mr. Fiseku's prior criminal history is now being computed. It increased his Criminal History Category from V to now VI. Without the Career

Offender status Mr. Fiseku would have 12 criminal history points placing him in Category V, with a Total Offense Level of 21.  This would place him within the 70-87 month advisory imprisonment range under the Guidelines.

By utilizing the 2007 version of 4A1.2(a)(2) which did not go into effect until 8 years after Mr. Fiseku's May 28, 1999 Illinois conviction and his Federal RICO conviction in 2003 violated the Ex Post Facto Clause.  And, "one of the principal interests that the Ex Post Facto Clause was designed to serve [is] fundamental justice." Peugh v. United States, 569 U.S. 530, 550 (2013)(citation omitted).

There is nothing in the Sentencing Commission's amendment to 4A1.2(a)(2) that says the change was retroactive. Mr. Fiseku not only committed these crimes before the Guidelines were amended, but a penalty had already been "incurred" under the old Guidelines in 2003 when the Probation Office agreed and the Court sentenced Mr. Fiseku under both prior offenses as one offense.  This should fall also under the law of the case doctrine.  See Dorsey v. United States, 567 U.S. 260, 272 (2012)("[P]enalties are 'incurred' under the older statute when an offender becomes subject to them, e.g., commits the underlying conduct that makes the offender liable.").

The 2007 amendment to the Guidelines 4A1.2(a)(2) does not expressly provide that it applies to acts before 2007.  A "change" in penalties, whether increasing or decreasing them, does not apply to penalties already incurred unless the new statute says so.

Moreover, the rule of lenity should come into play here because a Guidelines ambiguity leaves in doubt the extent of the punishment that may be imposed.  There is nothing that indicates the new amended Guideline was meant to permit this harsher sentence based on pre-2007 conduct.  Given the lack of textual directive to apply the 2007 change to pre-2007 convictions is certainly what the rule of lenity forbids.

This amendment violates the Ex Post Facto Clause.  The presumption against the retroactive application of new laws is an essential thread in the mantle of protection that the law affords individual citizens.  That presumption "is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." Lynce v. Mathis, 519 U.S. 433, 439 (1997)(citation omitted).  The "ex post

14

facto prohibition" in Article I of the Constitution "forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." Weaver v. Graham, 450 U.S. 24, 30 (1981). Indeed, the very "heart of the Ex Post Facto Clause bars application of a law 'that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime when committed.'" Johnson v. United States, 529 U.S. 694, 699 )2000)(quoting Calder v. Bull, 3 Dall. 386, 390 (1798)). A punishment that "applies to conduct before its enactment" and "raised the penalty from whatever the law provided when [the defendant] acted" violates the Clause. Id.

It is well settled, however, that a sentencing court is required to use the version of the Guidelines in effect on the date of the defendant's sentencing, U.S.S.G. Section 1B1.11(a), except when doing so would violate the Ex Post Facto Clause of the United States Constitution. U.S.S.G. Section 1B1.11(b)(1). See also United States v. Ortiz, 621 F.3d 82, 2010 WL 3419898, at *1 (2d Cir. 2010); accord, 18 U.S.C. § 3553(a)(4)(A)(ii)("The court, in determining the particular sentence to be imposed, shall consider . . . the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . in effect on the date the defendant is sentenced[.]").  When using the version of the Guidelines in effect on the date of sentencing raises ex post facto concerns, courts must use the Guidelines in effect on the date that the offense was committed. Id.

The Guidelines in effect on the date Mr. Fiseku was sentenced in 2017 had been amended to eliminate the concept of "related cases" under 4A1.2(a)(2). As noted in Ortiz, in order to determine whether the use of an amended version of the Guidelines violates the Ex Post Facto Clause, the sentencing court must consider whether the use of the amended Guidelines would create "a substantial risk that the defendant's sentence was more severe" than it would have been had the earlier version of the Guidelines been used. Ortiz, 2010 WL 3419898, at *4 (quoting United States v. Turner, 548 F.3d 1094 (D.C. Cir. 2008)).

It is clear that the 2007 amendment changed the legal consequences of the acts not only completed before its effective date, but another Court had already made a judicial decision in a prior case which was settled conclusively by the 2003 Federal judgment and should not have been permitted to be used against

Mr. Fiseku unless that decision and judgment was vacated and reversed, which it was not.  To disregard a prior court's final judgment should be barred under the res judicata and issue preclusion doctrines.

The term res judicata, which means essentially that the matter in the controversy has already been adjudicated, encompasses two significant different doctrines:  claim preclusion and issue preclusion. Under claim preclusion, a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues in the earlier suit.  The doctrine precludes not only litigation of claims raised and adjudicated in a prior litigation between the parties (and their privies), but also of claims that might have been raised in the prior litigation but were not.

The doctrine of issue preclusion, in contrast, bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim.  Fequiere v. Tribeca Lending, 2016 U.S. Dist. LEXIS 31786, 2016 WL 1057000, at *5 (E.D.N.Y. Mar. 11, 2016).

Here, the requirements for res judicata are met.  First, the prior offenses were previously adjudicated on the merits and determined to be utilized as one conviction.  Second, the requirement that the previous action involved [the party against whom res judicata is invoked] or its privy is also met.

The 2017 PSR findings and this Court's decision that the two convictions count separately required the Court to overrule the previous PSR and Court's decision.

In a similar vein, these issues that the government and Court determined counts as two convictions to qualify for Career Offender status was barred by the doctrine of collateral estoppel.  "[C]ollateral estoppel . . . means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."  Caldwell v. Gutman, Mintz, Baker & Sonnenfeldt, P.C., 701 F. Supp.2d 340, 349-50 (E.D.N.Y. 2010)(citing Leather v. Eyck, 180 F.3d 420, 424 (2d Cir. 1999)(citing Schiro v. Farley, 510 U.S. 222,232 (1994)).

Specifically, "[u]nder New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the

16

party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." In re Hyman, 502 F.3d 61, 65 (2d Cir. 2007).

The Supreme Court confirmed that "the doctrine of res judicata does . . . exist for criminal cases." See United States v. D'Amico, 734 F. Supp.2d 321 (S.D.N.Y. 2010)(citing United States v. Oppenheimer, 242 U.S. 85, 87 (1916)). See United States v. Bailin, 977 F.2d 270, 277-78 (7th Cir. 1992)(explaining that collateral estoppel protects against "the Government . . . hav[ing] the opportunity to hone its presentation or those issues which have already been decided against it.").

Here, after Mr. Fiseku's 1999 Illinois and 2003 federal convictions, the Guidelines changed and was later used to impose a harsher sentence by utilizing the new guidelines 4A1.2(a)(2). "Our sense of fairness is violated both by uncertainty in the law and by retrospective changes." Sash v. Zenk, 439 F.3d 61, 66 (2d Cir. 2006). The "ex post facto clause condemns" not just lack of notice but "acts that offend our fundamental sense that the government should not make more harsh the law governing the treatment of convicted criminals above their criminal acts are in the past." Id. at 66.

For these reasons, the Court should find that the former Guideline § 4B1.2(a)(2)(1993) applied and the 1999 and 2003 prior convictions should have been treated as one conviction. The Court should remand the case to make factual findings to clarify whether Mr. Fiseku's prior convictions should have been "related cases" under the Guidelines in effect at the time the offenses for these convictions were committed in 1999 and 2003. In addition, the Court should determine if sentencing Mr. Fiseku under the amended Guidelines violated the Ex Post Facto Clause of the U.S. Constitution, and, in the interest of justice correct Mr. Fiseku's sentence accordingly.

3. The Government Failed to Provide Accurate Judicial
   Documents to Verify Mr. Fiseku's Prior 1999 Illinois
   State Conviction for Career Offender Status

At no time did the PSR state or reference any criminal judicial document used for verification of Mr. Fiseku's priors. Also, the PSR did not reference any material in which it gained its information from in order to confirm that the alleged prior 1999 Illinois State conviction was accurate, or any State criminal code violated to which Mr. Fiseku pled guilty. Only a description of this prior offense was included in

the PSR. So what evidence or fact did the PSR and the Court rely upon to be sure this 1999 State conviction was an offense which would qualify as a "crime of violence" or "controlled substance" offense.

In United States v. Reyes, 691 F.3d 453, 459 (2d Cir. 2012), the Second Circuit held that "a sentencing court may not rely on a PSR's description of a defendant's pre-arrest conduct that resulted in a prior conviction to determine that the defendant does not object to the PSR description." Id. at 459; United States v. Makropoulos, 695 Fed. Appx. 609, 610 (2d Cir. 2017).

Section 4B1.1 focus is the conviction; not the charging document. Reyes, 691 F.3d at 569. Concerning the 1999 Illinois conviction, at no time did the PSR give any verifying statute of the Illinois State conviction for federal categorical comparison, which could not be made by the Court without this information. See Taylor v. United States, 495 U.S. 575 (1990); Shepard v. United States, 544 U.S. 13, 16 (2005); and, United States v. Savage, 542 F.3d 959 (2d Cir. 2008).

It has never been stated on record that the defendant was convicted of any Illinois State statute or code and the paragraphs in the PSR do not bootstrap itself into the Illinois conviction becoming a certain felony conviction to becoming a fact or offense to make Mr. Fiseku a career offender. The Government is liable for the woefully inaccurate enhancement since Mr. Fiseku could not have knowingly accepted a plea offer where the Government had no reliable information from the onset of the case to use for the Career Offender enhancement.

No plea agreement, plea or sentencing transcripts were produced for the 1999 prior Illinois State conviction. No indictment was obtained and produced either, all of which has deprived the Court of any reliability to ascertain the exact charges Mr. Fiseku pled guilty to. There have been no actual Shepard documents provided to the Court of the 1999 charges Mr. Fiseku pled guilty to.

The Court cannot rely on vague sentencing factors in the PSR and it was procedurally unfair to require a defendant to prove his own prior conviction statute. The Government was required at sentencing to produce documents consistent with Shepard since it was to resume the request to apply the career offender enhancement.

The Government relied on the PSR as evidence of the 1999 conviction which is unsupported hearsay and cannot be taken as fact which allows the Government to allege any arrest of any of the two charges it sees fit by unreliable documentation. They provided no evidence that shows what Mr. Fiseku and the Illinois State Court agreed upon, therefore, the argument made before this federal Court of this prior was hypothetically made.

In light of the fact that the Government failed to provide the defendant and Court with any documentation to verify Mr. Fiseku's previous 1999 Illinois conviction, this conviction could not be used to enhance his sentence as a career offender and Mr. Fiseku's PSR and sentence must be corrected.

4. The Sentencing Commission Exceeded Its Authority by Using
Application Note 1 Of § 4B1.2(a) To Add an Offense Not
Listed in The Guideline, Which Subjected Mr. Fiseku To
The "Career Offender" Enhancement of U.S.S.G. § 4B1.1.

On April 12, 2017, Mr. Fiseku was sentenced by the Court for violation of conspiracy to commit Hobbs Act robbery to 108 months of imprisonment. The parties disputed whether the "Career Offender" sentence enhancement of U.S.S.G. § 4B1.1(a) applied to Mr. Fiseku. The Court concluded that the enhancement did apply to Mr. Fiseku due to his current charge, and prior 1999 Illinois State conviction for a "controlled substance" and 2003 Federal RICO conviction based on the same charges. Under U.S.S.G. § 4B1.1(a) a "career offender" must have at least two prior felony convictions of either a crime of violence or a controlled substance offense. "The government bears the burden of showing that a prior conviction counts as a predicate offense for the purpose of a sentencing enhancement." United States v. Savage, 542 F.3d 959, 964 (2d Cir. 2008).

Mr. Fiseku disputes that his current conviction for conspiracy to commit Hobbs Act robbery constitutes a crime of violence for purposes of the career offender guideline. As an alternative to the reasons stated above as to why Mr. Fiseku is not a career offender, he also offers this argument in addition.

U.S.S.G. § 4B1.2(a)(2) enumerates "robbery" among the offenses which constitute a "crime of violence" for purposes of the career offender guideline. Mr. Fiseku argues that even if robbery itself is a "crime of violence," conspiracy to commit robbery is not.

The Guidelines define "crime of violence" for purposes of the Career Offender enhancement in two alternative ways. First, certain crimes, including robbery, are categorically crimes of violence. U.S.S.G. § 4B1.2(a)(2)("the Enumeration Clause")("murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c)"). Second, in addition to those enumerated crimes, any crime which "has as an element the use, attempted use, or threatened use of physical force against the person or another" is also a crime of violence. Id. § 4B1.2(a)(2)("the Elements Clause").

Application Note 1 to § 4B1.2 states that "the offenses of . . . conspiracy and attempting to commit" the crimes enumerated in 4B1.2(a)(2), including robbery, are also crimes of violence for purposes of the career offender enhancement. Such "[c]ommentary provisions [of the Sentencing Guidelines] must be given 'controlling weight' unless they: (1) conflict with federal statute, (2) violate the constitution, or (3) are plainly erroneous or inconsistent with the Guidelines provisions they purport to interpret." United States v. Jones, 878 F.3d 10, 18 (2d Cir. 2017); see Stinson v. United States, 508 U.S. 36, 42 (1993)(holding that commentary provisions "which function[] to interpret [a] guideline or explain how it is to be applied" are controlling but those which are plainly erroneous and inconsistent are not). If, however, "commentary and the guideline it interprets are inconsistent in that following one will result in violating the dictates of the other," the Guideline itself must govern. Stinson, 508 U.S. at 43.

Mr. Fiseku argues that Application Note 1, which categorically defines attempt to and conspiracy to commit robbery as a crime of violence, is plainly inconsistent with the Guideline it purports to interpret, § 4B1.2(a). For the following reasons, Mr. Fiseku contends that Application Note 1's provision that conspiracy to commit robbery is categorically a "crime of violence" for purposes of the career offender enhancement is plainly inconsistent with the Guideline and thus is not controlling.

First, Application Note 1's expansion of the Enumerated Clause to include crimes which the Guideline itself does not list is plainly inconsistent with that Enumeration Clause. Enumeration of additional crimes which, though related, are separate and distinct from the crimes enumerated in § 4B1.2(a)(2) is not the type of "interpretive and explanatory" commentary which is binding on federal courts. See Stinson, 508 U.S. at 42. Rather, it is inconsistent with the Guideline's Enumeration Clause because it purports to alter and expand, not explain, the text of that clause. The "offenses of aiding and abetting, conspiring, and attempting to commit" offenses enumerated in § 4B1.2(a)(2), which Application Note 1 purports to "include" as crimes of violence, are statutorily separate offenses which differ substantially from the underlying offenses that the Guidelines itself enumerates.

Second, Application Note 1's purported categorical inclusion of conspiracy as a crime of violence is plainly inconsistent with the Elements Clause because the crime of conspiracy does not have any element which requires the use of force. See Sessions v. Dimaya, 138 S. Ct. at 1209.

The statute itself makes clear that the elements of conspiracy to commit Hobbs act robbery could clearly be met without any use, attempted use, or threatened use of violence whatsoever. Therefore, with conspiracy, the Elements Clause cannot support the categorical inclusion of conspiracy as a crime of violence by Application Note 1. There are numerous cases in support of this position, from United States v. Davis, 139 S. Ct. 2319 to the Second Circuit's most recent holding in United States v. Barrett, 937 F.3d 126 (2019), which held that conspiracy to commit Hobbs Act robbery is categorically no longer a crime of violence for purposes of 18 U.S.C. § 924(c) and should lead this Court to reach a similar conclusion about conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) for purposes of the career offender enhancement.

When Mr. Fiseku was sentenced, neither Davis, nor Barrett were decided. The reasoning in both Davis and Barrett makes clear that the Second Circuit's conclusion in those cases do apply here. Following Davis, and Barrett, conspiracy to commit Hobbs Act robbery is no longer a predicate offense for violation of § 924(c). Although Mr. Fiseku did not plead guilty and was not convicted of violating § 924(c), he argues that Davis supports the proposition that his conviction for Hobbs Act robbery

conspiracy does not qualify as a crime of violence under the Federal Sentencing Guidelines Manual § 4B1.1 which governs career offender status.  Section 4B1.1 states:

A defendant is a career offender if (1) the defendant is at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.  The Guidelines define a "crime of violence" as a felony that either "(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2)  is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(2)."  U.S. Sentencing Guidelines manual § 4B1.2(a).

At the time of Mr. Fiseku's sentencing the Second Circuit's holding in United States v. Barrett, 903 F.3d 166 (2018) that conspiracy to commit Hobbs Act robbery is categorically a crime of violence, then may have been applicable for purposes of the career offender.  However, since then, the Supreme Court overruled that Barrett decision and remanded the case back to the Second Circuit in which the Court held conspiracy is no longer a crime of violence under the residual clause, and the statute of conspiracy does not have the elements of use, attempted use, or threatened use of violence to support "conspiracy" as a crime of violence under the elements clause.

Even though at the time of sentencing, the crime of violence included those which "by [their] nature, involve[ ] a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," the career offender guideline included no similar "substantial risk" definition of a crime of violence.  In addition, the text of the Guidelines does not list conspiracy as one of the enumerated offenses for a "crime of violence," the commentary of the Guidelines adds "conspiring" as a "crime of violence."  U.S.S.G. § 4B1.2 cmt. n. 1.2.

The commentary should not override the plain meaning of the text of the Guidelines.[3] See United States v. Shell, 789 F.3d 335, 340 (4th Cir. 2015)("it is the text of course, that takes precedence.").  The United States Supreme Court established over two decades ago that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it . . . is inconsistent with, or plainly erroneous reading of the guideline."  Stinson v. United States, 508 U.S. 36, 38 (1993).  How ever, listing the crime of conspiracy in the commentary does more than interpret or explain the Guideline text and instead adds an entirely new offense to the "crime[s] of violence."  See Stinson, 508 U.S. at 38; Shell, 789 F.3d at 345; see also United States v. Havis, 927 F.3d 382, 386 (6th Cir. 2009)("[b]ut the Government sidesteps a threshold question:  is this really an 'interpretation' at all?).  Thus, the commentary is plainly inconsistent with the text of the guideline, and any inconsistency should be "resolved in favor of the text."  See Shell, 789 F.3d at 346.

The discrepancy is intensified by the fact that the text lists "attempted use" of physical force as a crime of violence, suggesting the Sentencing Commission made an explicit choice to include some inchoate crimes and exclude others, such as conspiracy.  See U.S.S.G. § 4B1.2(a)(1);  see also United States v. Winstead, 890 F.3d 1082, 1091 (D.C. Cir. 2018)(noting "section 4B1.2(b) presents a very detailed 'definition' of controlled substance offense that clearly excludes inchoate offenses.  Expression unius est exclusio alterius . .. the Commission showed within § 4B1.2 itself that it knows how to include attempted offenses when it intends to do so.").  Therefore, the commentary listing "conspiracy" as a "crime of violence" improperly expands the text of the Guidelines and is not authoritative.[4]

---

[3] Importantly, "[u]nlike the Guidelines themselves . . . commentary to the Guidelines never passes through the gauntlets of congressional review or notice and comment." United States v. Havis, 927 F.3d at 386.  However, "[t]hat is not a problem, the Supreme Court tells us, because commentary has no independent legal force - it serves only to interpret the Guidelines' text, not to replace or modify it." Id. (citing Stinson, 508 U.S. 44-46.

[4] Other circuits have also found that the commentary cannot expand the text of U.S.S.G. $ 4B1.2. The Sixth Circuit has recently found that the inchoate crimes listed in the commentary cannot be used to expand the definition of the Controlled substance beyond the text of the guideline to include conspiracy crimes. Havis, 927 F.3d at 387. The D.C. Circuit has also found that it is improper for the commentary to improperly add inchoate offenses to $ 4B1.2(b). Winstead, 890 F.3d at 1089 ("[s]ection 4B1.2(b) presents a very detailed 'definition' of controlled substances that clearly excludes inchoate offenses.").

Previously, the Fourth Circuit found that "the commentary that includes attempts and conspiracies as crimes of violence [is] consistent with the language of the guideline." United States v. Mack, 855 F.3d 581, 585 (4th Cir. 2017). However, in making this decision, the Fourth Circuit relied upon the residual clause, finding the commentary "represent[ed] a common-sense understanding of the residual clause - inchoate crimes that would qualify as violent if completed 'present[] a serious potential risk of physical injury to another.'" Id.; see also U.S.S.G. § 4B1.2(a); 4B1.2(a)(2014). The Fourth Circuit's holding relied on § 4B1.2(a)(2)'s "residual clause," which has since been removed. Therefore, the Fourth Circuit's textual justification for relying on the commentary no longer exists. And because the commentary is plainly inconsistent with the text of the Guidelines, the commentary's inclusion of conspiring cannot be used to find that a Defendant meets the criteria for a prior conviction enhancement for a "crime of violence."

Given the elimination of the residual clause and the Supreme Court and other Circuit precedent, this Court cannot rely on the commentary to expand the list of enumerated offenses when it is plainly inconsistent with the text. See Stinson, 508 U.S. at 38; Mack, 855 F.3d at 585; Havis, 927 F.3d at 386; Winstead, 890 F.3d at 1091.

The Supreme Court has held that the Commentary to the Guidelines are "authoritative . . . unless [the Commentary interpretation] violates the Constitution or a federal statute, or is inconsistent with, or plainly erroneous reading of, the guideline." Stinson, 508 U.S. at 38; see also United States v. Rahim, 771 F. App'x 605, 614 (6th Cir. 2019)(referring to the doctrine of deference as "Stinson Deference"). The Sixth Circuit in Havis dealt with the issue of the appropriate level of deference a court should give to a Guideline commentary application note interpreting "the Sentencing Commission has no power to add attempted crimes to the list of offenses in § 4B1.2(b) through commentary." Id. at 384.

The Havis court first noted the Commission's unique dual legislative and judicial nature and that "two constraints - congressional review and notice and comment - stand to safeguard the Commission from uniting legislative and judicial authority in violation of the separation of powers." Id. at 385-86; see also United States v. Owens, 940 F.3d 308, 314 (6th Cir. 2019)("[The application notes and supporting

24

commentary's interpretation of the Guidelines], of course, [are] including the notice and comment aspects."). These added safeguards do not restrain the Commentary's interpretation of these rules. Id. at 386. The Sixth Circuit reasoned that the "commentary has no independent legal force - it serves only to interpret the Guidelines' text, not to replace or modify it." Id. (citing Stinson, 508 U.S. at 44-46); United States v. Rollins, 836 F.3d 737, 742 (7th Cir. 2016)(emphasis in original). The Sixth Circuit held that the "[c]ommentary binds the courts only 'if the guideline which the commentary interprets will bear the construction.'" Id. (quoting Stinson, 508 U.S. at 46). Courts are not bound to accept a commentary's application notes interpretation of the Guidelines if the interpretation is "' plainly erroneous or inconsistent with the' corresponding guideline." Id. (quoting Stinson, 408 U.S. at 46).

The Sixth Circuit in Havis found that the meaning of "controlled substance offenses" under § 4B1.2(b) did not bear the construction of the term provided by the applicable commentary application note, which included "attempt" crimes within the terms definition. Id. at 386-87. The application note added an offense to the Guidelines provision, which made no mention of attempted crimes [or conspiracy], and therefore could not reasonably be interpreting the terms of the Guidelines. Id. at 386-87. Because "application notes are to be interpretations of, not additions to, the Guidelines themselves," the notes addition of attempted crimes deserved no deference. Id. at 386. (quoting Rollins, 836 F.3d at 742)(emphasis in original)(internal quotation marks omitted). Mr. Fiseku contends that "conspiring" fits in the same category as "attempt."

Although in United States v. Tabb, 949 F.3d 81 (2d Cir. 2020), the Second Circuit foreclosed the argument that Application Note 1 conflicts with the Guidelines text by improperly expanding it, is foreclosed in this Circuit by United States v. Jackson, 60 F.3d 128 (2d Cir. 1995). This fails for two reasons. One, Tabb did not actually address the argument because the procedural error was harmless and Tabb encompassed Section 846 narcotics conspiracy, not Hobbs Act robbery conspiracy. Therefore, Tabb is not controlling, or precedent upon which it relies. Two, the Circuit Court did not take into account that since then the residual clause has been eliminated. And, most cases that considered the

commentary to be valid relied on "conspiracy" was a "crime of violence" under § 4B1.2(a)(2)'s "residual clause," which has since been removed.

The First, Third, Seventh and Eleventh Circuits have held the commentary is consistent with § 4B1.2(b)'s text.  United States v. Adams, 934 F.3d 720, 727-30 (7th Cir. 2019);  United States v. Smith, 54 F.3d 690, 693 (11th Cir. 1995);  United States v. Piper, 35 F.3d 611, 617 (1st Cir. 1994);  United States v. Hightower, 25 F.3d 182, 187 (3d Cir. 1994).  However, most of these Circuit holdings are before the "residual clause: was removed.

In United States v. Soto-Rivera, 811 F.3d 53 (1st Cir. 2016), the government conceded that it violated due process to use the residual clause of U.S.S.G. § 4B1.2(a) to classify Rivera as a career offender and thereby impose a longer sentence, the Court examined the statute and determined that U.S.S.G. § 4B1.2, application note 1, was not consistent with § 4B1.2(a)'s text in the absence of the residual clause.  With § 4B1.2(a) stripped of the residual clause, the court could not rely on Application Note 1 to uphold a defendant's designation as a career offender pursuant to U.S.S.G. § 4B1.1.

In 2018, the D.C. Circuit created a split when it ruled that the commentary conflicts with § 4B1.2(b), and the Sixth Circuit followed in 2019.  United States v. Havis, 927 F.3d 382, 385-387 (6th Cir. 2019)(en banc);  see also United States v. Winstead,  890 F.3d 1082, 1090-92 (D.C. Cir. 2018).  Numerous district courts in the Fourth Circuit have followed, United States v. Gibbs, No. 18-Cr-89 (S.D. W.V. July 31, 2019); and, United States v. Cooper, No. 19-Cr-81, 2019 U.S. Dist. LEXIS 174261 (S.D. W.V. Oct. 8, 2019) have ruled that conspiracy to commit Hobbs Act robbery is not a "crime of violence" under § 4B1.2.  Judge Joseph R. Goodwin stated that the commentary's inclusion of conspiracy adds an entirely new offense to "crime[s] of violence." 2019 U.S. Dist. LEXIS 174261, at *4.

In United States v. Swinton, 797 Fed. App'x. 598 (2d Cir. Dec. 23, 2019), the Circuit Court held that Swinton's appeal raised serious questions with serious consequences of whether the career offender Guideline applied to Swinton concerning the Sentencing Commission's use of commentary to add attempt crimes to the definition of controlled substance offenses. The Second Circuit held that neither parties nor the District Court have fully addressed the question in the case and they remanded for resentence, "with

directions that the district court consider again whether, in light of concerns addressed in Havis and Winstead, the career offender Guideline applies to Swinton on his criminal record." Mr. Fiseku contends the same circumstances have occurred in this case concerning "conspiracy" and this Court should as well remand this case for resentencing to resolve these issues concerning the career offender designation.

After careful consideration, this Court should also find that Application Note 1's inclusion of inchoate crimes is inconsistent with the text of § 4B1.2(b). See Burgess v. United States, 553 U.S. 124, 130 (2008)("As a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated."). As the D.C. and Sixth Circuits have noted, § 4B1.2 itself demonstrates the Commission knows how to include inchoate offenses when it wants to because § 4B1.2(a)(1) explicitly defines a "crime of violence" as an offense that "has as an element the use, attempted use, or threatened use of physical force . . . ."; Havis, 927 F.3d at 386; Winstead, 890 F.3d at 1091. See Stinson, 508 U.S. at 46 (holding commentary binds only "if the guideline which the commentary interprets will bear the construction").

The severity of the career offender designation reinforces the importance of courts strictly interpreting guideline text and scrutinizing commentary for inconsistency. In this case, designating Mr. Fiseku as a career offender increased his guideline range, prior to other adjustments, from 70-87 months to 151-188 months. This dramatic enhancement underscores that the Commission "exercises a sizeable piece of the ultimate governmental power, short of capital punishment - the power to take away someone's liberty." Havis, 927 F.3d at 385. Courts must remain vigilant of how the Commission wields the power, and , in this case any deference the Court owes the Commission "does not extend so far as to allow it to invoke its general interpretative authority via commentary . . . to impose such a massive impact on a defendant [like Mr. Fiseku] with no grounding in the guidelines themselves." Winstead, 890 F.3d at 1092.

Mr. Fiseku asks the Court to share the Sixth Circuit's concern that guideline commentary "never passes through the gauntlets of congressional review or notice and comment" so reliance on commentary is inconsistent with the guideline text violates the constitutional justification for the Commission's authority. Havis, 927 F.3d at 385-86. Mr. Fiseku would like to point out that regardless of application notes' level

27

of congressional review, they are only "interpretations of, not additions to, the Guidelines themselves." United States v. Rollins, 835 F.3d 737, 742 (7th Cir. 2016).

The Commission has since proposed an amendment to § 4B1.2 that would move the inchoate offense language from Application Note 1 to the guideline text. See 83 Fed. Reg. 65400-65412-15 (Dec. 20, 2018). Mr. Fiseku argues that the proposed amendment concedes the inadequate basis in § 4B1.2(b) for Application Note 1's inclusion of inchoate offenses. Until Congress amends it, the plain text of § 4B1.2(b) compels the Court to exclude "conspiring" as predicate offenses for the career offender designation.

As the Supreme Court said in Descamps, "[i]f the statute sweeps more broadly" than the § 4B1.2(a) definition - that is, if some conduct would garner a conviction but would not satisfy the "crime of violence" definition - then any "conviction under that law cannot count as a ['crime of violence'] predicate." Descamps v. United States, 133 S. Ct. 2276, 2281 (2013); see Id. at 2283.

Accordingly, since Davis, conduct that would be a conspiracy to commit Hobbs Act robbery is not a "crime of violence" under § 4B1.2's enumerated or force clauses, then it is not a "crime of violence" under the Guidelines. "[T]he mismatch of elements saves [Mr. Fiseku] from an [enhanced] sentence," Mathis v. United States, 136 S. Ct. 2243, 2251 (2016), because "[t]he key . . . is elements, not facts." Descamps, 133 S. Ct. at 2283.

The Supreme Court in Stinson, held that the commentary should "be treated as an agency's interpretation of its own legislative rule." 508 U.S. at 44-45 (citing Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)). Thus under this Seminole Rock deference, "Commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it . . . is inconsistent with, or a plainly erroneous reading of, that guideline." Id. at 38. If the two are inconsistent, "the Sentencing Reform Act itself commands compliance with the guideline." Id. at 43 (citing 18 U.S.C. § 3553(a)(4)(b)).

Mr. Fiseku argues that they are indeed inconsistent. By purporting to add conspiring offenses to the clear textual definition - rather than interpret or explain the ones already there - he contends that the commentary in Application Note 1 exceeds its authority under Stinson. See United States v. Price, 990

F.2d 1367 (D.C. Cir. 1993)), which reversed a career offender sentence similar in circumstances because the commentary impermissibly purported to expand the scope of a penalty to include conspiracy to violate substantive drug provisions.

Mr. Fiseku calls your attention to the Supreme Court decision in James v. United States, 550 U.S. 192 (2007), which held that the Armed Career Criminal Act's definition of "violent felony" did not encompass attempted burglary simply by including the completed offense of burglary. Accordingly, to Mr. Fiseku, the analogy in James is direct, conspiracy to commit robbery is not robbery any more than "attempted burglary" is burglary.

If the Sentencing Commission wishes to expand the definition of offenses to include "conspiring," it may seek to amend the language of the guidelines by submitting the change for congressional review. See Stinson, 508 U.S. at 44. But, surely Seminole Rock deference does not extend so far as to allow the Commission to invoke its general interpretive authority via commentary - to impose such a massive impact on a defendant with no grounding in the guidelines themselves which exceeds their authority.

It would seem that the U.S. Sentencing commission has exceeded its own authority in § 1B1.7, and made policy statements to totally implement a new structure to the guidelines, and commentary notes to expand guidelines, both with binding authority upon the courts. Congress cannot constitutionally shed this responsibility and authority on the Commission without running afoul of the Constitution's Fifth and Tenth Amendments requiring a defendant to have a binding sentence implemented by an act of Congress. It appears that the Commission has declared itself sole authority by reflexive court deference for implementations of these sentences. See Pereira v. Sessions, 201 L.Ed. 2d 433, 453-54 (2018). Explaining the guidelines definition and expanding the guideline definition are two entirely different actions by Commentary Note 1 to §§ 4B1.2(a)(explaining) and 4B1.2(b)(expanding).

Although the guidelines are now advisory, the Commentary Note does not allow for court discretion to be used in calculating inchoate offenses, which is contrary to the holding in United States v. Booker, 543 U.S. 220 (2005).

29

Seminole Rock deference cannot be given to U.S.S.G. § 4B1.2(b). The Commentary Note 1 to § 4B1.2 does not seek to explain the guideline, interpret or explain its application. The Commission made its own amendment to the plain guideline definition contrary to their own policy statement in § 1B1.7 on the grounds that inchoate offenses were not in the language of the guideline definition or 28 U.S.C. § 994(h) for career offender application of § 4B1.1. In short, the commentary can explain a guideline, but it cannot change it.

In Kisor v Wilkie, 139 S. Ct. 2400 (2019), the Supreme Court reaffirmed the doctrine of Auer Deference for an agency's interpretation of its own rules. Rather, "a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." Id. (citing Christopher v. Smithkline Beecham Corp., 567 U.S. 142, 155 (2012). Deference is also '"unwarranted"' "when a court conclusion that an interpretation does not reflect an agency's authoritative, expertise-based 'fair, [or] considered judgment.'" Kisor, 139 S. Ct. at 2414 (quoting Smithkline, Corp., 567 U.S. at 155. Deference is therefore not appropriate where the regulatory interpretation is not "the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views," 139 S. Ct. at 2416 (quoting United States v. Mead Corp., 533 U.S. 218, 257-59 (2001)(Scalia, J. dissenting)), does not "in some way implicate [the agency's] substantive expertise," 139 S. Ct. at 2417, or is a convenient post hoc rationalization to defend past agency action. See 139 S. Ct. at 2417. Without genuine uncertainty, deference "would 'permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation.'" Id. Seminole Rock, 325 U.S. at 414 (quoting Christensen v. Harris County, 529 U.S. 576, 588 (2000).

Last, courts afford agencies no deference in interpreting the Constitution. See United States v. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference . . . . [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991)).

Under U.S.S.G. § 4B1.1(a), a defendant qualifies as a "career offender" if (2) the instant offense "is a felony that is either a crime of violence or a controlled substance offense." Since Mr. Fiseku's 2017 sentencing for conspiracy to commit Hobbs Act robbery, the Supreme Courts decision's in Davis and Dimaya, and the Second Circuit's decision in Barrett, made clear that conspiracy to commit Hobbs Act robbery is no longer a crime of violence. Therefore, Mr. Fiseku's instant offense is neither a crime of violence nor a controlled substance offense to fit the criteria of a career offender as described in §§ 4B1.1(2) and 4B1.2(a).

As Mr. Fiseku has shown in the foregoing and there can be no dispute, the Sentencing Commission has added a substantive offense (here, the inchoate crime of conspiracy) to the relevant career offender Guideline through its commentary as opposed to the statutory prescribed channel to do so. "[C]ommentary, though important, must not be confused with gospel." United States v. Piper, 35 F.3d 611, 617 (1st Cir. 1994).

This Court should follow the Sixth and D.C. Circuit's lead and hold that Application Note 1's expansion of § 4B1.2(b) to include conspiracies and other inchoate crimes does not warrant deference, United States v. Crum, 934 F.3d 963, 966 (9th Cir. 2014)(explaining that § 4B1.2(b)'s definition "clearly excludes inchoate offenses" like attempt and conspiracy). Neither the government nor any circuit court to address the question has identified any "textual hook" in the guideline to anchor the addition of conspiracy offenses. See Soto-Rivera, 811 F.3d at 60.

If the Sentencing Commission wanted to give § 4B1.2(b) a more expansive interpretation, it had obvious alternatives at its disposal that would not have required straining the guideline's words past their breaking point. See Winstead, 890 F.3d at 1091.

As the Supreme Court recently clarifies, a court's duty to interpret the law requires it to "exhaust all 'traditional tools' of construction" "in all the ways it would if it had no agency to fall back on" before it defers to an agency's "policy-laden choice" between two reasonable readings of a rule. Kisor, 139 S. Ct. at 2415. This Court could not "bring all [its] interpretative tools to bear" on the text of § 4B1.2(a) and still find that conspiracies are ["crimes of violence"] as the guidelines defines them." Id. at 2423.

By Relying on commentary to expand the list of crimes that trigger career offender status, which may well lead judges to sentence many people to prison for longer than they would otherwise deem necessary (as the judge has done in this case), raises troubling implications for due process, checks and balances, and the rule of law. The Sentencing Commission is an unelected body that exercises "quasi-legislative power" and (unlike most other agencies) is located within the judicial branch. Mistretta v. United States, 488 U.S. 361, 393 (1989). Thus, it can only promulgate binding guidelines, which influence criminal statutes, because they must pass two checks: congressional review and "the notice and comment requirements of the Administrative Procedure Act." Havis, 927 F.3d at 385 (citing Mistretta, 488 at 394).

"Unlike the Guidelines themselves, however, commentary to the Guidelines never passes through the gauntlets of congressional review or notice and comment." Id. at 386. Thus, the same principles that require courts to ensure that agencies do not amend unambiguous regulations in the guise of "interpretation" ("without ever paying the procedural cost"), Kisor, 139 S. Ct. at 2420-21, apply with equal force (if not more) force to the Sentencing Guidelines and their commentary. Id. If it were otherwise, the Sentencing Commission would be empowered as a Trojan horse for rulemaking. Havis, 927 F.3d at 386-87.

This is surely not meant to do, especially when the consequences is the deprivation of individual liberty. See Winstead, 890 F.3d at 1092 ("This is all more troubling given that the Sentencing Commission wields the authority to dispense 'significant, legally binding prescriptions governing application of governmental power against individuals -- indeed, application of the ultimate governmental power, short of capital punishment.'" (quoting Mistretta, 488 U.S. at 413 (Scalia, J., dissenting))). The Sentencing Guidelines are no place for a short cut around the due process guaranteed to criminal defendants. If it so desires, the Sentencing Commission should expand the definition of crimes of violence to add conspiracies by amending the text of §§ 4B1.1(a), 4B1.2(a) and (b) through the statutorily prescribed rulemaking process. See 28 U.S.C. § 994(h), (p), (x).

As can be seen by the circuit court's split on the relationship between § 4B1.2 and Application Note 1 suggests the underlying question is close. There is plainly subsequent contrary authority on the question

at hand.  The Second Circuit's decision in Tabb was based on the guidelines before the residual clause was removed and before Davis and Barrett were decided.  Without the residual clause there is simply no mechanism or textual hook in the guideline that would allow the Court to import offenses not specifically listed therein into § 4B1.2's definition of "crime of violence."  Especially in Mr. Fiseku's case where no robbery actually took place.

Since the statute included only substantive offenses, but neither conspiracy nor attempt, this Court should invalidate  Application Note 1's inclusion of inchoate offenses as conspiracy to commit robbery and hold that Note 1 could not support Mr. Fiseku's sentence as a career offender because it is not supported by the statutory text it was grounded on.  Listing the crime of conspiracy in the commentary does more than interpret or explain the Guidelines text and instead adds an entirely new offense to the "crimes of violence" definition.  See Stinson, 508 U.S. at 38.  Because the commentary is plainly inconsistent with the text of the Guidelines, the commentary's inclusion of conspiracy cannot be used to find that a defendant meets the criteria for a prior conviction enhancement for a "crime of violence."  And, given the elimination of the residual clause and the Supreme Court's precedent in Davis, this Court cannot rely on the commentary to expand the list of enumerated offenses when it is plainly inconsistent with the text and designate Mr. Fiseku as a "career offender."

As an alternative, This Court can exercise its discretion to vary downwardly from Mr. Fiseku's 108 month sentence and thereby disagree with the commentary's inclusion of conpsiracy as a predicate offense on policy grounds.  Under Kimbrough v. United States, district courts have discretion to vary downwardly from a sentence on the basis of a policy disagreement with the relevant guidelines.  522 U.S. 85, 109-10 (2007).  In the interest of justice, Mr. Fiseku's sentencing enhancement based on career offender must be corrected.

Considering any one of the foregoing issues, Mr. Fiseku's current offense of conviction in this case, conspiracy to commit Hobbs Act robbery, is no longer a basis for a career offender finding.  Had Mr. Fiseku's Guideline range been determined without the career offender section or was calculated now, his offense level would be 21 and his Criminal History Category V with a Guideline range of 70-87 months.

33

Though the law has changed as to violent offenses and career offender, Mr. Fiseku is not eligible on that basis alone to be resentenced because the change just effected his Guideline calculations.

Since Davis and Barrett are not retroactive as to Guideline calculations, for Mr. Fiseku to be resentenced, another means is required. That Mr. Fiseku will not be released until February 2023 because he did not plead to a § 924(c) count that would have entitled him to be resentenced not as a career offender is simply not just. Fortunately, 18 U.S.C. § 3582(c)(1)(A)(i) of the First Step Act, now permits him to be resentenced and released.

5. Mr. Fiseku's Waiver of His Right to Collaterally
   Attack His Sentence is Unenforceable

On November 18, 2016, Mr. Fiseku pled guilty. Mr. Fiseku agreed not to file an appeal or otherwise challenge his sentence by petition pursuant to 28 U.S.C. § 2255 and 18 U.S.C. §3582, unless the Court imposed a sentence above 151-188 months. in exchange, the Government agreed it would move to dismiss the § 924(c) count.

Mr. Fiseku was sentenced on April 12, 2017 for conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a). In United States v. Davis, 139 S. Ct. 2319 (2019), the Supreme Court ruled that Section 924(c)'s residual clause was unconstitutionally vague, so that the Government could not rely on a Hobbs Act robbery conspiracy as a predicate crime of violence to obtain heightened criminal penalties under that provision. Id. at 2336. Subsequent to Davis, the Second Circuit held in United States v. Barrett, 937 F.3d 126 (2d Cir. 2019) that conspiracy to commit Hobbs Act robbery is not categorically a crime of violence and therefore cannot support a conviction under the elements clause. Id. at 30. Consequently, it is settled law that defendants may no longer be found guilty for the predicate act of conspiracy supporting a § 924(c) conviction. Conspiracy is no longer an offense as a "crime of violence."

Based on Mr. Fiseku's Hobbs Act robbery conspiracy no longer being a crime of violence, this Court can find that Mr. Fiseku's appeal waiver is not enforceable under the circumstances. Although the law "is now well established that a knowing and voluntary waiver of the right to appeal is generally enforceable." United States v. Hernandez, 242 F.3d 110, 113 (2d Cir. 2001). However, the Second Circuit has found

that a defendant may have a valid claim that a waiver is unenforceable under certain enumerated circumstances. See Sanford v. United States, 841 F.3d 578, 580 (2d Cir. 2016). In light of Davis and Barrett, Mr. Fiseku's sentence as a career offender based on conspiracy to robbery is based on a constitutionally impermissible factor and statute. It can not be disputed that after Mr. Fiseku was sentenced, the Supreme Court applied the doctrine of vagueness to two statutes resembling § 924(c)(3)(B)'s residual clause, United States v. Dimaya, 138 S. Ct. 1204 (2018), and Davis, 139 S. Ct. 2335 (2019). These arguments were not available to Mr. Fiseku at the time of his 2017 sentencing.

Here, Mr. Fiseku contends that he is "actually innocent" of his sentence as a career offender. After Davis, and Barrett, it is clear that his conspiracy to commit robbery conviction is not a predicate conviction for career offender status. For several of the issues addressed above, Mr. Fiseku also claims that he is actually innocent of being a career offender because under his prior convictions, before the 2007 amendment to § 4B1.2(a)(2), his two prior convictions should've been treated as related, rather than separate offenses.

In United States v. Maybeck, 23 F.3d 888, 890-91 (4th Cir. 1994), the sentencing court determined Maybeck's prior conviction for burglary was a crime of violence based on a mischaracterization in his presentencing interview. In fact, his prior conviction was for third-degree burglary, not armed burglary. The Fourth Circuit concluded that "[t]here is no question . . . Maybeck [was] actually innocent of being a career offender" because "Maybeck has only one prior felony conviction that was a crime of violence." Id. at 892 (footnote omitted). See Alaimalo v. United States, 645 F.3d 1042, 1047 (9th Cir. 2011)(petitioner showed actual innocence where statute of conviction was subsequently interpreted not to reach petitioner's conduct).

In this case, Mr. Fiseku's claim of actual innocence is based on retroactive change of law. His conviction is not a conviction for a predicate crime, and thus, he is actually innocent of the mandatory sentencing enhancement. Here, the statutory basis for Mr. Fiseku's career offender conviction no longer exists. See Boykin v. United States, 2020 U.S. Dist. LEXIS 27317 (S.D.N.Y. Feb. 18, 2020)("Since the Supreme Court held that § 924(c)(3)(B) [the 'risk of force clause'] is unconstitutionally vague, a predicate

crime qualifies as a 'crime of violence' only if it falls under the force clause, § 924(c)(3)(A);  924(c)(3)(B) has been effectively stricken from the statute.").

"A violation of a fundamental right warrants voiding an appellate waiver." United States v. Riggi, 649 F.3d 143, 147 (2d Cir. 2010).  Accordingly, the Court can find that Mr. Fiseku's appellate waiver is not enforceable.  See Bonilla v. United States, 2020 U.S. Dist. LEXIS 15896, 2020 WL 489573, * at 3 (E.D.N.Y. Jan. 29, 2020)(finding that a defendant's "waiver of appealability is not enforceable" against a Davis challenge);  Leyones v. United States, 2018 U.S. Dist. LEXIS 28729, 2018 WL 1033245, at *2-2 (E.D.N.Y. Feb. 22, 2018)(expressing "serious doubts" that "an appellate or collateral review [is] enforceable to bar a petitioner's claim that a newly announced constitutional rule warrants vacating his criminal conviction");  In re Hammoud, 931 F.3d 1032, 1041 (11th Cir. 2019)(allowing a defendant that signed an appeal waiver to challenge his sentence under 28 U.S.C. § 2255 based on the Supreme Court's ruling in Davis).

## 6. COVID-19

The unprecedented threat of COVID-19 could not have been foreseen by the Court at the time of Mr. Fiseku's 2017 sentencing, and poses extraordinary risks to Mr. Fiseku's health.  Courts in New York have previously recognized the "health characteristics that place an individual at an elevated risk of serious illness or death from COVID-19 can constitute extraordinary and compelling circumstances in the context of the current pandemic." United States v. Lockhart, 11-CR-231 (SJ), ECF 67 (E.D.N.Y. July 27, 2020).

The Centers for Disease Control ("CDC") offers a list of specific medical conditions that place people at an increased risk of severe illness from COVID-19.  One such condition is obesity (Body Mass Index [BMI] of 30 or higher).  As for age, the CDC graphically describes how age correlates with risk.  Mr. Fiseku is 49 years old and suffers from obesity.  He has a BMI of 31.  Mr. Fiseku's obesity significantly increases his risk of becoming severely ill and of dying should he contract the Coronavirus.  "Obesity may be one of the most important predictors of severe coronavirus illness . . . the new study points to the condition in and of itself as the most significant risk factor, after only older age, for being hospitalized

36

with COVID-19," Roni Caryn Rabin, Obesity Linked to Severe Coronavirus Disease, Especially for

Younger Patients, The New York Times (April 16, 2020). Available at:

http://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-risk.html.

Mr. Fiseku's obesity would make it more difficult to treat him, should he contract the coronavirus.

"The extra weight on people in the 40-plus BMI range who contract COVID-19 increases the chance they

will require hospitalization, most likely in the intensive case unit. It also hampers the ability of

physicians to treat them, especially with ventilators, doctors say . . . The severity of the disease increased

along with BMI. Along with making mechanical ventilation harder, being severely overweight can make

it harder to breath, which reduces the patient's own ventilation, said Dr. Kevin Kavanagh, a Kentucky

physician and founder of the patient advocacy group Health Watch USA," Jayne O'Donnell, Obesity

Boosts COVID-19 Risks, Challenges, USA Today, p. 3D (June 4, 2020).

See United States v. Catanzarite, 2020 WL 2786927, at *4 (D. N.J. May 29, 2020)("The competing

arguments and sources presented by the parties demonstrates that the relationship between hypertension,

obesity, and elevated risk from COVID-19 is not fully understood. A review of applicable COVID-19

case law similarly reveals varying information about defendants who suffer from hypertension and/or

obesity."). See also, Safiya Richardson, et al., Presenting Characteristics, Comorbidities, and Outcomes

Among 5700 Patients Hospitalized with COVID-19 in the New York City Area. The Journal of the

American Medical Association, April 22, 2020 (finding that among patients hospitalized in New York

City, "[t]he most common comorbidities were hypertension (3026; 56.6%), obesity (1737; 41.7%), and

diabetes (1808; 33.8%). Available at: https://jamanetwork.com/journals/jama/full article/2765184.

Courts have found that the Coronavirus pandemic presents extraordinary and compelling reasons for

Compassionate Release, particularly for inmates, who, like Mr. Fiseku, face heightened risk of getting

severely ill and of dying from the disease. "The COVID-19 situation in BOP facilities places some

inmates at a heightened risk of developing serious complications in the event of exposure. A 'once-in-a-

century pandemic' is an 'extraordinary and compelling' circumstance." United States v. Rainone, 2020

U.S.Dist. LEXIS 112784 (N.D. Ill. June 19, 2020); see United States v. Zukerman, 2020 U.S. Dist.

LEXIS 59588 (extraordinary and compelling reasons where defendant is 75 and has diabetes and obesity);

see also, United States v. Gonzales, 2020 U.S. Dist. LEXIS 93231 (S.D.N.Y. May 28, 2020), 45 year old

defendant's sentence of 14 years was reduced to time served where he was at heightened risk from

Coronavirus due to obesity, and where he served over 8 years in prison. Gonzales was released from FCI

Schuylkill).

The CDC has recently updated its guidance.  Whereas before the CDC advised that persons faced a

greater risk from Coronavirus when they had turned 65, the CDC now cautions that "[a]s you get older,

your risk for severe illness from COVID-19 increases.  For example, people in their 50's are at higher risk

for severe illness than people in their 40's."  Older Adults, CDC.gov.  Available at:

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (visited on June 30,

2020).

The BOP has been on a modified schedule, at one point for months equivalent to the SHU conditions,

which for the past six months Mr. Fiseku had been confined to a cell for 24 or 23 hours a day and now is

confined to the unit with outside recreation for one hour per week, weather permitting.  These harsh

conditions do not help with his obesity.  It has actually worsened this medical condition since he has less

of an opportunity to exercise during this pandemic.

The FCI Schuylkill facility went on complete lockdown March 1, 2020.  Since then the prison

schedule has been on modified lockdown.  Mr. Fiseku has spent six months stuck inside the cell or unit

while our country was in a state of emergency.  This Court, when sentencing him, did not anticipate or

intend for him to serve a portion of his sentence in lockdown under these harsh conditions, or in a manner

that would jeopardize his health or life.  He lives in constant fear that he might contract the deadly virus

that seems to kill people with his condition at a alarmingly high rate.  In December 2019, a flu outbreak

had sweep through FCI Schuylkill infecting staff and inmates.  Mr. Fiseku was sick for months due to this

outbreak which shows the rapid rate of how quickly the entire prison population became infected.  He was

placed on medication due to this outbreak.  See United States v. Rodriquez, No. 03-CR-271 (AB), 2020

U.S. Dist. LEXIS 58718, *33 (E.D. Pa. April 1, 2020)(granting compassionate release after finding that

38

defendant was at a high-risk were he to contract COVID-19, had served a lion share of his sentence, and the original sentence did not include "incurring a great and unforeseen risk of severe illness or death").

These harsh prison conditions Mr. Fiseku has endured for the past six months, unable to speak regularly with family members, no social visits, in which he has to worry about the health of his children, wife, who is a single mother, and his mother, have placed a lot of stress on him. This Court sentenced Mr. Fiseku under § 3553(a) factors in which the BOP would provide educational and vocational training, medical treatment if necessary, and rehabilitative programming. During this modified lockdown the BOP has failed to provide any vocational or educational training. He has been unable to program or exercise to maintain his health. Due to these lockdown conditions he has been unable to maintain his family bonds with his children and family due to limited phone call privileges and no social visitation for 6 months already.

The BOP seems so consumed with damage control it has demonstrated no actual effort to ameliorate these harsh effects of lockdown within lockdown on BOP inmates. One would think by the sixth month of this COVID-19 crisis, the BOP would have found creative solutions to easing the inmates suffering expected under lockdown. For example, one might have expected the swift establishment of relief from the deprivation of social visiting and programming -- by pivoting to Zoom or video, like the rest of the world. There is no shortage in technology and security industries for high tech solutions for the prisons. Many companies are successfully providing safe ways for inmates to interact with their families and engage in educational self-improvement. Indeed, in the State of Pennsylvania alone, prison officials proudly announced having provided over 100,000 remote social visits for inmates by video, among other creative initiatives. See e.g., Video Visitation Program, Pennsylvania Department of Corrections, accessed at:

https://www.cor.pa.gov/family-and-friends/pages/Video-Visitation.aspv.

Before the recent coronavirus lockdown, Mr. Fiseku enjoyed daily phone calls and in-person visits. Appended to this motion is a letter from his wife Fahreta Fiseku. (See Exhibit "F"). She reports that he has grown as a person over the last five years; he is remorseful for his past transgressions and positive

about his future.  His wife is a single mother.  Mr. Fiseku's children live with her now and it is hard for

her to seek employment because the schools and day cares are closed.  The family is in financial ruins and

the boys need their father.  Mr. Fiseku and his wife will be residing with his mother and his two sons if he

is released and has employment established with and ex-employer upon his release.  (See Exhibit "F").

Mr. Fiseku has no disciplinary record, which can be seen in his Re-Entry Plan (See Exhibit "G").

Most recently, Mr. Fiseku has completed a 12-hour Drug Abuse Education Course; Non-Residential Drug

Abuse Program; 16-hour Reach One, Teach One course; 25-hour 7 Habits on the Inside course; Stress

Management course; Creative Writing classes; and, 15 health classes.  Some of these courses are

evidence-based recidivism reduction programs.  As mentioned above rehabilitative programming has

since been suspended in light of the on-going pandemic.

Mr. Fiseku has an exceptional low risk of recidivism.  (See Exhibit "I" - BOP PATTERN Score).  In

accordance with the FSA, all inmates in the BOP have received an initial assessment using the

Department of Justice's risk and needs assessment called PATTERN.  The tool is designed to measure

risk of recidivism of inmates, and classify each prisoner as having minimum, low, medium or high risk of

recidivism, and access, determine, and predict the risk of misconduct of each inmate.  Mr. Fiseku has

been scored in the LOW risk category.  At this time his security level is classified "medium."

Under 18 U.S.C. § 3553(a)(2)(D) shows that additional incarceration is not necessary to provide Mr.

Fiseku with more education, vocational training or medical care.  In the five years he has been

incarcerated thus far, the programs listed above show he has met those goals and two years longer of

incarceration will not further any possible goals in these areas.  Quite contrary, Mr. Fiseku's many hours

of programming has helped prepare him for release.

Mr. Fiseku respectfully urges the Court to consider the fact that he has made positive use of his time in

prison and made efforts to come to terms with his criminal conduct.  He has maintained a clean

disciplinary record which demonstrates he has achieved goals that would serve as the measure of

rehabilitation, which is a goal for imprisonment and punishment.  As additional evidence of Mr. Fiseku's

efforts he submits his Re-Entry Plan which shows his accomplished programming evidencing his efforts to make productive use of his time while imprisoned. (see Exhibit "G").

Notwithstanding these harsh conditions of confinement, Mr. Fiseku has maintained an extraordinary outlook and attitude and has sought to improve himself to the utmost extent possible. The coursework demonstrates that his sentence, as served, has fulfilled § 3553(a)(2)(D)'s goal of providing the defendant with "needed educational or vocational training."

The rehabilitation evidence shows that Mr. Fiseku has a viable re-entry plan, having secured both a residence and a promise of future lawful employment, and that this reduces his likelihood of recidivism and mitigates the danger he might pose to the community. It also supports § 3553(a)(2)'s goals of providing "adequate deterrence" and protecting the public from "further crimes of the defendant" by minimizing his choice of recidivism.

The district court in United States v. Bannister, 786 F. Supp. 2d 617, 659 (E.D.N.Y. April 8, 2011), has noted that "[p]rograms such as these for basic education and vocational training reduce recidivism by 8 to 15 percent." Mr. Fiseku has been continuously employed during his entire incarceration. He is currently a unit orderly and receives satisfactory work reports. (See BOP Re-Entry Plan, Exhibit " ").

A report published by the United States Department of Justice, Office of Inspector General concluded that inmates 50 years and older "are generally less of a public safety threat" and that the rate of recidivism among this cohort is "significantly lower" than the re-arrest rate for all federal inmates. Office of Inspector General, The Impact on an Aging Inmate Population in the Federal Bureau of Prisons at iii. Available at: https://oig.justice.gov/reports/2015/e1505.pdf. The report also found that the re-arrest of inmates within this cohort generally declined even further as their age progressed. Id. at 51 (finding that inmates 50 years and older "cost[] 8 percent more to incarcerate than a younger inmate due in large part to increased medical needs."

"Recidivism rates decline continuously as age increases." U.S.S.G., Measuring Recidivism: The Criminal History Computation of Federal Sentencing Guidelines. at 12. See https://www.ussc.gov/publicat/recidivism/general.pdf. "Generally, the younger, the more likely the

offender recidivates." Id. Recidivism declines precipitously after 50 years of age.  As the Commission had determined: "Among all offenders under age 21, the recidivism rate is 35.5% while offenders over the age 50 have a recidivism rate of 9.5." Id.  Such statistics have been acknowledged by federal courts.  In United States v. Nellum, 2013 WL 300073 (N.D. Ind. Feb. 3, 2005), the district court observed that:  The positive correlation between age and recidivism is impossible to deny . . . . One can only reasonably assume that the trend of decreasing recidivism continues downward after the age of 50.  Under the guidelines, the age of the offender is not ordinarily relevant in determining the sentence, see § 5H1.1.  But under § 3553(a)(2)(6) age of the offender is plainly relevant to the issue of "protect[ing] the public from further crimes of the defendant." Id. At *3 (sentencing defendant to 108 months, 60 less than the 168 minimal guideline range).

Mr. Fiseku's clean institutional record and efforts to rehabilitate himself shows there is nothing to gain by having him spend two more years of his life in prison.  It is not worth spending §36,000 per year to continue his incarceration, which is a waste of resources, both human and financial, and no longer serves its purpose.

The relevant length of remaining portion of Mr. Fiseku's sentence is relevant under § 3553 for sentencing factors.  At this time, Mr. Fiseku has served over 60 months on his 108 months sentence.  He is due to be released in two years.  Put differently he has roughly served 70% of his initial sentence and 30% of his projected sentence remaining, without counting his projected release date to go to a halfway house would be six months earlier.

Throughout this pandemic, courts have released inmates with remaining years and percentages on their sentences comparable to and in excess of the remaining portion of Mr. Fiseku's sentence.  See, e.g., United States v. Valencia, 2020 WL 2319323 (S.D.N.Y. May 11, 2020)(roughly 3 years remaining on initial 10-year sentence (30%) and same period remaining until projected release date (30%);  United States v. Delgado, 2020 WL 246485 (D. Conn. Apr. 30, 2020)(obesity and sleep apnea; roughly 7.5 years remaining on initial 10-year sentence (75%) of same period remaining until projected release date (75%));  Williams-Bethea, 2020 WL 284898 (age 50, hypertension and obesity; 29 months remaining on initial 40-

month sentence (73%) and 23 months until projected release date (68%));  Harrell v. United States, 2020 WL 2768883 (E.D. Mich. May 28, 2020)(8 years remaining on 15 year sentence (53%) and 6 years until projected release date (46%));  United States v. Brannan, 2020 WL 1698392 (S.D. Tex. Apr. 2, 2020)(age 66; 2 years remaining on 3 year sentence (67%) and same period remaining until projected release date (67%));  United States v. Guzman, 2020 WL 2781713 (N.D. Ill. May 28, 2020)(age 67, roughly half of initial 12.5 year sentence remaining (50%) and 4 years until projected release date (40%)); United States v. Echevarria, 2020 WL 2113604 (D. Conn. May 4, 2020)(age 48, asthma, FCI Allenwood (no reported cases); 39 months remaining on initial 48 month sentence (81%));  United States v. Foreman 2020 WL 2315908 (age 58, obesity (but not severe obesity as defined by CDC; 9.5 months remaining on 1-year sentence (80%));  United States v. Gonzales, 2020 WL 2766048 (obesity, but not "severe" obesity as defined by CDC, FCI Schuylkill (no reported cases), roughly 5.5 years remaining on initial 14 year sentence (40%) and roughly 3.5 years remaining until projected release date (30%)).

Both remaining number of years and the remaining percentage of a sentence are potentially relevant under the § 3553 sentencing factors in a compassionate release context.  But in the context of a sentence like Mr. Fiseku's, the Court can find the remaining percentage to be more instructive, as a percentage calculation factors in the significant amount of time Mr. Fiseku has already served.  Employing similar logic in the context of assessing § 3553 factors, numerous courts have released inmates who had served more than half of their initial sentences of significant length.  See e.g., United States v. Goins, 2020 WL 3064452, at *7 (noting in releasing inmate who had served 8 years of an initial 13-year sentence that "[h]e has served over 65% of the sentence formally imposed . . . and over 85% of the time in custody that the parties intended him to serve.  He has already suffered meaningful and substantial punishment for his crimes . . . In addition, releasing Goins is consistent with the goal of deterrence.  The substantial period of custody that Goins has served is sufficient to deter him from committing future offenses.");  In United States v. Acoff, 2020 WL 2781798, at *3 (D. Conn. May 29, 2020)(noting in releasing inmate with about 40 months remaining on a 96-month sentence (42%) and roughly two years remaining until his projected release date (30%), given that he has already served more than half of his sentence . . . requiring further

prison time is not worth the risk of serious harm or death that it entails");  Gonzalez, 2020 WL 2766048, at *1 (noting in releasing inmate with 5.5 years remaining on a 14-year sentence (40%) and roughly 3.5 years remaining until his projected release date (30%) that "[h]e has already served more than eight years in prison" and "the time he has served in prison has already achieved much of the original sentence's retributive, deterrent, and incapacitated purpose");  United States v. Malone, 2020 WL 3065905, at *7 (W.D. La. June 9, 2020)(noting in releasing inmate with roughly 4.4 years remaining on a 9.75 year sentence (45%) and three years remaining on his projected release date (35%), that "[t]he time he has already served in prison has achieved much of the original sentence's purpose in terms of reflecting the seriousness of the offense, promoting respect for law, providing just punishment, and providing a deterrent effect.  A reduction in his sentence will not override the punishment he has already been subjected to, nor will it eradicate the effects of the Court's original sentence").

Over the past five years, Mr. Fiseku has grown both older and wiser.  He is almost 50 years old and naturally aging out of crime.  See U.S. Dep't of Justice, Nat'l Inst. of Justice, Five Things about Deterrence (May 2016) at 2 ("the data shows a deep decline at about age 35.  A more severe (i.e., lengthy) prison sentence for convicted individuals who are naturally aging out of crime does not achieve the goals of punishment and incapacitation."), https://bit.ly/2ltgkmu.  Mr. Fiseku has demonstrated, through his good conduct and engagement with the BOP skills and anti-recidivism programming over the past 60 months, that he is rehabilitated and committed to earning an honest living upon his release.  Cf. United States v. Millan, No. 91 Cr. 685 (LAP), 2020 WL 1674058 (S.D.N.Y. Apr. 6, 2019)(granting compassionate release to 57-year-old-man who has served 28 years of a life sentence based on his extraordinary rehabilitation).

(i) COVID-19 In Prisons
   Accommodations by BOP Are Insufficient to Address
   Increased Risk to Inmates Compared to Free Population

Prisons counter that they have COVID-19 under control because they are providing inmates masks, quarantining inmates to cells, limiting social contact, etc.  But they cannot change the very nature of prisons "crowded, with shared sleeping spaces and common areas, and often with limited access to

medical assistance and hygienic products." See, e.g., United States v. Zoquier-Solano, 13-CR-772, Doc. 45 (S.D.N.Y.)(JPO), citing United States v. Park, No. 16-CR-473, 2020 WL 1970603, at *2 (S.D.N.Y. Apr, 24, 2020). Not surprisingly, the death rate for inmates exceeds that of the free population despite accommodations of the BOP for the virus. A recent report published in the Journal of the American Medical Association shows that the COVID-19 death rate for prisoners has been 5.5 times higher than the U.S. Population case rate of 587 per 100,000. Saloner B, Parish K, Ward JA, DiLaura G, Dolovich S. COVID-19 Cases and Deaths in Federal and State Prisons. JAMA. 202; 324(6): 602 603 (Published July 8, 2020).

Inmates are given no say over the steady movement of people around them. They have no choices over the level of personal protective equipment to wear, the air they breathe, and limited choices regarding exercise and diet routines, all of which would be core themes of counseling for free people suffering from these conditions in order to increase the quality and quantity of their life.

The BOP will certainly argue, as the Warden did in his denial for Mr. Fiseku's request for compassionate release, that inmates need not worry because there were currently no case of COVID-19 outbreak in the prison. The obvious reason to that is: not yet. One can easily see how this plays out by a viewing of the BOP website "COVID-19" page. According to the BOP webpage, On August 24, 2020, FCI Schuylkill had 5 COVID-19 cases (all staff members), and then on August 25, 2020, it listed none. (See Figure 1, Data from August 10, 2020 and then Figure 2.1 Data from August 10, 2020, from bop.gov/covid). Crediting the August 24, 2020 entry of 5 active cases this is 5 times more than the same website listed for FCI Schuylkill on August 10, 2020, at that time they listed only 1 case (staff). Recently in September, a staff member came to work at FCI Schuylkill Special Housing Unit ("SHU") knowingly infected with coronavirus. The prison had to test every inmate and staff in the SHU that may have come in contact with this officer. This infected staff member(s) are not listed in their website. Another inmate recently self-surrendered at FCI Schuylkill after testing positive for COVID-19. He was eventually quarantined.

Many courts have confronted and rejected the arguments that the compassionate release eligibility depends upon whether the particular prison involved has yet had a major outbreak.  See United States v. Peters, 2020 WL 2092617, at *4 (D. Conn. May 1, 2020)(ordering defendant's release from FCI Schuylkill);  United States v. Roundtree, 2020 WL 2610923, at *7 (N.D.N.Y. 2020)(same, FCI Schuylkill);  United States v, Gonzales, 2020 U.S. Dist. LEXIS 93231 (S.D.N.Y. May 28, 2020)(same, FCI Schylkill);  United States v. Cromwell, No. 16-CR-107 (D. R.I. August 2020)(same, FCI Schuylkill);  United States v. Prado, No. 13-CR-00811(ALC)(S.D.N.Y. May 2020)(same, FCI Schuylkill);  United States v. Olivas, No. 07-Cr-10009(JTM),(D. Kan. August 2020)(same, FCI Schuylkill);  United States v. Gileno, No. 19-Cr-161 (VAB), 2020 WL 1916773 (D. Conn. Apr. 20, 2020)(same, FCI Schuylkill);  United States v. Hansen, 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020)(granting compassionate release even where no reported COVID-19 cases at defendant's facility);  United States v. Echevarria, 2020 WL 2113604, at *2 (D. Conn. May 4, 2020)(ordering defendant released from FCI Allenwood, which at the time had reported no cases of COVID-19).

Importantly, the numbers at FCI Schuylkill is only part of the story.  Just across the Susquehanna River, sits USP Lewisburg, and just an hour's drive from Lewisburg on Interstate 81 sits FCI Loretto. Using the August 10, 2020 date as a reference point, we see that on that date USP Lewisburg had 23 active cases and FCI Loretto had 42 active cases.

In the two weeks since August 10, 2020, the numbers at these facilities neighboring FCI Schuylkill have risen:  with some 24 state correctional institutions, 14 state community corrections centers, and 11 Bureau of Prisons facilities, the state of Pennsylvania Department of Corrections alone is the state of Pennsylvania's 15 largest employer.  Melamed, S., "can the Rural Prison Economy Survive the Era of Decarceration?" June 7, 2018, accessed at, https://www.inquirer.com/philly/news/pennsylvania/prison-industrial-complex-rural-pennsylvania-economy-philadelphia-incarceration-huntingdon-smithfield-20180607.html.  In a rural prison economy like this, the movement of staff and private contractors in and out of facilities must explain the spread of the virus among neighboring facilities, which leads inevitably to a breakout at FCI Schuylkill (which the August 24, 2020 numbers suggest).

In an affidavit from Mr. Fiseku, he avers that he comes into contact with staff all day long. Staff help prepare the meals and come to the units to deliver the meals and serve them three times a day; Staff bring the mail and periodicals; conduct sick call and pill line; other staff make rounds daily like psychology; chaplains; maintenance workers; commissary and laundry staff; dental and medical staff; recreation staff; unit team members; optometrist; Parole Board members and on Wednesday the executive staff come into the units. It is only these people who can bring the virus into the prison. All social visits have been cancelled 7 months ago. As of today, two inmates are presently in quarantine in the neighboring unit 3B. One inmate met with the Parole Board and was immediately quarantined. Another went to the outside hospital due to the inadequate medical care. Both of these inmates came in contact with these outside people, yet the same officers that were with the inmate and in contact with the same people, even closer, have not been quarantined. There is no way to avoid contact with staff. Once the virus enters the facility it will spread as the flu did in December/January. (See Exhibit "H").

In August 2020 the BOP had FCI Schuylkill converted a complete unit in the prison into a "quarantine hub" for inmates transferring in and from other prisons and jails in the Northeast regional area. Some are in-transit waiting to go to another facility, many are designated here and release into the general population. (Exh. "H"). Either way, the transit hub nature of a prison within a network of prisons within a prison industry state is an obvious danger. Mr. Fiseku is willing to proffer this testimony if called upon. He would describe all of the details listed in his sworn affidavit and provide additional information how staff are not always wearing masks and he has never seen anyone get a temperature check. In 7 months he was offered only three masks; hand sanitizer cannot be alcohol-based (which is the gold medical standard for hand sanitizers); Over 120 inmates are out of their cells at the same time and often none are wearing masks; out of necessity these inmates are "working out" in enclosed spaces without ventilation, and sweating and breathing heavily in unventilated, crowded areas, on top of one another, as antithical to health protocols. Inmates are running a barbershop right in the common area; Muslim inmates are congregating and conducting salat in large groups of 20-30 inmates, pressed together, numerous times a day in the common area. Thus, "[b]ecause inmates live in close quarters, there is an extraordinarily high

risk of accelerated transmission of COVID-19 within jails and prisons." Affidavit of Dr. Brie Williams, M.D., para. 7 (attached as Exhibit "E").

Mr. Fiseku urges the Court to seek to view the video surveillance footage of the units when they are operating with all of the inmates out of their cells, and you will see the "measures" taken by the BOP, insisting they are far outside health standard bounds as to be shocking. This information about FCI Schuylkill is also corroborated by findings made by a N.D.N.Y. district court judge, describing this very facility as being "self-evidently hazardous" to those with medical vulnerabilities. See United States v. Roundtree, 2020 WL 261093, at *8(N.D.N.Y. 2020). According to these findings at FCI Schuylkill "100 inmates live together in one building," share one water fountain, two phones, one ice machine, two hot water dispensers, and five computer terminals. Id. FCI Schuylkill inmates are described as sharing a communal TV room and communal bathrooms (sinks, urinals, showers and toilets). Id. The Court found that an inmate with a prison job had "frequent contact with 15 to 20 staff members" who gravitated in and out of the building putting inmates at risk because "the facility is no longer screening staff when they enter the complex for work." Id. Mr. Fiseku can show staff are not being tested because the week of September 1st, one infected staff member entered the facility and was working in the SHU.

As Dr. Williams explains, "[p]risons and jails are not actually isolated from our communities: Hundreds of thousands of correctional officers and correctional healthcare workers enter these facilities every day, returning to their families and to our communities at the end of their shifts, bringing back and forth to their families and neighbors and to incarcerated patients any exposure they have had during the day." (Exh. "E," para. 5). The rate of infection continues to climb in Pennsylvania. See John Hopkins University & Medicine Coroanvirus Resource Center U.S. Map, https://coronavirus.jhu.edu/us-map. Meanwhile county officials are "going rogue," and easing coronavirus restrictions against the order of Pennsylvania's governor. See Peter Hall, Schuylkill County tells governor it's going rogue, easing coronavirus restrictions without permission. The Morning Call (May 9, 2020), available at: https://bit.ly/3dGs1H8.

48

FCI Schuylkill correctional officer Jonathan Madonna, who is also president of the local union, Local 3020 of the American Federation of Government Employees, reported "that the prison is not equipped to deal with those potentially affected with coronavirus, placing the 292 staff members, including 125 corrections officers, at risk of contracting the disease . . . 'We don't have the medical resources to handle it' . . . He said personal protective equipment is scare and the BOP is not saying if or when any will become available. 'They're actually denying staff PPE, saying you don't need it.' Madonna said.  Those actions, he said, are in complete violation of the Centers for Disease Control and Prevention and the Federal Occupational Safety and Health Administration." Id.  The article disclosed that inmates were being transported from the Metropolitan Correctional Center ("MCC") in New York City to FCI Schuylkill despite having symptoms of the virus.  See Republican Herald article, dated May 23, 2020, by Frank Andruscavage, "Coronavirus Concerns At FCI Schuylkill, available at: https://www.republicanherald.com/coronavirus/coronavirus-concerns-at-fci-schuylkill-1.2610478 (last visted on June 10, 2020).  As a result of the threat of a COVID-19 outbreak because of inmates continuously being transferred to FCI Schuylkill and the prison staff being ill equipped to handle an outbreak, Jonathan Madonna retired.

Without question, the virus spreads faster through prisons than through the general population because inmates cannot practice social distancing.  "According to public health experts, social distancing measures are the most effective way to combat the rapid spread of COVID-19 and prevent illness ... 'Unfortunately, in the context of institutional confinement, social distancing can be nearly impossible to implement and follow, given the large number of inmates held together in crowded, closed facilities.  In light of this reality, courts around the country have recognized that the risk of COVID-19 to people held in jails and prisons 'is significantly higher than in the community, in terms of risks of transmission, exposure, and harm to individuals who become infected.'"  United States v. Williams, 2020 U.S. Dist. LEXIS 63824, at *3 - *5 (N.D. Fla. April 1, 2020)(internal citations omitted).  If there is only one prediction we can safely make about COVID-19, it is that, despite best efforts, it will spread in the prison environment.

(iii)  COVID-19 Has Worked Extraordinary and Compelling
       Hardship on Inmates During the Pandemic

There is more to the COVID-19 effect on the prison system than the actual physical experience and life-threatening dangers of contracting the virus.  We must not lose sight of the mental toll on the incarcerated population of living through a lockdown within a lockdown, all while helpless to direct one's own health care or to offer any comfort or protection to one's own family. What's worse is that when an inmate reports symptoms they are not taken to a medical facility, a hospital bed, or any other civilized isolation; rather, BOP places the inmate in the SHU solitary confinement.  See Bureau of Prison, BOP Implementing Modified Operations (May 28, 2020) (available at https://bit.ly/2Xzmsft) ("if the inmate has Covid-19 symptoms . . . . they will not be transferred and will instead be immediately placed in isolation").

Attorney General Barr acted decisively in March and April, 2020, directing that the BOP urgently use deincarceration as a means of ensuring safety for staff, inmates and communities.  Barr directed the BOP to use its "various statutory authorities to grant home confinement for inmates seeking transfers after considering the "totality of the circumstances for each individual inmate,"  including their "age and vulnerability . . . . to Covid-19."  Memorandum from AG Barr to Director of BOP, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (March 26, 2020) https://bit.ly/3jd0gtv.

The anecdotal experience of lawyers and inmates is that the BOP has simply ignored Barr's directive in the great majority of cases.  They have also failed to offer appropriate accommodations to prison staff, prompting lawsuits and labor actions and sending tensions enormously higher.  BOP staff have brought labor actions complaining of the inherent "super spreader" nature of the prison environment.  As one correction officer said in a sworn affidavit: the reasons officers "continue to work is because BOP did not want to give people paid administrative leave, even if they have Covid-19.  They were forcing people to use their sick leave or annual leave, which is already not enough leave time for many officers."  Chun v. Edge, No. 20-CV-1590 (E.D.N.Y. May 11, 2020).  Staff will continue to bring the virus in and out of facilities because officers worry "they won't get promotions or will experience other negative job

effects(retaliation)" if they stay at home. Id. The BOP has no system in place to perform contact-tracing. Corrections officers learn their colleagues are infected "through the grapevine." Id. The Chun case actually explains why a correctional guard came to work at FCI Schuylkill after knowing she was infected with the coronavirus, and officers will continue to come to work and risk infecting both staff and inmates.

III. The Criteria for Reassessing the Length of Mr. Fiseku's
Sentence Weighs Strongly in Favor of a Sentence Reduction

In determining whether Mr. Fiseku's sentence should be reduced, the Court must first make a determination that he "is not a danger to the safety of any person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). If he is not, the Court must look to the factors set out in 18 U.S.C. § 3553(a) to determine the appropriate sentence. As explained below all of the relevant factors weigh strongly in favor of granting the relief Mr. Fiseku seeks.

A. Mr. Fiseku Is Not A Danger or Threat to The Community

If Mr. Fiseku were released, he would not pose a danger to the community. As noted above, Mr. Fiseku is seven (7) months away from turning 50 years old and statistics show a major decrease in recidivism at age 50. While in prison Mr. Fiseku has worked tirelessly to turn himself into someone his family and children can be proud of. He has completed hundreds of hours of coursework demonstrating outstanding growth while in prison and his most recent BOP report indicates an impressively clean disciplinary record. He has demonstrated through his good conduct and engagement with BOP skills and anti-recidivism programming over the past 60 months that he is rehabilitated and committed to earning an honest living upon his release.

See United States v. Decator, No. 95-Cr-0202, 2020 WL 1676219, * 4 (D. Md. April 6, 2020)(summarizing defendant's post sentencing conduct, and stating that "[f]rom all accounts, Decator is a much different man today that he was when he participated in the armed bank robberies" of which he was convicted); See also, United States, v. Redd, No. 97-CR-00006, 2020 WL 1248493, ay *10 (E.D. Va. March 16, 2020)(granting motion to reduce sentence, and noting defendant's "demonstrated . . . commitment to self-improvement,: including "hundreds of hours [in] vocational programs, assisting

others in their rehabilitative efforts, exhibiting solid work habits," and other accomplishments);  United States v. Perez, 88-CR-10084, 2020 WL 1180719, at *3 (D. Kan. March 11, 2020)(granting motion for reduction of sentence, and noting that defendant had a relatively clean disciplinary record in prison, had gained his GED and availed himself of various educational programs, and stating that although the defendant's rehabilitation alone was not a sufficient reason for release, "his conduct while in prison combined with other facts and circumstances of his case shows that he poses no significant risk to public safety upon release.").

Mr. Fiseku has made extraordinary strides to become a good citizen, father and worker.  He is not a danger to the community nor to anyone else.  An additional 24 months in prison, and 18 months to half-way house confinement will not make him more prepared for release.  And, of course, he will be on supervised release for the next three years.  In addition, losing his father at a very young age, had left him with little guidance in his youth, as well as having an extraordinary and difficult and traumatic childhood. His wife is a single parent at this time and unable to seek employment since schools and day care are closed which also represents an extreme hardship showing that she needs Mr. Fiseku home to assist her with the children and his elderly mother.  looking at all of the stress he has endured, including the thoughts of becoming infected by the virus, it is surprising that he has made such great strides while incarcerated and is even more impressive when viewed in context with his background.

This Court, when sentencing Mr. Fiseku, did not anticipate or intend for him to serve a portion of this sentence on lockdown, or modified lockdown for over 7 months already, and in a manner that would jeopardize his health and life, and in fear that he might contract the deadly virus that seems to kill people with his conditions at alarmingly high rates.  See United States v. Rodriguez, No. 03-CR-271 (AB), 2020 U.S. Dist. LEXIS 58718, *33 (E.D. Pa. April 1, 2020) (granting compassionate release after finding that defendant was a high-risk were he to contract COVID-19, had served the lion share of his sentence, and the original sentence did not include "incurring a great and deadly unforeseen risk of severe illness or death").

In short, there is absolutely nothing to suggest that Mr. Fiseku would recidivate or otherwise present a threat to the community if he were released. He never actually committed the robbery in this case, so there is no victim, in fact he is also no threat to Christopher Bua who the government purported Mr. Fiseku conspired to rob. Mr. Bua just spent two years with Mr. Fiseku here in FCI Schuylkill where they became friends. In addition, Mr. Fiseku's record while in prison is a strong indicator that he is now a grown and mature man and naturally aging out of crime as he is likely to become a productive and valuable member of society if released.

IV CONCLUSION

For all of the foregoing reasons, the sentence imposed on Bekim Fiseku "no longer serves Legislative objectives," thus justifying relief under Section 3582. Millan, 2020 WL 1674058, at *5. We respectfully ask that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(ii) and release him to home confinement to be supervised by the Probation Department, or consider additional alternatives. In furtherance of this motion, we ask that the Court appoint counsel and schedule an evidentiary hearing at which Mr. Fiseku can be heard on the propriety of his claims and resentencing.

Dated: October 1, 2020

Respectfully submitted,

Bekim Fiseku, pro-se
Defendant - Movant
Fed. Reg. No. 59080-053
FCI Schuylkill
P.O. Box 759
Minersville, PA   17954

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,
      Respondent,

        V.                             Crim. Case. No. 15 Cr. 384 (PAE)

BEKIM FISEKU,
      Defendant/Movant
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# EXHIBITS

To Motion for Compassionate Release
Pursuant to 18 U.S.C. § 3582

October 1, 2020

BEKIM FISEKU, pro-se
Defendant/Movant
Fed. Reg. No. 59080-053
FCI Schuylkill
P.O. Box 759
Minersville, PA   17954

# EXHBIT INDEX

EXHIBIT

A - Application to Warden Scott Finley for Reduction
    in Sentence, dated April 6, 2020

B - Warden Finley's Denial of Application for Reduction
    in Sentence, dated April 14, 2020

C - Reconsideration to Warden Finley for Reduction
    in Sentence, dated June 1, 2020

D - Warden Finley's Second Denial for Reduction
    of Sentence, dated July 1, 2020

E - Affidavit of Dr. Brie Williams

F - Letter from Fahreta Fiseku

G - BOP Documents

H - Affidavit of Bekim Fiseku

I - BOP PATTERN Score

# EXHIBIT A

To: Scott Finley
Warden, FCI Schuylkill

From: Bekim Fiseku
Reg#: 590 80 053
Unit: 3A

Subj: Application for Compassionate Release

Dear Warden Finley:

This is my formal request for compassionate release pursuant to title 18 U.S.C. section 3582 (c)(1)(A), as amended by the First Step Act ("FSA"). See P.L. 115-391, 132 Stat. 5194 at section 603 (Dec. 21, 2018). In addition, I seek release under the Coronavirus Aid, Relief and Economic Security Act (the Cares Act), Section 12003 (b)(2).

Specifically, I seek a reduction to time served due to the heightened risk of death due to

(1)

y past struggles from the flu and the fact that

is impossible to practice "social distancing" and

her safety measures suggested by the C.D.C in

prison environment.

This request for compassionate release is

based on "extraordinary and compelling" circumstances

which could not reasonably have been forseen by the

court at the time of sentencing. In addition to the

First Step Act of 2018 see also BOP program

statement 5050.50.

I have two extraordinary circumstances,

considered together, justify a sentence reduction

under section 3582(c)(1):(#1), My recent battle with

the flu which caused a severe lung Infection that

...sted over 2 months and only started to heal

...ter recieving Prednazone by Schuylkill Medical

...aff which is a type of steroid that also suppresses

...e immune system. My health would seriously be

...pordized by the coronavirus which is said to be

...) to 10x more stressful on the body.

(#2) I have also served 5 yrs of my 9 yr

...ntence with around 2 yrs left to serve on thi

...ntence, and according to new case law I am no

...nger a Career Offender which would lower my

...uidelines calculation. In 5 yrs I have demonstrate

...y commitment to full Rehabilitation by adhering

...) all rules and regulations with respect towards

...aff with no disciplinary incidents and completion

all classes required of me and at almost 50
s old with two sons ages 6 and 5 yrs old I an
t a risk to recidivate and do not pose a threa
the public, such that no penological interest is
ved by my continued incarceration.

After pleading guilty to "Conspiracy to commit
obbs Act Robbery" I was sentenced as a Career
ffender to 108 months, under 4B1.1 of the Sentencing
uidelines. My Instant offense "Conspiracy to commit Hobbs
ct Robbery" was determined to be a "Crime of Violence
nder Application Note 4B1.2 of the commentary that
ctes " a crime of violence includes the offenses of
iding and abetting, conspiracy and attempting to
ommit such offenses.

(4)

was sentenced in April of 2017. My Instant

fense "Conspiracy to Commit Hobbs Act Robbery" should

t have been used to designate me as a ~~Caft~~ Career

fender. The Application Note to Section 4B1.2 was no:

it a mere "Interpretation" of the guidelines, but a:

tempt to actually change the plain text to add

offense not listed in the guideline. Commentary

the Guidelines is not law. The Commissions use of

mentary to add conspiracy crimes to the definitio

"Hobbs Act Robbery" just adds an offense not listee

the actual Guidelines. "The commentary to the

sidelines never passes through the Gauntlets of

ngressional review or notice and comment, and under

preme Court precedent - it has no independant legal

rce.

(5)

...ited States v Havis 927 F.3d at 386 (6th Cir. 2019) (Citing

...nson v. United States, 508 U.S. 36, 44-46 (1993)). Therefore,

...e U.S. Sentencing Commission stepped beyond the Congressional

...its by making "Conspiracy to Commit Hobbs Act Robbery"

...der USSG Section 4B1.2 cmt, application note 1, a crime

violence. My crime of conviction "Conspiracy to Commit

bbs Act Robbery" therefore does not qualify as a

rime of violence" for Career Offender application. See also

...ited States v Winstead 890 F.3d 1082, 190-92 (D.C. Cir. 2018)

f the commission wants to expand the definition of

...ontrolled Substance Offenses' to include attempts [or conspiracy:

...: may seek to amend the language of the Guidelines

...y submitting the change of Congressional review."). See

so United States v. Davis, S.Ct. 2B10 (June 24 2019) affirmed that

...onspiracy to Commit Hobbs Act Robbery" fails to satisfy

the crime of violence element under 924(c)'s residual clause,
which was also ackNowledged by the removal of the
residual clause of the Career Offender in 2016 by
Amendment 798 which also caused more unpredictability
and arbitrariness in the Guidelines, See also
United States v. Eason (16-15413)(11th Cir. March 24 2020),
whether a conviction for "Hobbs Act Robbery" qualifies
as a "Crime of violence" under the Sentencing Guidelines
4B1.2(a), "the answer is no". In sum and Substance
by no longer being a Career Offender, my Criminal History,
and Offense level categories would be lowered and
your office can correct this by filing a request with
my Sentencing court and request a sentence reduction

My coronavirus risk of infection is higher in an avg male at my age who needs Prednazor overcome the flu because of the inherent risks sed to someone who is incarcerated and confined a cell with another person on a daily basis. Indeed e CDC provides no true guidence for BOP official: sponsible for safeguarding the Inmate population.

The need to "flatten the curve" is critical for both e general public and the prison population. The rly release of some incarcerated people is perhaps e most important measure that can be taken to duce the population density in the federal prison stem. And compassionate release pursuant to 18 USC ction 3582(c)(1)(A) is a fair, and just reasonable means

of doing so. For qualified inmates, ~~orders~~ orders

granting compassionate release can be entered immediate

so as to protect them from coronavirus infection, to

increase the ability of other inmates to engage some

form of social distancing and to protect the BOP

staff who will need to continue working to maintain

the federal prisons necessary operations.

According to the standards set by Congress for

compassionate release, I am one such inmate who

qualifies:
  * I am 49 yrs old
  * I have already served over 65% of my
sentence.
  * I have held the same orderly job in

?A since arriving to Schuylkill over 3 yrs ago. I

have completed the Non-Residential Drug Education

⑨

Course Program from Dr Murray and the Drug Abuse Educational Course from Ms Fredrick for which both can attest to my attitude, character, attendance and respect towards staff. I have also completed 7 Habits of Highly Effective people and Reach One - Teach One for which Ms Regal can attest to my attitude, participation, character and respect towards staff. I also participate in recreation activities everyday and have completed Anatomy classes, stress mngmt, Skin Health, Body Composition and a few others for which rec. specialists Ducayne, Petrulyak and rec Supervisor Cuff can attest to my participation, attentiveness and respect towards staff. I have shown my desire for rehabilitation through my accomplishments. I have no disciplinary incidents since arrest.

﹡ I have the support of my family who have

have been by my side throughout my incarceration and

will continue to support me employment and housing

released.

Accordingly, for all the reasons stated above,

pray and Implore your office to submit a motion

the court on my behalf for compassionate release

rsuant to 18 U.S.C Section 3582(c)(1), and the

res Act, Section 12003(B)(2), requesting my immediate

lease from FCI Schuylkill to home Confinement.

Thank you for your time and Consideration

Respectfully

# EXHIBIT B

```
Name:        FISEKU, Beckim
Reg. No.:    59080-053
Unit:        Unit – 3A
Page 1 of 2
```

## Inmate Request to Staff Response

This is in response to your Inmate Request to Staff, dated April 12, 2020, wherein you request a Compassionate Release/Reduction in Sentence (RIS) based upon the COVID-19 outbreak emergency.

Program Statement 5050.50: Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §4205(g) §3582(c)(1)(A), section 2, Section A, specifies that:

*a. A request for a motion under 18 U.S.C. 4205(g) or 3582(c)(1)(A) shall be submitted to the Warden.  Ordinarily, the request shall be in writing, and submitted by the inmate.  An inmate may initiate a request for consideration under 18 U.S.C. 4205(g) or 3582(c)(1)(A) only when there are particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing.  The inmate's request shall at a minimum contain the following information:*

*(1)   The extraordinary or compelling circumstances that the inmate believes warrant consideration.*

*(2)   Proposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment.*

*A request for a RIS is considered "submitted" for the purposes of 18 USC §3582 (c)(1), when received by the Warden in accordance with this section.*

You are requesting Compassionate Release/Reduction in Sentence (RIS) due to the COVID-19 outbreak emergency.

The Bureau of Prisons is taking extraordinary measures to contain the spread of COVID-19 and treat any affected inmates.  We recognize that you have legitimate concerns and fears about the spread and effects of the virus.  However, your concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from your sentence.  Additionally, you are currently assigned regular duty status with no medical restrictions. You are currently able to adapt to activities of daily living and are able to perform self-maintenance activities in a correctional environment.

Name:        FISEKU, Beckim
Reg. No.:    59080-053
Unit:        Unit - 3A
Page 2 of 2

Accordingly, your request for Compassionate Release/RIS based on
Extraordinary or Compelling Circumstances is denied.

_04/14/20_
Date

_Scott Finley_
Scott Finley, Warden

# EXHIBIT C

To: Scott Finley                                    April 30, 2020
     WARDEN, FCI Schuylkill

From: Bekim Fiseku
Reg # - 59080053
Unit - 3A

     This is my formal request ~~For~~ Reconsideration
for Compassionate release pursuant to title 18 USC
§§
Section 3582 (c)(1)(A), as amended by the First
Step Act ("FSA"). See P.L. 115-391, 132 Stat. 5194 at
Section 603 (Dec. 21, 2018). In addition, I seek releas-
under the Coronavirus Aid, Relief and Economic
Security Act (the Cares Act), Section 12003 (b)(2).

     Specifically, I seek a reduction to time served
due to the hightened risk of death due to
my past struggles from the flu and the fact
that it is impossible to practice "social distancing
and other safety measures suggested by the
C.D.C. in a prison environment

This request for compassionate release is based on "extraordinary and compelling" circumstances which could not reasonably have been foreseen by the court at the time of sentencing. In addition to the First Step Act of 2018 see also BOP program statement 5050.50.

I have two extraordinary circumstances, considered together, justify a sentence reduction under Section 3582(c)(1): (1). My recent battle with the flu which caused a severe lung infection that lasted over 2 months and only started to heal after recieving Prednazone by Schuylkill medical which is a type of steroid that also suppresses the immune system. My health would seriously be jepordized by the coronavirus which is said to be up to 10x more stressful on the body.

② I have also served 5 yrs of my 9 yr sentence with around 2 yrs left to serve on this sentence, and according to new case law I am no longer a Career Offender which would lower my guidelines calculation. In 5 yrs I have demonstrated my commitment to full Rehabilitation by adhearing to all rules + regulation and respect towards staff with no disciplinary incidents and completion of all classes required of me and at almost 50 yrs old with 2 boys ages 6 + 5 I am not a risk to recidivate and do not pose a threat to the public, such that no penological interest is served by my continued incarceration.

After pleading guilty to "Conspiracy to commit Hobbs Act Robbery" I was sentenced as a Career Offender to 108 months, under 4B1.1 of the sentencing guidelines. My Instant Offense "Conspiracy to commit Hobbs Act Robbery" was determined to be a "Crime of Violence" under Application Note 4B1.2 of the Commentary that states a crime of violence includes the offenses of aiding and abetting, conspiracy and attempting to commit such offenses. I was sentenced in April of 2017. My Instant offense ~~had~~ "Conspiracy to Commit Hobbs Act Robbery" should not have been used to designate me as a Career Criminal Offender. The Application Note to Section 4B1.2 was not just a mere "Interpretation" of the guidelines, but an attempt to actually change the plain text to add an offense not listed in the guideline. Commentary to the Guidelines is not law. The Commissions use of commentary to add conspiracy crimes to the definition of "Hobbs Act Robbery" just adds an offense not listed in the actual Guideline.

(14)

"The commentary to the Guidelines never passes through the Gauntlets of congressional review or notice and comment and under Supreme Court precedent - it has no independent legal force". United States v Havis 927 F.3d at 386 (6th Cir. 2019) (citing Stinson v. United States, 508 U.S. 36, 44-46 (1993)), Therefore, the U.S. Sentencing Commission stepped beyond the "congressional limits by making "conspiracy to commit Hobbs Act Robbery" under USSG Section 4B1.2 cmt., application note 1, a crime of violence. My crime of conviction "Conspiracy to commit Hobbs Act Robbery" therefore does not qualify as a "crime of violence" for Career Offender application. See also United States v. Winstead 890 F.3d 1082, 190-92 (D.C. Cir. 2018) ("If the commission wishes to expand the definition of 'controlled substance Offenses' to include attempts or conspiracy's, it may seek to amend the language of the guidelines by submitting the change of congressional review") See also United States v. Davis, S. Ct. 2310 (June 24 2019) affirmed that "Conspiracy to Commit Hobbs Act Robbery" fails to satisfy the crime of violence element under 924(c)'s residual

Clause, which was also acknowledged by the removal of the residual clause of the Career Offender in 2016 by Amendment 798 which also caused more unpredictability and arbitrariness in the Guidelines. In Sum and Substance by no longer being a Career Offender my criminal history and offense level categories would be lowered and your office can correct this injustice by filing a request with my sentencing court and request a sentence reduction.

My coronavirus risk of infection is higher than an avg male at 49 yrs old who needs Prednizon to overcome the flu because of the inherent risks posed to someone who is incarcerated and confined to a cell with another person on a daily basis. Indeed the CDC provides no true guidance or BOP officials responsible for safeguarding the inmate population.

The need to "flatten the curve" is critical for both the general public and the prison population. The early release of some incarcerated people is perhaps the most important measure that can be taken to reduce the population density in the federal prison system. And compassionate release pursuant to 18 U.S.C. section 3582(c)(i)(A) is a fair, and just reasonable means of doing so. For qualified inmates, orders granting compassionate release can be entered immediately so as to protect them from coronavirus infection, to increase the ability of other inmates to engage some form of

Social distancing and to protect the BOP staff who will need to continue working to maintain the federal prisons necessary operations.

According to the standards set by Congress for compassionate release, I am one such inmate who qualifies.

- I am 49 yrs old
- I have already served over 65% of my Sentence
- I have taken and completed many programs including Non Residental Drug Program — Drug Abuse Education Course — 7 Habits of Highly Effective People — Reach One, Teach One — Anatomy Class — Stress Mngmt Class — Skin Health — Body Composition and a few others. I have shown my desire for rehabilitation through my accomplishments.
- I have the support of my family who have been with me during this incarceration and who will continue to support me if released, with employment and housing.

Accordingly, for all the reasons stated above, I implore Your Office to submit a motion to the court on my behalf for compassionate release pursuant to 18 U.S.C. Section 3582(c)(1), and the Cares Act, Section 12003(B)(2), requesting my immediate release from FCI Schuylkill to home confinement.

Thank You for your time and Consideration

Respectfully

April 30, 2020

EXHIBIT D

FISEKU, Beckim
Reg. No.:     59080-053
Unit:         Unit - 3A
Page 1 of 2

---

## Inmate Request to Staff Response

This is in response to your Inmate Request to Staff, received on
June 8, 2020, wherein you request a Compassionate Release/Home
Confinement in accordance with Attorney General William Barr's
March 26, 2020 Memorandum, the First Step Act, and the Coronavirus
(COVID-19).  Specifically, you request a reduction to time served due
to the heightened risk of death from your past struggles from the flu
and the fact it is impossible to practice social distancing.  You
state your recent battle with the flu lasted over two months and only
started to heal after receiving Prednisone from medical staff.  You
claim Prednisone suppresses your immune system which puts you at a
greater risk for contracting the virus.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a
sentencing court, on motion of the Director of the BOP, to reduce a
term of imprisonment for extraordinary or compelling reasons.  BOP
Program Statement No. 5050.50, <u>Compassionate Release/Reduction in
Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A)
and 4205(g)</u>, provides guidance on the types of circumstances that
present extraordinary or compelling reasons, such as the inmate's
terminal medical condition; debilitated medical condition; status as a
"new law" elderly inmate, an elderly inmate with medical conditions,
or an "other elderly inmate"; the death or incapacitation of the
family member caregiver of the inmate's child; or the incapacitation
of the inmate's spouse or registered partner.  Your request has been
evaluated consistent with this general guidance.

A review of your case, indicates your medical history does not meet
the criteria, as stated above, regarding a Compassionate Release/RIS
for inmates with medical conditions.  You are currently able to
independently adapt to activities of daily living and are able to
perform self-maintenance activities in a correctional environment.
Accordingly, your Compassionate Release/RIS request is denied at this
time.

The BOP is taking extraordinary measures to contain the spread of
COVID-19 and treat any affected inmates.  We recognize that you, like
all of us, have legitimate concerns and fears about the spread and
effects of the virus.  Currently, section 12003(b)(2) of the
Coronavirus Aid, Relief, and Economic Security Act (CARES Act) grants
discretion to the BOP to place inmates on home confinement for a
longer term under 18 U.S. C. 3624(c)(2).  The BOP's discretion is
guided by criteria listed in the memorandum from the Attorney General.

FISEKU, Beckim
Reg. No.:   59080-053
Unit:          Unit - 3A
Page 2 of 2


After a complete review of your circumstances based upon the Attorney
General's criteria, you do not meet the minimum criteria for home
confinement consideration because you have a "Low" risk of recidivism.
Additionally, your primary offense is violent and your intended
release residence, in Staten Island, New York, has a significant level
of COVID-19 infection as per Centers for Disease Control and
Prevention statistics. In view of the fact the conditions of your
release would present a significantly higher risk of contracting
COVID-19 than your current confinement at FCI Schuylkill.
Consequently, your request for home confinement based on concerns
about CIVID-19 is denied.

If you are not satisfied with this response to your request, you may
commence an appeal of this decision via the administrative remedy
process by submitting your concerns on the appropriate form (BP-9)
within 20 days of the receipt of this response.


Scott Finley, Warden                          07/01/20
                                              Date

# EXHIBIT E

```
---------------------------------   x
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :
APPLICATION FOR RELEASE FROM        :   **AFFIDAVIT OF BRIE WILLIAMS,**
CUSTODY                             :   **M.D.**
                                    :
                                    :
                                    :
                                    :
                                    :
---------------------------------   X
```

I, Brie Williams, hereby affirm as follows:

      1.     I am a doctor duly licensed to practice medicine in the State of California.

      2.     I am currently a Professor of Medicine at the University of California, San Francisco ("UCSF") in the Geriatrics Division, Director of UCSF's Amend: Changing Correctional Culture Program, as well as Director of UCSF's Criminal Justice & Health Program. In that capacity, my clinical research has focused on improved responses to disability, cognitive impairment, and symptom distress in older or seriously ill prisoners; a more scientific development of compassionate release policies; and a broader inclusion of prisoners in national health datasets and in clinical research. I have developed new methods for responding to the unique health needs of criminal justice-involved older adults—including an evidence-based approach to reforming compassionate release policies and the design of a new tool to assess physical functioning in older prisoners. I was previously a consultant for the California Department of Corrections and Rehabilitation, as well as for other state prison systems.

      3.     I have extensive experience working with vulnerable populations, in particular the incarcerated and the elderly.

4.      I submit this affidavit in support of any defendant seeking release from custody during the COVID-19 pandemic, so long as such release does not jeopardize public safety and the inmate can be released to a residence in which the inmate can comply with CDC social distancing guidelines.  The statements in this affidavit are based only on the current state of emergency and the circumstances described below.

**The Risk of Infection and Accelerated Transmission of COVID-19 within Jails and Prisons is Extraordinarily High.**

5.      Prisons and jails are not actually isolated from our communities: hundreds of thousands of correctional officers and correctional healthcare workers enter these facilities every day, returning to their families and to our communities at the end of their shifts, bringing back and forth to their families and neighbors and to incarcerated patients any exposures they have had during the day.  Access to testing for correctional staff has been "extremely limited," guards have reported a "short supply" of protective equipment, and prisons are not routinely or consistently screening correctional officers for symptoms.[1]

6.      The risk of exposure is particularly acute in pre-trial facilities where the inmate populations shift frequently.[2]  For example, despite the federal government's guidance to stay

---

[1] Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://www.vice.com/en_ca/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

*See also* Daniel A. Gross, *"It Spreads Like Wildfire": The Coronavirus Comes to New York's Prisons*, The New Yorker (Mar. 24, 2020), https://www.newyorker.com/news/news-desk/it-spreads-like-wildfire-covid-19-comes-to-new-yorks-prisons; Josiah Bates, *'We Feel Like All of Us Are Gonna Get Corona.' Anticipating COVID-19 Outbreaks, Rikers Island Offers Warning for U.S. Jails, Prisons*, Time (Mar. 24, 2020), https://time.com/5808020/rikers-island-coronavirus/; Sadie, Gurman, *Bureau of Prisons Imposes 14-Day Quarantine to Contain Coronavirus*, WSJ (Mar. 24, 2020), https://www.wsj.com/articles/bureau-of-prisons-imposes-14-day-quarantine-to-contain-coronavirus-11585093075; Cassidy McDonald, *Federal Prison Workers Say Conflictings Orders on Coronavirus Response Is Putting Lives at Risk*, CBS News (Mar. 19, 2020), https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/.

[2] Emma Grey Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*, Wired (Mar. 24, 2020), https://www.wired.com/story/coronavirus-covid-19-jails-prisons/.

inside and many states' stay-in-place orders, many prosecutors are still arresting individuals and seeking detention.[3]  Pre-trial detention facilities are still accepting new inmates who are coming from communities where COVID-19 infection is rampant.  As of today's date, the Bureau of Prisons is still moving inmates from facility to facility, including prisoners in New York.[4]

7.      Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons.  Inmates share small cells, eat together and use the same bathrooms and sinks.  They eat together at small tables that are cleaned only irregularly.  Some are not given tissues or sufficient hygiene supplies.[5]  Effective social distancing in most facilities is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as a lack of hand sanitizer or sufficient opportunities to wash hands.[6]

**Inmate Populations Also Have the Highest Risk of Acute Illness and Poor Health Outcomes if Infected with COVID-19.**

8.      There are more than 2.3 million people incarcerated in the United States[7]

---

[3] Stephen Rex Brown, *'Business as Usual' For Federal Prosecutors Despite Coronavirus, Nadler Writes, Calling for Release of Inmates*, N.Y. Daily News (Mar. 20, 2020), https://www.nydailynews.com/new-york/ny-nadler-doj-inmates-20200320-d6hbdjcuj5aitppi3ui2xz7tjy-story.html.

[4] Courtney Bublé, *Lawmakers, Union Urge Halt to All Prison Inmate Transfers*, Government Executive (Mar. 25, 2020), https://www.govexec.com/management/2020/03/lawmakers-union-urge-halt-all-prison-inmate-transfers/164104/; Hamilton, *Sick Staff, Inmate Transfers*; Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates*, ABC News (Mar. 23, 2020),https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416.

[5] Justine van der Leun, *The Incarcerated Person Who Knows How Bad It Can Get*, Medium (Mar. 19, 2020), https://gen.medium.com/what-its-like-to-be-in-prison-during-the-coronavirus-pandemic-1e770d0ca3c5 ("If you don't have money, you don't have soap or tissues."); Keri Blakinger and Beth Schwartzapfel, *How Can Prisons Contain Coronavirus When Purrell Is a Contraband?*, ABA Journal (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[6] Rosa Schwartzburg, *'The Only Plan the Prison Has Is to Leave Us To Die in Our Beds'*, The Nation (Mar. 25, 2020), https://www.thenation.com/article/society/coronavirus-jails-mdc/.

[7] Kimberly Kindy *et al.*, *'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons Face Coronavirus Threat*, Washington Post (Mar. 25, 2020), https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html.

approximately 16% of whom are age 50 or older.[8] The risk of coronavirus to incarcerated seniors is high. "Their advanced age, coupled with the challenges of practicing even the most basic disease prevention measures in prison, is a potentially lethal combination."[9] To make matters worse, correctional facilities are often ill-equipped to care for aging prisoners, who are more likely to suffer from chronic health conditions than the general public.

9.      An estimated 39-43% of all prisoners, and over 70% of older prisoners, have at least one chronic condition, some of the most common of which are diabetes, hypertension, and heart problems.[10] According to the CDC, each of these conditions—as well as chronic bronchitis, emphysema, heart failure, blood disorders, chronic kidney disease, chronic liver disease, any condition or treatment that weakens the immune response, current or recent pregnancy in the last two weeks, inherited metabolic disorders and mitochondrial disorders, heart disease, lung disease, and certain neurological and neurologic and neurodevelopment conditions[11]—puts them at a "high-risk for severe illness from COVID-19."[12]

---

[8] Brie Williams *et al.*, *Strategies to Optimize the Use of Compassionate Release from US Prisons*, 110 AJPH S1, S28 (2020), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305434; Kimberly A. Skarupski, *The Health of America's Aging Prison Population*, 40 Epidemiologic Rev. 157, 157 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5982810/.

[9] Weihua Li and Nicole Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19*, The Marshall Project (Mar. 19, 2020), https://www.themarshallproject.org/2020/03/19/this-chart-shows-why-the-prison-population-is-so-vulnerable-to-covid-19.

[10] Brie A. Williams *et al.*, *How Health Care Reform Can Transform the Health of Criminal Justice-Involved Individuals*, 33 Health Affairs 462-67 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4034754/; Brie A. Williams *et al.*, *Coming Home: Health Status and Homelessness Risk of Older Pre-release Prisoners*, 25 J. Gen. Internal Med. 1038-44 (2010), *available at* https://link.springer.com/content/pdf/10.1007/s11606-010-1416-8.pdf; Laura M. Maruschak *et al.*, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, U.S. Dept of Justice (Oct. 4, 2016), at 5, *available at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[11] Harvard Health Publishing, *Coronavirus Research Center*, Harvard Medical School (Mar. 25, 2020), https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center.

[12] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: People Who Are at Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last updated Mar. 22, 2020).

10.     However, even many young federal prisoners suffer from asthma, rendering them also very vulnerable to coronavirus.[13]

11.     But it is not only the elderly, or those with preexisting medical conditions that are at risk of coronavirus in a correctional setting.  As of March 23, 2020, New York City reported that "[p]eople ranging in ages from 18 to 44 have accounted for 46 percent of positive tests."[14] Across the United States, 38% of those hospitalized are between the ages of 20 and 54 and 12% of the intensive care patients are between 20 and 44.[15]

12.     This data is of particular concern for inmate populations, since prisoners' physiological age *averages 10 to 15 years older* than their chronological age.[16]  Therefore, the consensus of those who study correctional health is that inmates are considered "geriatric, by the age of 50 or 55 years."[17]  It is not clear that prison health care administrations are taking accelerated ageing into account when determining the eligibility criteria for age-related screening tools and medical care protocols for coronavirus, potentially leaving large swathes of the prison population at risk.[18]

---

[13] Laura Maruschak, *Medical Problems of Jail Inmates*, Dep't of Justice (Nov. 2006), at p. 2, *available at* https://www.bjs.gov/content/pub/pdf/mpji.pdf.

[14] Kimiko de Freytas-Tamura, *20-Somethings Now Realizing That They Can Get Coronavirus, Too*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/nyc-coronavirus-young.html.

[15] *Id.*

[16] Brie A. Williams *et al.*, *Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care*, 102 Am. J. Public Health 1475-81 (2012), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/; *see also* Brie Williams *et al.*, *Detained and Distressed: Persistent Distressing Symptoms in a Population of Older Jail Inmates*, 64 J. Am. Geriatrics Soc. 2349-55 (2016), https://onlinelibrary.wiley.com/doi/pdf/10.1111/jgs.14310 ("For example, older jail inmates with an average age of 60 in this study reported poor or fair health [and] chronic lung disease . . . at rates similar to those reported by community-based lower income older adults with an average age of 72.").

[17] Brie A. Williams *et al.*, *The Older Prisoner and Complex Chronic Medical Care* 165-70 in World Health Organization, *Prisons and Health* (2014), https://pdfs.semanticscholar.org/64aa/10d3cff6800ed42dd152fcf4e13440b6f139.pdf.

13.     In one study, we found that inmates who died in hospitals were, on average, nearly two decades younger than non-incarcerated decedents, had significantly shorter hospitalizations, and had higher rates of several chronic conditions including cancer, liver disease and/or hepatitis, mental health conditions, and HIV/AIDS."[19]

**The Entire Community is at Risk If Prison Populations Are Not Reduced**

14.     As the World Health Organization has warned, prisons around the world can expect "huge mortality rates" from Covid-19 unless they take immediate action including screening for the disease.[20]

15.     As of March 24, 2020, at least 38 people involved in the New York City correctional system have tested positive for Covid-19.[21]  Already, three inmates and three staff at federal correctional facilities across the United States have tested positive for the coronavirus, according to the Federal Bureau of Prisons.[22]

16.     Jails and prisons are fundamentally ill-equipped to handle a pandemic.

17.     Medical treatment capacity is not at the same level in a correctional setting as it is in a hospital.  Some correctional facilities have no formal medical ward and no place to quarantine

---

[18] Brie A. Williams *et al.*, *Differences Between Incarcerated and Non-Incarcerated Patients Who Die in Community Hospitals Highlight the Need For Palliative Care Services For Seriously Ill Prisoners in Correctional Facilities and in Community Hospitals: a Cross-Sectional Study*, 32 J. Pallitive Med. 17-22 (2018), *available at* https://journals.sagepub.com/doi/pdf/10.1177/0269216317731547.

[19] *Id.* at 20.

[20] Hannah Summers, *'Everyone Will Be Contaminated'*: *Prisons Face Strict Coronavirus Controls*, The Guardian (Mar. 23, 2020), https://www.theguardian.com/global-development/2020/mar/23/everyone-will-be-contaminated-prisons-face-strict-coronavirus-controls.

[21] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons.*

[22] Ryan Lucas, *As COVID-19 Spreads, Calls Grow to Protect Inmates in Federal Prisons*, NPR (Mar. 24, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/24/820618140/as-covid-19-spreads-calls-grow-to-protect-inmates-in-federal-prisons.

sick inmates, other than the facilities' Special Housing Unit (SHU).[23]  While the cells in the SHU have solid doors to minimize the threat of viral spread in otherwise overcrowded facilities, they rarely have intercoms or other ways for sick inmates to contact officers in an emergency.[24]  This is particularly dangerous for those with COVID-19 infection since many patients with COVID-19 descend suddenly and rapidly into respiratory distress.[25]

18.     Even those facilities that do have healthcare centers can only treat relatively mild types of respiratory problems for a very limited number of people.[26]  This means that people who become seriously ill while in prisons and jails will be transferred to community hospitals for care. At present, access to palliative care in prison is also limited.

19.     Corrections officers may also be particularly vulnerable to coronavirus due to documented high rates of diabetes and heart disease.[27]  Prison staff in Pennsylvania, Michigan, New York and Washington state have tested positive for the virus, resulting in inmate quarantines. In Washington, D.C., a U.S. marshal who works in proximity to new arrestees tested positive for the virus, meaning dozens of defendants headed for jail could have been exposed.[28]  In New York,

---

[23] MCC New York COVID 19 Policy Memo, Mar. 19, 2020, https://www.documentcloud.org/documents/6818073-MCC-New-York-COVID-19-Policy-Memo.html; Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[24] Brie Williams *et al.*, *Correctional Facilities in the Shadow of COVID-19: Unique Challenges and Proposed Solutions*, Health Affairs (Mar. 26, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/.

[25] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19–Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[26] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*; Li and Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19*.

[27] Brie Williams, *Role of US-Norway Exchange in Placing Health and Well-Being at the Center of US Prison Reform*, https://ajph.aphapublications.org/doi/10.2105/AJPH.2019.305444 (published Jan. 22, 2020).

[28] Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, WSJ (Mar. 22, 2020), https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600 ("We're all headed for some dire consequences," said Daniel Vasquez, a former warden of San Quentin and Soledad state prisons in

236 members of the New York Police Department have tested positive for coronavirus and 3,200 employees are sick, triple the normal sick rate.[29]  Two federal prison staffers have also tested positive.[30]

20.      For this reason, correctional health is public health. Decreasing risk in prisons and jails decreases risk to our communities.

21.      Reducing the overall population within correctional facilities will also help medical professionals spread their clinical care services throughout the remaining population more efficiently.  With a smaller population to manage and care for, healthcare and correctional leadership will be better able to institute shelter in place and quarantine protocols for those who remain. This will serve to protect the health of both inmates as well as correctional and healthcare staff.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: San Francisco, California
       March 27, 2020

_____
Dr. Brie Williams

---

California. "They're in such close quarters—some double- and triple-celled—I think it's going to be impossible to stop it from spreading.").

[29] Erin Durkin, *Thousands of NYPD Officers Out Sick Amid Coronavirus Crisis*, Politico (Mar. 25, 2020), https://www.politico.com/states/new-york/albany/story/2020/03/25/thousands-of-nypd-officers-out-sick-amid-coronavirus-crisis-1268960.

[30] Elinson and Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*.

# EXHIBIT F

# EXHIBIT G

```
   SCHI0          *         INMATE EDUCATION DATA        *      09-03-2020
PAGE 001          *              TRANSCRIPT              *      10:19:43

REGISTER NO: 59080-053      NAME..: FISEKU              FUNC: PRT
FORMAT.....: TRANSCRIPT      RSP OF: SCH-SCHUYLKILL FCI

-------------------------- EDUCATION INFORMATION --------------------------
FACL ASSIGNMENT DESCRIPTION                   START DATE/TIME STOP DATE/TIME
SCH  ESL HAS    ENGLISH PROFICIENT            07-11-2003 1344 CURRENT
SCH  GED EARNED GED EARNED IN BOP             01-13-2004 1056 CURRENT

--------------------------- EDUCATION COURSES ----------------------------
SUB-FACL    DESCRIPTION                   START DATE  STOP DATE EVNT AC LV  HRS
SCH         COLLEGE CORRESPONDENCE COURSE 08-05-2020 CURRENT
SCH         WORLD'S GEOLOGICAL WONDERS 1  08-31-2020 09-01-2020  P  C  P    3
SCH         SELF STUDY MALE SPORTS STARS  07-10-2020 07-20-2020  P  C  P   10
SCH         SELF STUDY AA HISTORY         07-10-2020 07-20-2020  P  C  P    3
SCH         SELF STUDY WORLD WAR I        07-10-2020 07-20-2020  P  C  P    3
SCH         FCI ACE APICULTURE            02-03-2020 07-15-2020  P  C  P   10
SCH         SELF STUDY EARTH SCIENCE      04-17-2020 04-20-2020  P  C  P    3
SCH         SELF STUDY SOLAR SYSTEM       04-16-2020 04-20-2020  P  C  P    3
SCH         FCI 7 HABITS ON THE INSIDE    10-07-2019 01-22-2020  P  C  P   25
SCH         ACE CREATIVE WRITING II       07-15-2019 09-23-2019  P  C  P   16
SCH         FUNCTIONAL ANATOMY 4          09-19-2019 09-21-2019  P  C  P    2
SCH         FUNCTIONAL ANATOMY 3          08-10-2019 08-14-2019  P  C  P    2
SCH         FUNCTIONAL ANATOMY 2          07-25-2019 08-14-2019  P  C  P    2
SCH         FCI STRESS MANAGEMENT - RPP 1 07-25-2019 08-14-2019  P  C  P    4
SCH         FCI DIABETES AWARENESS        07-17-2019 07-18-2019  P  C  P    4
SCH         FUNCTIONAL ANATOMY 1          07-17-2019 07-18-2019  P  C  P    2
SCH         FCI WEIGHT MANAGEMENT - RPP 1 06-20-2019 06-23-2019  P  C  P    4
SCH         FUNCTIONAL ANATOMY 7          06-20-2019 06-23-2019  P  C  P    2
SCH         FUNCTIONAL ANATOMY 8          06-20-2019 06-22-2019  P  C  P    2
SCH         ACE CREATIVE WRTNG/SPOKEN WORD 04-01-2019 05-21-2019 P  C  P   16
SCH         FUNCTIONAL ANATOMY 6          05-15-2019 05-15-2019  P  C  P    2
SCH         SKIN HEALTH - 2 HOURS         05-15-2019 05-15-2019  P  C  P    2
SCH         FCI BODY COMPOSITION          04-18-2019 04-21-2019  P  C  P    4
SCH         FCI BLOOD PRESSURE - RPP 1    04-21-2019 04-21-2019  P  C  P    4
SCH         ACE REACH ONE TEACH ONE       01-18-2018 03-08-2018  P  C  P   16
SCH         FCI/FPC DRUG EDUCATION- RPP 6 02-13-2018 03-09-2018  P  C  P   13
BRO M       BLOOD PRESSURE                04-06-2017 04-27-2017  P  C  P    8
BRO M       CARDIO TRAINING               02-22-2017 03-22-2017  P  C  P    5
BRO M       ART PRGM ALL UNITS            01-24-2017 02-14-2017  P  C  P    8
BRO M       CHESS LEVEL 2                 11-07-2016 12-19-2016  P  C  P   14
BRO M       ANGER MANAGEMENT              09-19-2016 11-30-2016  P  C  P   24
BRO M       INTRODUCTION TO CHESS         10-31-2016 10-31-2016  P  C  P    2
BRO M       FINANCE PRE-TRIAL             06-23-2016 08-03-2016  P  C  P   12
BRO M       BASKETBALL REFEREE OFFICIATING 05-16-2016 06-27-2016 P  C  P   14
BRO M       TUTOR TRAINING                06-23-2016 06-23-2016  P  C  P    2
BRO M       HEALTH EDUCATION PROGRAM      04-26-2016 05-24-2016  P  C  P   10
LEE         RPP4 CCC                      12-11-2012 12-11-2012  P  C  P    2
LEE         RPP5 RPP ORIENTATION          05-01-2012 05-01-2012  P  C  P    1
LEE         RPP1 AIDS AWARENESS           05-01-2012 05-01-2012  P  C  P    1
LEE         RPP4 USPO                     08-14-2007 08-14-2007  P  C  P    1

G0002       MORE PAGES TO FOLLOW . . .
```

```
   SCHI0          *        INMATE EDUCATION DATA        *      09-03-2020
PAGE 002 OF 002 *              TRANSCRIPT              *      10:19:43

REGISTER NO: 59080-053     NAME..: FISEKU                FUNC: PRT
FORMAT.....: TRANSCRIPT     RSP OF: SCH-SCHUYLKILL FCI
```

```
---------------------------- EDUCATION COURSES ----------------------------
```

| SUB-FACL | DESCRIPTION | START DATE | STOP DATE | EVNT | AC | LV | HRS |
|---|---|---|---|---|---|---|---|
| LEE | RPP5 RELEASE PROCEDURES | 08-14-2007 | 08-14-2007 | P | C | P | 1 |
| LEE | JOB FAIR INTERVIEW | 09-22-2006 | 12-28-2006 | P | C | P | 10 |
| LEE | BASIC ACCOUNTING/FINANCE | 04-05-2005 | 06-19-2005 | P | C | P | 16 |
| LEE | HEALTHY HEART CLASS | 08-12-2004 | 08-12-2004 | P | C | P | 2 |
| LEE | WALKING & JOGGING PGM | 10-01-2004 | 01-07-2005 | P | C | P | 3 |
| LEE | INTRODUCTION TO BUSINESS MGMT | 07-19-2004 | 09-26-2004 | P | C | P | 18 |
| LEE | BASIC REAL-ESTATE COURSE | 07-13-2004 | 09-26-2004 | P | C | P | 18 |
| OTV GP | HORTICULTURE/LANDSCAPE VT - AM | 02-07-2004 | 02-20-2004 | P | W | I | 6 |
| OTV GP | ADV GED MON-FRI 12:00-3:00 PM | 09-13-2003 | 12-12-2003 | P | C | P | 116 |
| OTV GP | TENNIS CLINIC | 07-05-2003 | 09-14-2003 | P | C | P | 20 |
| OTV GP | EDUCATION ORIENTATION - AM | 07-22-2003 | 07-22-2003 | P | C | P | 3 |

```
--------------------------- HIGH TEST SCORES ---------------------------
```

| TEST | SUBTEST | SCORE | TEST DATE | TEST FACL | FORM | STATE |
|---|---|---|---|---|---|---|
| ABLE | LANGUAGE | 12.9 | 08-28-2003 | OTV | | |
| | NUMBER OPR | 10.2 | 08-28-2003 | OTV | | |
| | PROB SOLV | 13.0 | 08-28-2003 | OTV | | |
| | READ COMP | 13.0 | 08-28-2003 | OTV | | |
| | SPELLING | 10.2 | 08-28-2003 | OTV | | |
| | VOCABULARY | 13.0 | 08-28-2003 | OTV | F | |
| GED | AVERAGE | 614.0 | 12-16-2003 | OTV | PASS | NY |
| | LIT/ARTS | 800.0 | 12-16-2003 | OTV | ID | NY |
| | MATH | 520.0 | 12-16-2003 | OTV | ID | NY |
| | SCIENCE | 670.0 | 12-16-2003 | OTV | ID | NY |
| | SOC STUDY | 530.0 | 12-16-2003 | OTV | ID | NY |
| | WRITING | 550.0 | 12-16-2003 | OTV | ID | NY |

```
G0000       TRANSACTION SUCCESSFULLY COMPLETED
```



## STRATFORD CAREER INSTITUTE

Mailing/Shipping Address:
1 Champlain Commons, Unit 3, PO Box 1560
St. Albans, VT  05478–5560

Main Office:
8675 Darnley Road, Mount–Royal, QC  H4T 1X2
1–800–435–5338

*******************AUTO**MIXED AADC 054
ꞁᴵᴵꞁꞁꞁᵗᴵᴵᵗᴵꞁᵗᵗᴵᵗᴵᴵᴵᴵᴵꞁᴵᴵᵗᵗᴵᴵᵗᴵᴵᵗᵗᴵᴵᵗᵗᴵᴵᵗᴵᵗᴵᴵꞁᴵᵗᴵᴵꞁ
Bekim Fiseku                    9013 T1 106
59080053
Federal Cor. Inst. Schuylkill
PO Box 759
Minersville PA  17954–0759

Student No.:  **G258759**

Assignment No.:  **DDB1–B**

Date Graded:  August 24, 2020

Reference No.:  VEZ202008241

**Overall Grade:  100%**

Dear Bekim Fiseku,

I have reviewed your work for:  **Contractor/Construction Mgnt Exam 2 Module 1**

The following results outline your answers for each question.

| Question Number | Your Answer | Correct Answer | Reference |
|---|---|---|---|
| 1 | C | C | Correct |
| 2 | D | D | Correct |
| 3 | B | B | Correct |
| 4 | A | A | Correct |
| 5 | D | D | Correct |
| 6 | A | A | Correct |
| 7 | C | C | Correct |
| 8 | D | D | Correct |
| 9 | B | B | Correct |
| 10 | D | D | Correct |
| 11 | C | C | Correct |
| 12 | A | A | Correct |
| 13 | C | C | Correct |
| 14 | B | B | Correct |
| 15 | A | A | Correct |
| 16 | B | B | Correct |
| 17 | D | D | Correct |
| 18 | C | C | Correct |
| 19 | B | B | Correct |
| 20 | A | A | Correct |

Hard work almost always yields rewards — as you have proven here. Your performance indicates that you are a serious student with a genuine interest in this field. We are pleased to have you in the program.

Your answers will be on file for 30 days. Notify us within 30 days if you have any question about your test score.



## STRATFORD CAREER INSTITUTE

Mailing/Shipping Address:
1 Champlain Commons, Unit 3, PO Box 1560
St. Albans, VT  05478–5560

Main Office:
8675 Darnley Road, Mount–Royal, QC  H4T 1X2
1–800–435–5338

*********************AUTO**MIXED AADC 054

ꞏꞏlꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏꞏ

Bekim Fiseku                                9028 T1 89
59080053
Federal Cor. Inst. Schuylkill
PO Box 759
Minersville PA  17954–0759

Student No.: **G258759**

Assignment No.: **DDB1–C**

Date Graded:  August 31, 2020

Reference No.:  VEZ202008315

**Overall Grade:  100%**

Dear Bekim Fiseku,

I have reviewed your work for:  **Contractor/Construction Mgnt Exam 3 Module 1**

The following results outline your answers for each question.

| Question Number | Your Answer | Correct Answer | Reference |
|---|---|---|---|
| 1 | A | A | Correct |
| 2 | C | C | Correct |
| 3 | D | D | Correct |
| 4 | A | A | Correct |
| 5 | D | D | Correct |
| 6 | C | C | Correct |
| 7 | B | B | Correct |
| 8 | D | D | Correct |
| 9 | A | A | Correct |
| 10 | C | C | Correct |
| 11 | B | B | Correct |
| 12 | D | D | Correct |
| 13 | B | B | Correct |
| 14 | A | A | Correct |
| 15 | C | C | Correct |
| 16 | B | B | Correct |
| 17 | C | C | Correct |
| 18 | D | D | Correct |
| 19 | B | B | Correct |
| 20 | A | A | Correct |

Your superlative performance here indicates your dedication to your studies and your aptitude for them.

Your answers will be on file for 30 days. Notify us within 30 days if you have any question about your test score.



**STRATFORD CAREER INSTITUTE**

Mailing/Shipping Address:
1 Champlain Commons, Unit 3, PO Box 1560
St. Albans, VT  05478–5560

Main Office:
8675 Darnley Road, Mount–Royal, QC  H4T 1X2
1–800–435–5338

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*AUTO\*\*MIXED AADC 054

ılı.ılıılıııllllllıllıl.ılıılıllı.ıllll.ılllılırııılılıılı

Bekim Fiseku                        9013 T1 ₁₀₇
59080053
Federal Cor. Inst. Schuylkill
PO Box 759
Minersville PA  17954–0759

Student No.: **G258759**

Assignment No.: **DDB1–A**

Date Graded:  August 24, 2020

Reference No.: VEZ202008244

**Overall Grade:  100%**

Dear Bekim Fiseku,

I have reviewed your work for:  **Contractor/Construction Mgnt Exam 1 Module 1**

The following results outline your answers for each question.

| Question Number | Your Answer | Correct Answer | Reference |
|---|---|---|---|
| 1 | D | D | Correct |
| 2 | A | A | Correct |
| 3 | C | C | Correct |
| 4 | D | D | Correct |
| 5 | C | C | Correct |
| 6 | B | B | Correct |
| 7 | A | A | Correct |
| 8 | B | B | Correct |
| 9 | C | C | Correct |
| 10 | B | B | Correct |
| 11 | A | A | Correct |
| 12 | B | B | Correct |
| 13 | D | D | Correct |
| 14 | A | A | Correct |
| 15 | C | C | Correct |

We are impressed with your ability to select the best answers, carefully reasoning to discard less satisfactory alternatives. It is a sign that you are truly learning the material.

Your answers will be on file for 30 days. Notify us within 30 days if you have any question about your test score.



**STRATFORD CAREER INSTITUTE**

Mailing/Shipping Address:
1 Champlain Commons, Unit 3, PO Box 1560
St. Albans, VT  05478–5560

Main Office:
8675 Darnley Road, Mount–Royal, QC  H4T 1X2
1–800–435–5338

***********************************SNGLP

|ᴵ|ₗₗₗₗ·|·ᴵᴵᴵ|ₗₗ···|·|·ᴵ·|ᴵₗₗₗₗ|ₗ|·ᴵᴵᴵ|·ₗ|ᴵₗₗ·ₗ|ₗᴵᴵᴵᴵ|ₗ·
Bekim Fiseku                       9115 **T1** 59
59080053
Federal Cor. Inst. Schuylkill
PO Box 759
Minersville PA  17954–0759

Student No.:  **G258759**

Assignment No.:  **DDB2A1**

Date Graded:  October 16, 2020

Reference No.:  VEZ202010163

**Overall Grade:  100%**

Dear Bekim Fiseku,

I have reviewed your work for:  **Contractor/Construction Exam 1 Module 2**

The following results outline your answers for each question.

| Question Number | Your Answer | Correct Answer | Reference |
|:---:|:---:|:---:|:---:|
| 1 | B | B | Correct |
| 2 | D | D | Correct |
| 3 | A | A | Correct |
| 4 | C | C | Correct |
| 5 | D | D | Correct |
| 6 | A | A | Correct |
| 7 | B | B | Correct |
| 8 | C | C | Correct |
| 9 | A | A | Correct |
| 10 | D | D | Correct |
| 11 | C | C | Correct |
| 12 | B | B | Correct |
| 13 | A | A | Correct |
| 14 | D | D | Correct |
| 15 | C | C | Correct |
| 16 | A | A | Correct |
| 17 | B | B | Correct |
| 18 | C | C | Correct |
| 19 | D | D | Correct |
| 20 | B | B | Correct |

Most of our students pass our examinations, but As are given to relatively few. This should encourage you that you have made a wise career selection and can look forward to success — if you maintain the standard you have set here.

Your answers will be on file for 30 days. Notify us within 30 days if you have any question about your test score.

# Certificate of Completion

Presented to

## BECKIM FISEKU

For successfully completing the

### Drug Abuse Education Course

The Drug Abuse Education Course is a minimum of 12 hours.  The goal of this program is to help the offender to make an accurate evaluation of the consequences of his alcohol/drug use and consider the need for treatment.

3/9/2018

*A. Faldenick*

Drug Abuse Treatment Specialist

**FCI Schuylkill**

# Certificate of Completion

## This certifies that

## Beckim, Fiseku # 59080-053

### Has satisfactorily completed

## Non-Residential Drug Abuse Program

on the 25th of November, 2019 at FCI Schuylkill.

_Mr. Cramer, Drug Treatment Specialist_

```
  SCHI0  531.01 *            INMATE HISTORY            *      10-26-2020
PAGE 001 OF 001 *               WASPB                 *      11:38:20


 REG NO..: 59080-053 NAME....: FISEKU, BECKIM
 CATEGORY: WSP        FUNCTION: DIS        FORMAT:


FCL    ASSIGNMENT DESCRIPTION                  START DATE/TIME STOP  DATE/TIME
SCH    PAR NATLC  NATIONAL PARENTING PGM CMPLT  09-08-2020 0832 09-08-2020 0832
SCH    PAR NATLC  NATIONAL PARENTING PGM CMPLT  09-08-2020 0832 09-08-2020 0832
SCH    PAR NATLW  NATIONAL PARENTING PGM WAIT   01-26-2020 0855 09-08-2020 0832
SCH    PAR IODC   INSIDE OUT DAD COMPLETE       09-08-2020 0831 09-08-2020 0831
SCH    PAR IODC   INSIDE OUT DAD COMPLETE       09-08-2020 0830 09-08-2020 0830
SCH    PAR IODC   INSIDE OUT DAD COMPLETE       09-08-2020 0830 09-08-2020 0830
SCH    PAR IODW   INSIDE OUT DAD WAITING        01-26-2020 0855 09-08-2020 0830
SCH    PAR ONEC   PHASE ONE COMPLETE            08-18-2020 0821 08-18-2020 0821




G0005      TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

```
  SCHIO  531.01 *              INMATE HISTORY            *      10-26-2020
PAGE 001 OF 001 *               PT OTHER                *      11:38:45


  REG NO..: 59080-053 NAME....: FISEKU, BECKIM
  CATEGORY: PTO       FUNCTION: DIS      FORMAT:


 FCL    ASSIGNMENT DESCRIPTION                   START DATE/TIME STOP  DATE/TIME
 SCH    ARTH FND P ARTHRITIS FOUNDATION WALK PART 10-13-2020 1733 CURRENT
 SCH    CR TH WAIT CRIMINAL THINKING WAIT         02-05-2020 1302 CURRENT
 SCH    BRN HLTH C BRAIN HEALTH AS YOU AGE COMP   09-14-2020 1605 09-14-2020 1605




 G0005       TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | |
|---|---|
| Inmate Name:  FISEKU, BECKIM | Reg #:  59080-053 |
| Date of Birth:  06/11/1971 | Sex:  M   Race:  WHITE | Facility:  SCH |
| Encounter Date:  11/03/2017 08:48 | Provider:  Lupotsky, A. RN | Unit:  C01 |

Nursing - Sick Call Note encounter performed at Health Services.

**SUBJECTIVE:**

**COMPLAINT 1**        **Provider:** Lupotsky, A. RN

**Chief Complaint:** Cough
**Subjective:**    To sick call with c/o cough and congestion x2 weeks.
**Pain:**        Yes
**Pain Assessment**
  **Date:**
  **Location:**
  **Quality of Pain:**
  **Pain Scale:**
  **Intervention:**
  **Trauma Date/Year:**
  **Injury:**
  **Mechanism:**
  **Onset:**
  **Duration:**
  **Exacerbating Factors:**
  **Relieving Factors:**
  **Comments:**

**OBJECTIVE:**
**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 11/03/2017 | 08:51 SCH | 99.0 | 37.2 | Oral | Lupotsky, A. RN |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 11/03/2017 | 08:51 SCH | 91 | Via Machine | | Lupotsky, A. RN |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 11/03/2017 | 08:51 SCH | 22 | Lupotsky, A. RN |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 11/03/2017 | 08:51 SCH | 131/82 | Right Arm | Sitting | Adult-regular | Lupotsky, A. RN |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 11/03/2017 | 08:51 SCH | 95 | Room Air | Lupotsky, A. RN |

**Exam:**
  **General**

| | | | |
|---|---|---|---|
| Inmate Name: FISEKU, BECKIM | | Reg #: | 59080-053 |
| Date of Birth: 06/11/1971 | Sex: M   Race: WHITE | Facility: | SCH |
| Encounter Date: 11/03/2017 08:48 | Provider: Lupotsky, A. RN | Unit: | C01 |

**Exam:**

    **Appearance**

        Yes: Alert and Oriented x 3, Dyspneic, Diaphoretic, Acutely Ill

        No: Cyanotic

    **Skin**

        **General**

            Yes: Warmth

    **Nose**

        **General**

            Yes: Congestion

    **Pulmonary**

        **Observation/Inspection**

            No: Accessory Muscle Use, Nasal Flaring

        **Auscultation**

            Yes: Clear to Auscultation

**ASSESSMENT:**

    Infection - Respiratory, Signs of

    Inmate with c/o cough and congestion x2 weeks.  Non productive dry cough, nasal congestion and dyspnea noted. Lungs CTA.  Diaphoretic.  Denies hx of asthma.  Low grade fever 99.0.  States he has tried commissary medication without + effect.  Per PA new order noted.

**PLAN:**

**New Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | predniSONE Tablet | 11/03/2017 08:48 | 60mg Orally  -   daily x 3 day(s) -- Take with food |

**Disposition:**

    Follow-up at Sick Call as Needed

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 11/03/2017 | Counseling | Compliance - Treatment | Lupotsky, A. | Verbalizes Understanding |

**Copay Required:** Yes        **Cosign Required:** Yes

**Telephone/Verbal Order:** Yes   **By:** Mace-Leibson, Ellen DO CD

**Telephone or Verbal order read back and verified.**

Completed by Lupotsky, A. RN on 11/03/2017 09:32
Requested to be cosigned by  Mace-Leibson, Ellen DO CD.
Cosign documentation will be displayed on the following page.
Requested to be reviewed by  Rush, Joe PA-C.
Review documentation will be displayed on the following page.

# Bureau of Prisons
## Health Services
## Health Problems

Reg #: 59080-053                    Inmate Name:  FISEKU, BECKIM

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| **Current** | | | | | | |
| Diseases of lips | | | | | | |
| 04/23/2012 09:18 EST  Fortney, Homer D.M.D. | III | ICD-9 | 528.5 | 04/23/2012 | Current | 04/23/2012 |
| Periapical abscess without sinus | | | | | | |
| 08/17/2016 07:43 EST  Patel, Dinesh DDS | | ICD-10 | K047 | 08/17/2016 | Current | |
| Localized swelling, mass and lump, neck | | | | | | |
| 09/01/2016 12:47 EST  Timothy, Beverly ANP-C  Right Side of Neck | | ICD-10 | R221 | 09/01/2016 | Current | |
| Other medical exam for administrative purposes | | | | | | |
| 04/23/2012 12:16 EST  Herrell, P K NP | III | ICD-9 | V70.3 | 04/23/2012 | Current | 04/23/2012 |
| **Resolved** | | | | | | |
| Acute upper respiratory infection, unspecified | | | | | | |
| 05/15/2019 09:52 EST  Swaboski, M. CRNP | | ICD-10 | J069 | 03/09/2016 | Resolved | 05/15/2019 |
| 03/09/2016 09:37 EST  Baker, Bridget PA-C | | ICD-10 | J069 | 03/09/2016 | Current | |
| Chronic periodontitis, localized | | | | | | |
| 01/17/2020 13:34 EST  Hartland, Richard DMD  #10 | | ICD-10 | K0531 | 01/17/2020 | Resolved | 01/17/2020 |
| Chronic periodontitis, localized | | | | | | |
| 10/11/2017 11:03 EST  Hartland, Richard DMD  #19 | | ICD-10 | K0531 | 10/10/2017 | Resolved | 10/11/2017 |

**Total: 7**



## Summary Reentry Plan - Progress Report
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: FISEKU, BECKIM  59080-053

SEQUENCE: 00203280
Report Date: 09-24-2020



| | |
|---|---|
| Facility: | SCH SCHUYLKILL FCI |
| Name: | FISEKU, BECKIM |
| Register No.: | **59080-053** |
| Quarters: | C02-222L |
| Age: | 49 |
| Date of Birth: | 06-11-1971 |

| | |
|---|---|
| Custody Level: | IN |
| Security Level: | MEDIUM |
| Proj. Rel Date: | 02-20-2023 |
| Release Method: | GCT REL |
| DNA Status: | LEE00436 / 05-04-2007 |

### Contact Information
**Release contact & address**
Kujtime Fiseku, MOTHER
175 Garfield Ave, Staten Island, NY 10305 US
phone (mobile) : 718-720-0672

### Offenses and Sentences Imposed

| Charge | Terms In Effect |
|---|---|
| 18:1951 CONSPIRACY TO COMMIT ROBBERY | 108 MONTHS |

Date Sentence Computation Began:      04-12-2017
Sentencing District:   NEW YORK, SOUTHERN DISTRICT

| Days FSGT / WSGT / DGCT | Days GCT or EGT / SGT | Time Served | + Jail Credit  - InOp Time |
|---|---|---|---|
| 0 /    0 /    0 | 270 | Years: 5 Months: 3 Days: 5 | + 660    JC  - 0     InOp |

### Detainers

| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

### Program Plans

Mr. Fiseku arrived at FCI Schuylkill on May 1, 2017, as an Initial Designation. At his initial program review he was encouraged to maintain clear conduct and participate in the Inmate Financial Responsibility Program. He was recommended to enroll into and complete academic programs to include, but not limited to, Drug Education, Functional Resume Building, Personal Financial Education, and Job Fair to assist him with his release needs.

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| SCH | 3A ORD PM | UNIT 3A ORDERLY PM | 05-16-2017 |

### Work Assignment Summary

Mr. Fiseku is currently assigned to 3A Orderly PM. He receives good work performance evaluations on a monthly basis and maintains a positive rapport with his supervisor. He completes independent tasks with little to no supervision.

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| SCH | ESL HAS | ENGLISH PROFICIENT | 07-11-2003 |
| SCH | GED EARNED | GED EARNED IN BOP | 01-13-2004 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| SCH | | COLLEGE CORRESPONDENCE | 08-05-2020 | CURRENT |
| SCH | | WORLD'S GEOLOGICAL WONDERS 1 | 09-15-2020 | CURRENT |
| SCH | C | WORLD'S GEOLOGICAL WONDERS 1 | 08-31-2020 | 09-01-2020 |
| SCH | C | SELF STUDY MALE SPORTS STARS | 07-10-2020 | 07-20-2020 |
| SCH | C | SELF STUDY AA HISTORY | 07-10-2020 | 07-20-2020 |
| SCH | C | SELF STUDY WORLD WAR I | 07-10-2020 | 07-20-2020 |
| SCH | C | FCI ACE APICULTURE | 02-03-2020 | 07-15-2020 |
| SCH | C | SELF STUDY EARTH SCIENCE | 04-17-2020 | 04-20-2020 |



## Summary Reentry Plan - Progress Report

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: FISEKU, BECKIM 59080-053

SEQUENCE: 00203280
Report Date: 09-24-2020

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| SCH | C | SELF STUDY SOLAR SYSTEM | 04-16-2020 | 04-20-2020 |
| SCH | C | FCI 7 HABITS ON THE INSIDE | 10-07-2019 | 01-22-2020 |
| SCH | C | ACE CREATIVE WRITING II | 07-15-2019 | 09-23-2019 |
| SCH | C | FUNCTIONAL ANATOMY 4 | 09-19-2019 | 09-21-2019 |
| SCH | C | FUNCTIONAL ANATOMY 3 | 08-10-2019 | 08-14-2019 |
| SCH | C | FUNCTIONAL ANATOMY 2 | 07-25-2019 | 08-14-2019 |
| SCH | C | FCI STRESS MANAGEMENT - RPP 1 | 07-25-2019 | 08-14-2019 |
| SCH | C | FCI DIABETES AWARENESS | 07-17-2019 | 07-18-2019 |
| SCH | C | FUNCTIONAL ANATOMY 1 | 07-17-2019 | 07-18-2019 |
| SCH | C | FCI WEIGHT MANAGEMENT - RPP 1 | 06-20-2019 | 06-23-2019 |
| SCH | C | FUNCTIONAL ANATOMY 7 | 06-20-2019 | 06-23-2019 |
| SCH | C | FUNCTIONAL ANATOMY 8 | 06-20-2019 | 06-22-2019 |
| SCH | C | ACE CREATIVE WRTNG/SPOKEN | 04-01-2019 | 05-21-2019 |
| SCH | C | FUNCTIONAL ANATOMY 6 | 05-15-2019 | 05-15-2019 |
| SCH | C | SKIN HEALTH - 2 HOURS | 05-15-2019 | 05-15-2019 |
| SCH | C | FCI BODY COMPOSITION | 04-18-2019 | 04-21-2019 |
| SCH | C | FCI BLOOD PRESSURE - RPP 1 | 04-21-2019 | 04-21-2019 |
| SCH | C | ACE REACH ONE TEACH ONE | 01-18-2018 | 03-08-2018 |
| SCH | C | FCI/FPC DRUG EDUCATION- RPP 6 | 02-13-2018 | 03-09-2018 |

**Education Information Summary**

Mr. Fiseku is English Proficient and earned his GED while incarcerated in the Bureau of Prisons. He has actively programmed during this period of incarceration. He has completed Pre-Release courses Drug Education, Blood Pressure, Weight Management and Stress Management. He has completed the Non-Residential Drug Treatment Program. He is currently enrolled in the College Correspondence course.

## Discipline Reports

| Hearing Date | Prohibited Acts |
|--------------|-----------------|
| 07-16-2009 | 307 : REFUSING TO OBEY AN ORDER |
| | 398 : INTERFERING W/STAFF-MODERATE |
| 12-30-2003 | 112 : USE OF DRUGS/ALCOHOL |
| 10-22-2003 | 305 : POSSESSING UNAUTHORIZED ITEM |
| 06-04-2003 | 410 : USING MAIL W/O AUTH |
| 06-04-2003 | 410 : USING MAIL W/O AUTH |
| 05-29-2003 | 101 : ASSAULTING WITH SERIOUS INJURY |
| 02-12-2002 | 201 : FIGHTING WITH ANOTHER PERSON |

**Discipline Summary**

Mr. Fiseku has maintained clear conduct during his current term of incarceration.

## ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|------|-----------|--------|-------|------|
| SCH | A-DES | US DISTRICT COURT COMMITMENT | 05-01-2017 | CURRENT |

## Current Care Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 01-20-2005 |
| CARE1-MH | CARE1-MENTAL HEALTH | 04-18-2012 |

## Current Medical Duty Status Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 04-26-2012 |
| YES F/S | CLEARED FOR FOOD SERVICE | 04-26-2012 |

## Current PTP Assignments

| Assignment | Description | Start |
|------------|-------------|-------|

*NO ASSIGNMENTS*



## Summary Reentry Plan - Progress Report
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: FISEKU, BECKIM 59080-053

SEQUENCE: 00203280
Report Date: 09-24-2020

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| DAP NO INT | DRUG ABUSE PROGRAM NO INTEREST | 08-27-2020 |
| ED COMP | DRUG EDUCATION COMPLETE | 03-09-2018 |
| NR COMP | NRES DRUG TMT/COMPLETE | 11-25-2019 |

### Physical and Mental Health Summary

Mr. Fiseku is classified as a Care Level 1: Healthy or Simple Chronic Care and Care Level 1: Mental Health inmate. He is assigned Regular Duty status with no medical restrictions.

### FRP Details

Most Recent Payment Plan

| FRP Assignment: | NO OBLG | FINANC RESP-NO | Start: 12-12-2018 |
|---|---|---|---|

Inmate Decision: **AGREED**    **$25.00**          Frequency: **QUARTERLY**
Payments past 6 months:    **$0.00**       Obligation Balance: **$456,815.00**

#### Financial Obligations

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 2 | ASSMT | $200.00 | $25.00 | IMMEDIATE | EXPIRED |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 1 | ASSMT | $100.00 | $100.00 | IMMEDIATE | EXPIRED |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 5 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 3 | REST NV | $69,797.00 | $69,697.00 | DEFERRED | WAIT PLAN |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 4 | REST NV | $387,118.00 | $387,118.00 | DEFERRED | WAIT PLAN |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |

### Financial Responsibility Summary

Mr. Fiseku was ordered to pay a $100.00 felony assessment for this term of incarceration. He completed payments on this with his participation in the Inmate Financial Responsibility Program.

### Release Planning

Mr. Fiseku was sentenced in the Southern District of New York to serve 108 months followed by a 3 year term of supervised release. At the competition of his sentence, he plans on releasing to Staten Island, New York, and reside with his mother.

### General Comments

Mr. Fiseku actively participates in academic programs. He maintains a positive rapport with inmates and staff alike at this institution.



## Summary Reentry Plan - Progress Report
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: FISEKU, BECKIM 59080-053

SEQUENCE: 00203280
Report Date: 09-24-2020

|  |  |
|---|---|
| Name: | FISEKU, BECKIM |
| Register Num: | 59080-053 |
| Age: | 49 |
| Date of Birth: | 06-11-1971 |
| DNA Status: | LEE00436 / 05-04-2007 |

X _____
Inmate   (FISEKU, BECKIM, Register Num: 59080-053)

_____9/24/20_____
Date

_____C/L_____
Chairperson

_____9/24/20_____
Date

_____
Case Manager

_____9/24/20_____
Date

Reg #: 59080-053          FISEKU, BECKIM

Offender Details   Sentry Assignments

First Name: BECKIM

Middle Name:

Last Name: FISEKU                Suffix:

Birth Date: 06/11/1971       Age: 49

SSN: 045728694              Sex: M

Height (inches): 70      06/23/2015

Weight (lbs): 208      06/23/2015

BMI (kg/m²): 29.8          Eye Color: BROWN

Hair Color: BROWN

Ethnicity: OTHER

Race: WHITE

Medical Care Level: CARE1

MH Care Level: CARE1-MH

Psych Alert: No       Suicide Watch: No

Complex: SCH--SCHUYLKILL FCI

Facility: SCH--SCHUYLKILL FCI

Quarters: C02-222L

Unit Team: 3



Projected Release Date: 02/20/2023

Prefers Spanish: ☐          Pill Line Onl

Last Updated Date: Thu Aug 27 2020 09:

Merges                                              Save        Cance

# EXHIBIT H

TRULINCS 59080053 - FISEKU, BECKIM - Unit: SCH-C-A

--------------------------------------------------------------------------------

FROM: 59080053
TO:
SUBJECT: Honorable Judge Paul A. Engelmayer
DATE: 10/29/2020 03:05:02 PM

Honorable Judge Paul A. Engelmayer

Your honor i would like to start with a declaration under penalty of perjury that i will never commit another crime ever again. Five yrs ago i was arressted for making a terrible decision to scope out a house and plan a robbery. Thank God officers pulled us over in the planning stage and let us go. That night after being let go i was ecstatic that i was given another chance so i totally abandoned the notion of a robbery and went back to work the very next morning feeling very lucky to be at work and thought it was over and continued to work for another 8 months until my arrest. The morning of my arrest i was in disbelief as to why i was being arrested until the agent told me. After almost  8 months from our encounter with the officers, my codefendant whom i never talked to again after abandoning our plan was arrested for what i don't know till this day, he co-operated and testified to our abandoned crime which led to me being indicted for conspiracy to commit hobbs act robbery.

Your Honor for some reason since this nightmare started 5 yrs ago i have made a number of wrong decisions in the beginning of this case. When i was first arrested, i finally became a father to 2 beautiful newborn boys who were 6 & 18 months old. Dorian was my first boy and Luan was my 2nd. So when i was arrested it was like the end of the world for me and my family...That first yr was the worst time in my life. So when the prosecution offered me 30-37 months on the first plea it might as well have been life because of my circumstances i described above. It  was  a colossal blunder not to accept the plea by me that i regret everyday of this incarceration because i feel i would of been home already depending on your Honor. So i decided to go to a suppression hearing with your Honor and lost on a "close call" from your honors analysis and decision. Right after the suppression hearing i was offered 210-262 months because of my decision to opt for a suppression hearing. That offer really put me in a low point with the thought of my boys being full grown when i came home. About 6-8 months went by until my 3rd offer from the prosecution came to me on a fri for 57-71 months which i tried to accept only to be told on the following Monday something to the effect from my lawyer that a mistake was found and i am deemed to be a career offender. I asked my lawyer how do i get 4 offers, 2 with the career designation and 2 without and wasn't really given a clear answer. So my 4th offer was 151-188 which i accepted with reservation and hoped for the best. Your Honor ultimately sentenced me to 108 months in prison.

Over 64 months have passed since my nightmare began for which i accepted and accept full responsibility for my actions and horrible decisions. My boys are 7 and 6 yrs old now and thank god i still have a respectful relationship with my ex-wife for whom i will be forever in debt for my beautiful boys and for who i will make sure

TRULINCS  59080053 - FISEKU, BECKIM - Unit: SCH-C-A

----------------------------------------------------------------------------------------------------

never is in need or want of any help with our boys. Your Honor my mom is 70 yrs old and has been through so much in her life

first dealing with my father's slow demise from aids and worrying for yrs after, whether she contracted the disease through

testing every few months, and then dealing with my troubled life, and now with her advanced age and 1 knee replacement 5

yrs ago and now being unable to get the other knee replaced because of the dangers with her age and risks associated with

it, it is becoming harder and harder for my mom to get around and the pain that comes with it my mother needs me now

more than ever and i will also be there for her  from the day i get out. Your Honor 13 yrs ago my mom also took out a 120 k

dollar loan so she can help me pay for my wedding and to this day is still paying for it. My mom has been able to pay for the

loan because of the 2 rentals she has and her s.s.. Now your Honor, my moms tenants have notified my mom with their

intentions of moving out both respectively anywhere from 3- 6months from now which will put extra pressure and stress

on her bills. In these times who knows what kind of repercussions that will have on my moms health and finances...Your

Honor with a job already lined up and my presence at home it would make all the difference coming home 18 months earlier

so i can be there for my mom. Your Honor this second wave being predicted by the news and medical professionals could be

more devastating than what my family is going through now.  I cannot come to grips with what that might look like

based on what we have witnessed so far.

Your Honor i haven't seen my boys in over 8 months and i miss holding them and

laughing with then and talking to them so much. Your Honor I also want to provide for my boys because it has become very

difficult for my ex wife to take care of the boys and to provide financial support because of the uncertainty with school and

daycare. Your Honor with halfway house i can be home in 18-24 months, but under the many different needs from my family

18-24 months early can make all the difference to my mom who hopefully lives to be 100 so i can take care of her but who

needs my help now more than ever and 18-24 months early can also make all the difference for my ex-wife who needs my

help with our sons that i know i can provide by either working financially or as a stay at home father so my ex-wife can work.

Your Honor i am a totally changed man and am totally transformed from who i was 5 yrs ago to who i am today. I only

thought about myself and everyone else was in the periphery now i truly believe that for the rest of my life I owe it to my

mom,my boys and my ex-wife to be there for them.

Your Honor in the past 64 months i have not received any infractions or incident

reports and have kept the same job from the day i was incarcerated. I have completed every program required of me by the

BOP and completed other courses i found interesting. I have been enrolled in college for the past few months for

Construction Management for which i am in my second semester course. I was in Construction as a Project Manager before

being arrested and found it to be very rewarding because of the leadership role needed to coordinate at least 5-6 different

trades all working in unison.

TRULINCS  59080053 - FISEKU, BECKIM - Unit: SCH-C-A

-----------------------------------------------------------------------------------------------------

Your Honor because of my mom, my boys and my ex-wife I beg your Honor  give me

a chance to play a supportive role to my family in these challenging times that were not foreseen  by anyone.

Sincerely & Respectfully  Bekim Fiseku

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA,
            Respondent,

                             :

        V.                             Crim. Case No. 15 Cr. 384 (PAE)

                             :

BEKIM FISEKU,
            Defendant/Movant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
(County of Schuylkill
State of Pennsylvania)

AFFIDAVIT OF BEKIM FISEKU

    I, Bekim Fiseku, hereby swear under the penalties of perjury, pursuant to 28 U.S.C. § 1746,

and says that:

    (1) I am the Defendant in the above-captioned case;

    (2) While incarcerated here at FCI Schuylkill in Minersville, Pennsylvania, the prison went on lockdown on March 3, 2020 due to the Coronavirus pandemic. Since the initial lockdown the BOP has initiated numerous phases of a modified schedule to ensure the safety of staff, inmates and the general public.

    (3) Although these measures are in place there is not much the BOP can do to protect my safety since it is impossible to social distance in prison. All day long I come in contact with up to 20 staff members. Visitation was cancelled March 3rd, 2020 so the only way inmates can contract the virus is through staff coming in and out of the prison. Each day my three meals per day are prepared by staff, delivered to the units by staff and handed out by staff. The following staff come into my unit one or more times a day; medical, psychology, chaplains, laundry services, commissary, maintenance and recreation. If necessary or warranted an inmate could come in contact with dental staff, Parole Board members, optometrists and the executive staff who come into the unit once per week.

    (4) There are several inmates quarantined inside the attached Unit 3B. One of these inmates met with the parole board; the other inmate went to the outside hospital due to poor medical care. Although these inmates came in contact with outside people, so did the prison staff. When these inmates returned to the unit the escorting staff were not wearing masks. And the escorting staff were not placed in quarantine. So if the inmate contracted the virus so did the staff. Their measures sound good but make no sense and surely can not stop the virus.

    (5) FCI Schuylkill has taken 4B unit and turned it into a "quarantine hub" for all inmates in-transit in the Northeastern Region. Some of the inmates who are transferred to this prison are placed in quarantine because they have been designated to this facility. As long as the BOP buses inmates in and out of this facility there will be a chance the virus gets in here and spreads like wildfire. I am the canary in the

coalmine.  These quarantined inmates come in contact with the same exact staff members that I do on a daily basis.

(6)  In December 2019 through January 2020, the flu swept through the prison.  Staff and inmates alike were infected and became very sick.  I was very sick for months as were other inmates I spoke with.  I sought medical treatment because I was having problems breathing and was having terrible body aches.  There was no way for the prison to combat this strain of the flu.  It shows how quickly COVID-19 will spread through the prison.  Most of us inmates now believe this flu may have been COVID-19.  Because the prison officials have never tested any inmates in here we will never be sure if this was the flu or COVID-19.

(7) Because the prison officials and BOP continued to bus inmates into the prison during this lockdown and modified lockdown, it has caused correction officer Jonathan Madonna to retire.  He worked in the mess hall and was very outspoken with how the BOP were violating their own rules and regulations concerning the measures they claim to put in place to protect the health and safety of staff and inmates.

(8) The court should order the security footage of the unit during hours when inmates are out of the cells, particularly from 7am until 3:30 pm and you will see over 120 inmates in a small confined space.  A group of 20-30 Muslim inmates will be praying crunched on top of one another in the common area.  20-30 inmates at a time will be working out in groups or alone at every available square inch of the unit not occupied by a chair.  These inmates are sweating and breathing very heavy on top of all of the other inmates watching TV or just sitting in their chairs.  Two barbers will be cutting hair in different ends of the unit.  While all of this is going on, hardly any inmates are wearing masks.  Numerous staff are not wearing masks.  If they are wearing any protection it is a bandana which according to CDC does not stop the COVID-19 particles from getting through the pores of the cloth.  It is as good as wearing no mask.  Masks have been given out to the inmates three times in 7 months and are not always available to us.  The first masks were made from the discarded, old, khaki Prison clothing and/or prison bed sheets.  I have never seen them check a prisoner's temperature.  We recently were given a spray bottle with a cleaning chemical inside.  It does not sanitize or kill the virus.  One hand sanitizer is posted at the front door of the unit.  It is not alcohol based so it does nothing to protect us from the virus.  A review of the unit surveillance footage will show that the measures the BOP is taking is so far outside of health standards it is shocking.

(9) The conditions in this prison are certainly hazardous.  Over 120 inmates live in this small area.  We live two men to a cell with a sink and toilet.  There are 5 computer terminals on top of one another three phones in a small closet, 8 showers used by 120 inmates each day.

(10) Recently, a staff member came to work here in the Special Housing Unit("SHU") who was infected with the coronavirus.  This staff member knew she was infected and came to work anyways.  If the facility was testing they would have flagged the officer.  Eventually, the Schuylkill officials were alerted by another staff member and they had to test the inmates in the SHU and the SHU staff members.  On September 17, 2020, a group of 25 correctional officers came into my unit and conducted a "shake-down" of every cell in the unit, including mine.  The officer who came to work sick was part of the "shake-down" group.  These officers came in close contact with me as well as touched my clothing, bedding, toothbrush and many other items to include food.  Many of these officers were not wearing masks.  I was certainly put at risk.

(11)  many inmates including myself, are very worried about our families during these times and are unable to stay in contact with them on a daily basis.  It has been 7 months now with no chance of seeing my children or family members.  The prison will reopen with a modified visitation schedule in which an inmate can get one visit every 2 weeks, for 1 hour on a designated day according to the unit and first letter of our last name.  I am not going to have my family drive 4 hours to come here and see me for 1 hour separated by a partition.  I will be unable to speak with my children up close or hang them. In addition, my wife has lost her job due to the pandemic and does not have the money to travel all the way here to see me for one hour.  The BOP has done nothing to ease our stress by offering us Skype or some other form of "Facetime."  Most state prisons have been allowing video visits as well as offering tablets so that inmates can communicate with their families.  The BOP has offered an additional 200 minutes of extra phone time.  Even though at first the calls were for 5 minutes, which is now an 8 minute phone call it is not enough adequate time to contact numerous family members to make sure everyone is doing well. And, to let them know I am well so they do not worry.  During these very stressful times where we are isolated from our families the BOP has really done nothing to ease our stress and anxiety.  The BOP claims to have implemented all of these phases to ensure our safety and ease our stress, but, implementing them and actually doing them is two different matters.

(12)  If called to testify at a hearing on my compassionate release motion I will proffer all of the information provided in the foregoing and additional information as needed.

The foregoing is true and correct to the best of my knowledge and belief.


Dated:  October 1, 2020

Minersville, PA


Bekim Fiseku
Defendant
Fed. Reg. No. 59080-053
F.C.I. Schuylkill
P.O. Box  759
Minersville,  PA   17954

# EXHIBIT I

DATE REVIEWED: _____11/22/19_____

CO2-2232

INSTITUTION: _____Sch_____   UNIT: _____3A_____

INMATE NAME: _____Fiseku, Beckim_____   REG NO: _____54080-053_____

FIRST STEP ACT (Circle One):   ~~ELIGIBLE~~   /   INELIGIBLE

RECIDIVISM RISK LEVEL (Circle One):   MINIMUM   LOW   MEDIUM   HIGH

CAPTION:

United States of America

CERTIFICATE OF SERVICE*

Docket Number: 15 Cr. 384 (PAE)

v.

Bekim Fiseku

I, Bekim Fiseku , hereby certify under penalty of perjury that
_____
(print name)

on 11/2/2020 , I served a copy of Motion
_____
(date)

18 U.S.C. 3582 plus Exhibits
_____
(list all documents)

by (select all applicable)**

___ Personal Delivery        X United States Mail        ___ Federal Express or other
                                                             Overnight Courier

___ Commercial Carrier        ___ E-Mail (on consent)

on the following parties:

Robert Allen (AUSA), One St. Andrew's Plaza, New York NY 10007

| Name | Address | City | State | Zip Code |
|------|---------|------|-------|----------|

| Name | Address | City | State | Zip Code |
|------|---------|------|-------|----------|

| Name | Address | City | State | Zip Code |
|------|---------|------|-------|----------|

| Name | Address | City | State | Zip Code |
|------|---------|------|-------|----------|

*A party must serve a copy of each paper on the other parties, or their counsel, to the appeal or proceeding.  The Court will reject papers for filing if a certificate of service is not simultaneously filed.

**If different methods of service have been used on different parties, please complete a separate certificate of service for each party.

11/2/2020
_____
Today's Date

_____
Signature

Certificate of Service Form (Last Revised 12/2015)



U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution, Schuylkill
P.O. Box 759
Minersville, PA 17954-0759

Official Business

U.S. POSTAGE PAID
FCM 2-DAY
MINERSVILLE, PA
17954
NOV 03 20
AMOUNT
$0.00
R2305K141057-10
10007
1004

CERTIFIED MAIL

7017 2620 0001 1640 1730

The Honorable Paul A. Engelmayer
United States District Judge
Thru Good Marshal United States Courthouse
40 Foley Square
New York, New York 10007

rec'd 11/10/20
PM

LEGAL

USM40LD
SDNY

PRIORITY MAIL
TRACKED
INSURED
UNITED STATES POSTAL SERVICE
For Domestic and International Use
Label 107R, June 2014