

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

June 20, 2025

**BY ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Bekim Fiseku*, 15 Cr. 384 (PAE)

Dear Judge Engelmayer:

      The Government respectfully submits this letter in advance of the violation of supervised release hearing scheduled for June 24, 2025, to summarize the evidence that the Government expects to offer at the hearing and set forth the applicable law.

**I.    Background**

      **A.    Defendant's Underlying Conviction**

      On April 12, 2017, this Court sentenced defendant Bekim Fiseku to 108 months' imprisonment followed by a three-year term of supervised release for conspiracy to commit robbery of a marijuana trafficker, in violation of 18 U.S.C. § 1951. Dkt. No. 93. The defendant—who has an extensive and troubling criminal history, including two prior federal racketeering convictions involving bank robberies, home invasions, and drug trafficking, PSR ¶¶ 29-40—began serving his term of supervised release on February 17, 2023. The defendant was initially supervised by United States Probation Officer Jessica Roman, in the Eastern District of New York. Beginning in September 2023, the defendant's supervision was transferred to United States Probation Officer Ryan Lehr.

      At sentencing for the defendant's underlying conviction, this Court noted the gravity of the defendant's conduct, stating: "Had the crime spun out of control, as it easily could have . . . you might well be faced here today with charges that included the word murder." Dkt No. 97, 29:2-5. Unfortunately, that prescient warning has now come to pass. On October 22, 2024—less than two years into his supervised release—the defendant killed an innocent cyclist while fleeing from the scene of a burglary.

B.  **Proof of the Defendant's Violations**

The Government expects that the evidence presented at the hearing will show that the defendant attempted to commit a burglary, killed a cyclist while fleeing from that burglary in his own truck, and then spent months on the run from law enforcement, who eventually apprehended him in an area where he was not permitted to be under the terms of his supervised release. Specifically, the Government expects the evidence will show the following:

At approximately 3:25 p.m. on October 22, 2024, a black Dodge Ram pickup truck (the "Dodge truck") entered Queens through the Queens-Midtown Tunnel. GX 100 at 00:01-00:30 ("Composite Video"); GX 102. License plate reader data confirmed the vehicle was registered to the defendant. GX 100 at 00:10; GX 101.

Surveillance video captured the defendant in Queens later that evening. Starting at approximately 6:34 p.m., the defendant was near 38-27 Crescent Street, which is a warehouse the defendant later tried to break into (the "Warehouse"). The Warehouse belonged to the owner of a nearby hotel, who used part of the Warehouse to store items for his hotel. The hotel owner rented out the rest of the Warehouse to an associate, who used his portion of the building to store boxes of items that he sold. The Warehouse was typically protected by multiple locks and a video-surveillance system.

The defendant spent much of the late afternoon and evening casing the Warehouse. As noted above, the defendant arrived near the Warehouse at approximately 6:34 p.m., parking his Dodge truck down the street. The defendant was wearing a light-colored, short-sleeved, button-down shirt, and he was accompanied by another man ("Co-Conspirator-1"), who was wearing a black t-shirt. GX 100 at 00:42-19:49; GX 104; GX 104A; GX 105; GX 105B.

For approximately an hour and a half after arriving at the Warehouse, the defendant scouted the area. Surveillance video shows that the defendant repeatedly walked between the Dodge truck—which he had parked down the street—and the Warehouse. Each time the defendant entered the Dodge truck, the defendant would return to the driver's side of the vehicle. GX 100 at 00:42-19:49; GX 104; GX 104A; GX 105; GX 105B. At approximately 8:15 p.m., the defendant entered a nearby bodega, providing surveillance cameras inside the bodega with a clear view of his face and a watch he wore on his wrist. The defendant left the store soon after entering it. He then went back out to the vicinity of the Warehouse. GX 100 at 21:35-51; GX 109; GX 109A, GX 211.

After leaving the bodega, the defendant and Co-Conspirator-1 continued to scout the area around the Warehouse. Over the course of hours, each walked past the Warehouse, occasionally returning to the Dodge truck. Each time either one went to the Dodge truck, the defendant would

enter the driver's side, and Co-Conspirator-1 would enter the passenger's side.[1] GX 100 at 23:59-30:00; GX 104B; GX 105B.

At around 10:20 p.m., the defendant and Co-Conspirator-1 began the burglary in earnest. Surveillance video shows that, between approximately 10:22 and 10:55 p.m., Co-Conspirator-1 walked toward the Warehouse, wearing a mask and gloves and carrying duct tape. Co-Conspirator-1 then waited near the Warehouse as the defendant drove the Dodge truck to the Warehouse, arriving at approximately 10:57 p.m. Unlike earlier, the defendant was wearing a mask when he arrived near the Warehouse and had a black sweatshirt on over his light colored shirt. GX 100 at 35:45-41:40; GX 105C; GX 105D; GX 104C; GX 104D.

Once in position, the defendant and Co-Conspirator-1 attempted to break into the Warehouse. Surveillance video shows the Dodge truck parked outside the Warehouse. Audio from a surveillance system nearby picked up the sounds of the crime, including metallic banging from the defendant and Co-Conspirator-1 trying to break into the building. GX 100 at 41:41-46:56; GX 104D; GX 115.

Just minutes later, a man called 911 to report a break in near the Warehouse. The caller reported that "somebody is trying to break in" to a building and that the burglar had a "black truck." GX 100 at 44:02-27; GX 116. As explained further below, the Government expects that the owner of the hotel will testify that he recognizes the voice of the 911 caller as the person who was renting part of the Warehouse, who had access to video from surveillance cameras outside the Warehouse. The Government expects that the hotel owner will also testify that he subsequently spoke to the 911 caller about the break-in, and that the 911 caller showed him video from the incident.

The 911 call reporting the defendant's burglary set off a tragic series of events. Police began arriving near the Warehouse soon after the call. Surveillance video shows that the defendant entered the driver's side of the Dodge truck before he and Co-Conspirator-1 began driving away. GX 100 at 41:41-46:56; 104D; 115. Police spotted the Dodge truck and pursued it. Radio transmissions captured officers identifying the vehicle and noting duct tape covering the license plate. During the ensuing chase, surveillance cameras captured the defendant driving at excessive speeds, weaving in and out of bicycle lanes, and running red lights in his attempt to evade capture. GX 100 at 46:57-54:10; GX 117; GX 118; GX 119; GX 120; GX 121; GX 122; GX 123; GX 124; GX 125; GX 126.

Eventually, while running a red light at approximately 11:10 p.m., the defendant struck a cyclist crossing an intersection. The collision threw the victim off her bike and slammed her into a parked car, then onto the sidewalk. GX 100 at 54:11-33; GX 127. NYPD officers who were pursuing the defendant stopped to try to help the victim. GX 100 at 54:34-55:06; GX 128. But

---

[1] Surveillance video shows that Co-Conspirator-1 drove a different vehicle—a white Range Rover—which he parked near the Dodge truck in the hours before the attempted burglary. GX 100 at 23:59-27:45; GX 110; GX 111; GX 105B.

Hon. Paul A. Engelmayer
June 20, 2025
Page 4 of 16

the defendant did not. He continued to speed away. GX 100 at 55:07-27; GX 129; GX 130; GX 131; GX 132; GX 133. The victim died from her injuries. GX 201.

Because the collision battered the Dodge truck, the car did not make it far. Surveillance video shows that, shortly after the crash, the defendant abandoned the Dodge truck from the driver's side, still wearing a black sweatshirt over his light-colored shirt.[2] Multiple surveillance videos caught his escape. They show the defendant hopping a fence, losing his watch in the process, running through residential backyards, scaling another fence, discarding his gloves, moving through a parking lot, and finally disappearing into the night—leaving behind a dead cyclist and his abandoned truck. GX 100 at 55:43-59:10; GX 134; GX 135; GX 136; GX 137; GX 138; GX 139; GX 140; GX 141; GX 141A; GX 142.

The next day, police officers walked through the scene of the defendant's escape, locating and photographing his lost watch. GX 331, GX 332, GX 333. The police also found the defendant's Dodge truck abandoned approximately one mile from the collision, with substantial damage and a license plate covered in duct tape to evade detection. Detectives from the NYPD searched the Dodge truck and found inside the tools of the defendant's burglary scheme, including duct tape, screwdrivers, bolt cutters, a pry bar, a mask, and a pair of gloves. GX 301-323.

Following the October 22nd incident, the defendant vanished. On October 29, 2024, the Probation Office filed an emergency petition, and the Court granted a warrant for his arrest. The defendant remained a fugitive for four months. While evading capture, law enforcement determined that the defendant was communicating with, among others, convicted felon Samir Metovic, who was assisting him while he was on the run.

The defendant was eventually apprehended on February 12, 2025, at the Skyway Motel in Jersey City, New Jersey. When law enforcement approached the motel, the defendant was observed running from the location carrying a brown paper bag. After a brief foot pursuit, the defendant was apprehended and taken into custody. A search incident to arrest revealed that the defendant was in possession of a substance believed to be marijuana, a white powdery substance which later tested positive for cocaine, a list of names, and a counterfeit New York State photo identification card bearing the defendant's photo but Metovic's name and address. GX 202, GX 203, GX 204, GX 206, GX 212. Also found on the defendant's flight path was a hat with fake gray hair that the defendant had been wearing and dropped at some point during his flight. GX 205.

On June 9, 2025, Probation filed a Second Amended Violation of Supervised Release Report against the defendant, which lists eight specifications. The Government expects to proceed

---

[2] Though surveillance video shows that Co-Conspirator-1 enters the Dodge truck after the attempted burglary, it does not capture Co-Conspirator-1's exit from the Dodge truck.

with respect to Specifications 1 through 6 and Specification 8 at the violation of supervised release hearing.[3]

### C. The Government's Expected Witnesses at the Hearing

At the hearing, the Government expects to offer testimony from the following individuals:

NYPD Detective Nicholas Sofokles is expected to testify about: (1) creating a comprehensive video compilation from dozens of surveillance sources documenting the defendant's activities on October 22, 2024; (2) his methodology for reviewing multiple hours of footage from various camera systems and selecting relevant segments; (3) synchronizing footage from different sources with varying timestamps to create an accurate chronological sequence; (4) his process for verifying the authenticity and accuracy of all source materials; (5) technical aspects of the compilation including basic quality enhancements for clarity and the addition of identifying markers; and (6) confirming that no footage was altered, excluded, or manipulated in any way that would change the narrative of events depicted.

Probation Officer Ryan Lehr is expected to testify about: (1) his supervision of the defendant since September 2023, including his knowledge of the defendant's employment and the fact that the defendant did not hold a construction job; (2) notification by NYPD of the October 22nd fatal hit-and-run involving the defendant's vehicle; (3) his identification of the defendant on surveillance video; and (4) lack of permission for the defendant to be in New Jersey at the time of his February 2025 apprehension.

Elias Batalias is expected to testify about: (1) renting the warehouse on Crescent Street starting in or about October 2023; (2) subletting space in the warehouse to another individual; (3) the warehouse being the target of the October 22, 2024, burglary attempt and a 911 call placed by his tenant; (5) a video of the burglary the tenant showed Batalias; and (6) the layout and use of the warehouse facility.

NYPD Officer Siobhan O'Brien is expected to testify about: (1) responding to the burglary in progress call on Crescent Street on October 22, 2024; (2) observing the defendant's black pickup truck fleeing the scene; (3) pursuing the vehicle; (4) witnessing the defendant's truck strike the victim; and (5) stopping to render aid to the victim while the defendant fled the scene without stopping.

NYPD Detective Daniel McCabe is expected to testify about: (1) processing the defendant's abandoned pickup truck on October 24, 2024; (2) recovering tools including a pry bar, bolt cutters, hammer, and screwdriver from inside the vehicle; (3) discovering face coverings, gloves, duct tape, and the defendant's identification documents; (4) observing that the license plate had

---

[3] Specification 7 relates to the defendant's possession of marijuana. Because the substance believed to be marijuana was not tested, the Government will not proceed with that specification.

been covered with gray tape; and (5) photographing and documenting all evidence recovered from the vehicle.

NYPD Detective Tammy Allen is expected to testify about processing a watch as evidence at a location along the defendant's established flight path.

FBI Special Agent Jarryd Butler is expected to testify about: (1) initially learning of the defendant through an organized crime investigation involving drug smuggling at the MDC; (2) attending the August 2024 search of the defendant's residence with Probation Officers; (3) identifying the defendant in October 22nd convenience store surveillance footage based on prior face-to-face interactions; (4) assisting in the four-month fugitive investigation following the October 22 incident; (5) the defendant's apprehension in Jersey City on February 12, 2025; (6) recovery of suspected cocaine and other items from the defendant during a search incident to arrest; and (7) FBI testing of the recovered cocaine.

### D. The Government's Expected Documentary and Video Evidence at the Hearing

The Government expects to offer certain documentary and video evidence, including: (1) a 911 call recording made during the October 22nd incident; (2) NYPD radio calls that were transmitted during the chase; (3) body-worn camera footage recorded shortly after the defendant collided with the victim; (4) photos of evidence recovered from the defendant's truck, the scene of the burglary, and locations along the defendant's flight path; (5) a composite video compilation created from multiple surveillance cameras showing the defendant's movements before and after the attempted burglary; and (6) the cyclist's death certificate.

## II. Applicable Law

A district court may revoke supervised release and impose a term of imprisonment if the court "finds by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3). "The preponderance standard requires proof that the defendant's violation of supervision was more likely than not." *United States v. Edwards*, 834 F.3d 180, 199 (2d Cir. 2016) (internal quotation marks omitted). Because the standard of proof for revocation proceedings is lower than at a criminal trial, "a district court may find that a defendant has committed another crime even in the absence of a conviction for that crime." *United States v. Glenn*, 744 F.3d 845, 848 (2d Cir. 2014).

Because neither the Confrontation Clause nor the Federal Rules of Evidence apply at violation of supervised release hearings, it is well established that hearsay is admissible, provided that such admission is consistent with the Due Process Clause and with Federal Rule of Criminal Procedure 32.1. Therefore, when the Government seeks to introduce hearsay statements of a witness who also testifies at the hearing, such hearsay is admissible so long as it "bears sufficient indicia of reliability." *United States v. Diaz*, 986 F.3d 202, 210 (2d Cir. 2021) (internal quotation marks omitted). Where a hearsay declarant does *not* testify, hearsay that is not otherwise admissible pursuant to an established exception is admissible when "good cause" exists to deny the defendant

the opportunity to confront the declarant. *United States v. Carthen*, 681 F.3d 94, 100 (2d Cir. 2012) (citing Fed. R. Crim. P. 32.1(b)(2)(C)). Of course, neither the "good cause" nor the "sufficient indicia of reliability" requirements apply if the proffered statement falls under a hearsay exception.

### III. Legal Issues

The Government has conferred with the defense to identify and resolve potential evidentiary issues in advance of the hearing. The conversations have been productive at streamlining the presentation of evidence, including helping both parties avoid the need to call many custodial witnesses. From the conversations, the Government has identified the following evidentiary and legal issues that may arise during the hearing.

### A. Composite Video

#### 1. The Compilation Is Admissible Under Rule 1006

As the description of the proof above shows, much of the critical evidence in this case comes from a large number of surveillance videos. To aid in the effective and efficient presentation of those videos, the Government intends to offer into evidence a compilation of videos and other recordings created by Detective Sofokles from the New York City Police Department, who will testify at the hearing. The Government has provided the defense and the Court with the full complement of component videos, photographs, and recordings used to create this video compilation. The Government plans to also offer into evidence those underlying videos and recordings, but to present the relevant portions through the compilation, rather than individually pulling up each video and playing the key passage.

Detective Sofokles's compilation is admissible under Federal Rule of Evidence 1006 as a summary of voluminous recordings. Rule 1006 permits admission of "a summary . . . to prove the content of voluminous admissible . . . recordings . . . that cannot be conveniently examined in court." This rule is essentially a rule of convenience, allowing a judge or jury to consider a condensed version of voluminous evidence in place of combing through hours of footage. *See United States v. Fuller*, 2024 WL 4880497, at *5 (D.D.C. Nov. 25, 2024) (Rule 1006 summaries are particularly helpful when dealing with voluminous video evidence that would otherwise consume excessive court time).

The use of summary testimony is a "common procedure" that has been "repeatedly approved" by the Court of Appeals. *United States. v. Lasko*, 146 F. App'x 530, 532 (2d Cir. 2005) (summary order) (citing *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977)); *see United States v. Ho*, 984 F.3d 191, 210 (2d Cir. 2020) ("[I]t was clearly not an abuse of discretion for the district court to conclude that hundreds of pages of evidence merited the use of summary charts in a complex fraud trial."); *United States v. Miller*, 954 F.3d 551, 565 (2d Cir. 2020) (approving use of a summary chart for "hundreds of calls and text messages").

To be admissible, a summary must be "based on foundation testimony connecting it with the underlying evidence summarized." *SEC v. Lek Secs. Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 3034888, at *2 (S.D.N.Y. July 11, 2019) (citing *Fagiola v. Nat'l Gypsum Co. AC & S.*, 906 F.2d 53, 57 (2d Cir. 1990)). Although the rule itself requires that the originals or duplicates be made available to the opposing party for examination and copying, the proponent need not play or introduce every minute of every video in open court. *See People of State of N.Y. by Vacco v. Operation Rescue Nat.*, 80 F.3d 64, 72 (2d Cir. 1996) ("Nor is there merit to Broderick's contention that his clients had a right to have recorded evidence displayed in its entirety in open court. . . . [T]he allowance in Rule 1006 of the Federal Rules of Evidence for complex evidence to be presented in summary form should be read to preclude an absolute right of a litigant to command that a videotape be shown in full, or every word of a document be read, in open court."). Indeed, the plain language of Rule 1006 imposes no requirement that all of the voluminous evidence supporting a chart or graph be introduced into evidence as a precondition to admitting the summary.

Here, the composite video distills hundreds of hours of surveillance files from different cameras into a single, coherent presentation showing the defendant's movements before and after the attempted burglary.[4] *See United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988) (finding no abuse of discretion where court allowed summary charts identifying phone participants, conspirators' numbers and addresses, and the locations from which calls were placed or received).

Detective Sofokles will testify to his methodology in creating the compilation, including his process for reviewing multiple hours of surveillance footage from numerous camera sources, his criteria for selecting relevant segments, and his procedures for synchronizing footage from different camera systems with varying timestamps. He will testify that the compilation "organizes the [footage] and required no expertise to create." *Nat'l Credit Union Admin. Bd. v. Wells Fargo Bank, Nat'l Ass'n*, No. 14 Civ. 10067 (KPF), 2020 WL 2216560, at *2 (S.D.N.Y. May 7, 2020) ("That the work was time-consuming, burdensome, or performed by people with expertise does not convert it into expert testimony."); *United States v. Whittingham*, 346 F. App'x 683, 685 (2d Cir. 2009) ("[P]hotographs [were adequately authenticated] through testimony . . . regarding how the videos were recorded, collected, and time-stamped, as well as the circumstantial evidence placing the defendant at her desk during those times. Although there was testimony that the timestamp [of] the video was off by as much as five minutes, this slight discrepancy does not prove fatal; indeed, this testimony may make the evidence less credible to the jury, but it does not make it inadmissible. Therefore, we cannot say that the district court abused its discretion in admitting this evidence.").

Detective Sofokles will testify that the compilation accurately represents the pertinent portions of the source footage and contains no alterations, enhancements, or modifications beyond

---

[4] The 2024 amendment to Rule 1006 clarifies that a summary may be admitted as substantive evidence "whether or not [the underlying items] have been introduced into evidence."

permissible technical adjustments such as chronological ordering of clips, basic quality improvements for clarity, and the addition of identifying markers (such as red circles to highlight individuals). *See United States v. Segines*, 17 F.3d 847, 854 (6th Cir. 1994) ("Informant Smith and Agent Brock, the latter being the member of the Caribbean/Gang Task Force in charge of the transcription, testified concerning the means of preparation of the composite tape and of the accompanying transcript. Brock stated that the composite tape was made so that 'instead of having hours of video machines playing [in the arcade], you have more concise tapes with the pertinent relevant conversations on it.' This testimony provided an adequate foundation to show that the composite tape was an accurate representation of the originals."). Detective Sofokles will also confirm that he excluded certain footage only when it was duplicative of events already captured by other cameras or showed periods of inactivity, and that no footage was excluded that would change the narrative presented by the compilation. *See United States v. Miller*, 954 F.3d 551, 565 (2d Cir. 2020) ("A summary need not include all the information . . . if particular kinds of information are not relevant and are either uniformly included or uniformly excluded."). Additionally, the Government has provided the defense with complete copies of all underlying source videos and photographs used in the compilation, enabling the defense to verify the accuracy and completeness of Detective Sofokles's work.

2. The Compilation Is Admissible as a Demonstrative Aid

Even if the Court had any reservations about admitting the composite video as evidence, it should still permit its use as a demonstrative aid to Detective Sofokles's testimony, pursuant to Rule 611(a) of the Federal Rules of Evidence. Rule 611(a) gives the Court broad authority to exercise "reasonable control over the mode . . . of presenting evidence" to ensure it is effective for determining the truth and avoids wasting time. Courts routinely allow summaries or compilations of evidence as illustrative aids, even if those aids are not themselves admitted into evidence. *See United States v. Rom*, 528 F. App'x 24, 29 (2d Cir. 2013).

Here, the demonstrative is especially appropriate because this is a bench proceeding, not a jury trial. Any risk that the factfinder might confuse the compilation as independent substantive evidence is entirely absent. The Court can assess the video for what it is: a streamlined visual aid that maps the defendant's movements across time and space using stipulated, authenticated source material.

Additionally, as discussed above, Detective Sofokles will authenticate the composite video by attesting that it was created from the original files without tampering and that it fairly represents what he observed in those videos. He can narrate the timeline depicted–identifying locations, persons, and events shown–based on his firsthand investigation and familiarity with camera systems. Importantly, his narrative will not introduce any new hearsay or opinion beyond the footage; it will simply guide the Court through the visual evidence. And as noted above, the Government intends to separately offer into evidence all of the materials that appear in the video, so the defense

has a full and fair opportunity to cross examine Detective Sofokles about whether his video compilation is incomplete or inaccurate.[5]

### B. 911 Call and NYPD Radio Run

The Government will seek to admit the 911 call placed during the October 22, 2024 attempted burglary, GX 116, and the NYPD "radio run" of officers involved in pursuing defendant's Dodge truck and NYPD dispatch, GX 118. Both the 911 call and the radio run are admissible non-hearsay because they are present sense impressions and excited utterances. Even if they were deemed to be hearsay, they are admissible under the "good cause" exception to the bar on hearsay in violation of supervised release hearings.

1. <u>Background</u>

    a. 911 Call

As explained above, surveillance video shows that the defendant and Co-Conspirator-1 began trying to break into the Warehouse shortly before 11:00 p.m. on October 22, 2024. At approximately 11:00 p.m., an individual called 911 and reported that "I think somebody's trying to break in at uh, by the hotel over here." GX 116. After giving the address of a hotel across the street from the Warehouse, the caller added, "black truck." *Id.* The Government expects Batalias will testify that he recognizes the voice of the 911 caller as the person who rented a portion of the Warehouse. The Government expects Batalias will also testify, among other things, that the 911 caller had access to a live video feed from surveillance cameras stationed on the front of the Warehouse.

Through conversations with multiple witnesses, the Government has identified the 911 caller and issued a subpoena for his testimony at the hearing. The 911 caller's attorney accepted service of the subpoena, but informed the Government that, among other things, the 911 caller will invoke the protections of the Fifth Amendment if called to testify at the hearing.

    b. The Radio Run

The "radio run" is a recording of the transmissions between the NYPD officers pursuing the defendant's Dodge truck and NYPD dispatch on the night of October 22, 2024. GX 118. The NYPD radio run contains statements from the officers involved in the chase as to their observations, the location of the defendant's truck, and plans for the pursuit. For example, an officer reports "Dodge Ram, black in color, fleeing that location from the burg [burglary], but no license plate, he has duct tape on the license plate" and gives the directions the truck is traveling. *Id.* 2:03-

---

[5] The Government has also conveyed to the defense that it is willing to stipulate to the authenticity of any videos the Government has produced in discovery and that the defense wishes to offer—even if the videos are not in the compilation—so the defense is not hampered at the hearing by difficulty procuring the testimony of witnesses to authenticate videos.

2:13. The radio run also contains excited statements from the officers, including "stay there, stay there, cut that off!" *Id.* 3:37-39. The radio run contains the officers' observations when the cyclist was struck and their urgent calls for a "bus" or ambulance. *Id.* 9:09-9:30. Detective Sofokles will testify about the nature of a radio run and how he synced the radio run to available surveillance video footage of the NYPD pursuit. Officer O'Brien will testify to hearing radio transmissions during the pursuit.

        2.        <u>Admissibility of the 911 Call and Radio Run</u>

            a.        The 911 Call and Radio Run Are Present Sense Impressions

The present-sense impression exception to the rule against hearsay permits the admission of a "statement describing or explaining an event or condition made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). Present sense impressions are "considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002). "For statements to qualify as present sense impressions, precise contemporaneity is not required." *United States v. Ibanez*, 328 F. App'x 673, 675 (2d Cir. 2009); *see also* Fed. R. Evid. 803(1), advisory committee's note (1972) ("With respect to the time element, [Rule 803(1)] recognizes that in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable."). Here, the timing was precisely contemporaneous, and the declarants are clearly describing events as they occurred.

The surveillance video shows that the 911 call was made while men in a black truck attempted to burglarize the Warehouse. The 911 caller had a live video camera pointed at the area where the burglars were operating, and he described the men and their black truck to the 911 operator consistent with the surveillance video from Crescent Avenue. Because the 911 caller described the events while he perceived them, the 911 call is an admissible present sense impression.

In addition, the radio run contains real-time descriptions of events from officers such as the truck's location, condition (*e.g.*, duct tape on the license plate), conduct (*e.g.*, riding in bike lanes), and ultimate collision with a cyclist. The available surveillance video confirms that these transmissions were made accurately and contemporaneously.

For the foregoing reasons, the 911 call and radio run are admissible present sense impressions.

            b.        The 911 Call and Radio Run Are Excited Utterances

The excited utterance exception to the rule against hearsay permits the admission of a hearsay statement "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). "The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and

thereby offers some guarantee of its reliability." *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998).

Both the 911 call and the radio run are excited utterances. The 911 caller reported the burglary as it occurred, and he was one of the intended victims of the robbery. The audio from the 911 call shows that the caller was excited at the time of the call. He called while the burglary was in progress. He spoke loudly. And at times, he seemed out of breath. There was no apparent reason, or time, for the caller to fabricate the events: His property was at risk, and he was reacting accordingly, calling the police in real time.

The radio run also captures individuals under the stress of a startling event. The voices of the officers are often raised and infused with urgency. Rightly so; at the time of the radio run, officers were following a truck that refused to pull over, engaged in dangerous and reckless conduct, and ultimately struck a cyclist, killing her. These events were startling, and the declarants were speaking under the stress of the excitement the events caused.

Both recordings capture speakers under stress from shocking events, making them reliable excited utterances that should be admitted at the hearing.

      c.  Even if the 911 Call and Radio Run Were Hearsay, There Is Good Cause for Their Admission

Even if the Court determines that the 911 call or radio run is hearsay, as set forth above, Rule 32.1 allows for the introduction of hearsay when there is good cause to do so. To determine whether good cause exists, "the [C]ourt must balance, on the one hand, the defendant's interest in confronting the declarant, against, on the other hand, the government's reasons for not producing the witness and the reliability of the proffered hearsay." *United States v. Peguero*, 34 F.4th 143, 154 (2d Cir. 2022).

There is good cause to admit the 911 call. The Government has subpoenaed the 911 caller to testify, but his attorney has stated that the caller will invoke his Fifth Amendment right not to testify. The 911 call is reliable because it is corroborated by, among other things, the surveillance video, the defendant's flight from the NYPD, the burglar's tools found in the defendant's truck, and the testimony of Batalias. In these circumstances, good cause exists, and the 911 call is admissible. *See id.* at 156 (admitting declarant's out of court statement that was corroborated by other evidence).

There is similar good cause to admit the radio run. Several officers participated in the pursuit of the defendant on October 22, 2024. It would strain NYPD and judicial resources to call each officer who spoke or heard the radio run, particularly when Detective Sofokles and Officer O'Brien can testify about the radio run. The radio run is reliable evidence of the events of that evening because it is corroborated by the surveillance video, the photographic evidence of the

defendant's truck, and the testimony of Detective Sofokles and Officer O'Brien. The radio run is a reliable recording of the events of October 22, 2024 and should be admitted.[6]

### C. Felony Murder under New York Law (Specification Eight)

The Government previewed at the last status conference that the Probation Office may add an additional specification for felony murder. Because the contours of that doctrine are less developed in the federal system, below is a brief summary of the relevant law.

On June 9, 2025, Probation filed the Second Amended Violation of Supervised Release Report against the defendant, which included Specification Eight:

> On or about October 22, 2024, in Queens County, New York, the supervisee committed a state crime, murder in the second degree, in violation of New York Penal Law 125.25(3), Class A felony, in that he acting either alone or with one or more other persons, committed or attempted to commit burglary, and in the course of and in furtherance of such crime, or of immediate flight therefrom, he, or another participant, caused the death of a person other than one of the participants.

New York Penal Law § 125.25(3) establishes that a person is guilty of murder in the second degree when:

> Acting either alone or with one or more other persons . . . [he] commits or attempts to commit robbery, burglary, kidnapping, arson, rape in the first degree, a crime formerly defined in section 130.50 of this title, the crime of sexual abuse in the first degree, aggravated sexual abuse, escape in the first degree, or escape in the second degree, and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants[.]

The felony murder rule reflects the legislative judgment that when a defendant commits certain inherently dangerous felonies, he should be held strictly liable for any deaths that occur during the commission of those crimes, regardless of intent to kill. Proving felony murder requires establishing the following four elements:

---

[6] In evaluating the lawfulness of a *Terry* stop of the defendant in the underlying case, this Court called the police radio runs "the best evidence of when the various events occurred." *United States v. Fiseku*, 15 Cr. 384 (PAE), 2015 WL 7871038 at *11 (S.D.N.Y. Dec. 3, 2015).

1. Element One: Commission or Attempt of an Enumerated Felony

The felony murder statute applies to deaths occurring during the commission or attempted commission of specifically enumerated felonies. Burglary is expressly included in this list under Penal Law § 125.25(3).

2. Element Two: Death During the Felony or Immediate Flight

The temporal scope of felony murder extends beyond the actual commission or attempted commissions of the underlying felony to include deaths occurring during "immediate flight" from the crime. This expansion recognizes that the dangers inherent in felonious conduct do not cease the moment the crime is technically complete, but continue during the perpetrator's flight.

The New York Court of Appeals established the analytical framework for determining whether a death occurred during "immediate flight" in *People v. Gladman*, 41 N.Y.2d 123 (1976). The *Gladman* court identified several factors that guide this determination, including: the distance and location of the homicide from the site of the felony; the time interval between the felony and the homicide; whether the perpetrators still possessed stolen goods or other fruits of the crime; whether police or victims were actively chasing the felons at the time; and whether the felons had reached or were still en route to a safe refuge when the death occurred. *Id.* at 129.

These factors are not mechanical tests but rather guideposts for determining whether the criminals were still in the throes of flight or whether they had effectively fled and the felony episode had ended. *Id.* Nevertheless, the Court of Appeals has consistently held that the "immediate flight" doctrine encompasses situations where defendants engage in dangerous conduct while attempting to evade capture, even when some time and distance separate the underlying felony from the resulting death. The key inquiry is whether the defendants were still in the process of fleeing and had not yet reached a place of temporary safety. A few cases illustrate these principles in practice.

In *People v. Stokes*, 88 N.Y.2d 618 (1996), the New York Court of Appeals applied these principles to a case where defendants committed a knifepoint robbery and then fled in a vehicle, ultimately causing a fatal collision with a woman waiting at a bus stop. The court held that the death occurred during immediate flight, emphasizing that "immediate flight and attempts to thwart apprehension are patently within the furtherance of the cofelons' criminal objective." *Id.* at 627 (quoting *People v. Hernandez*, 82 N.Y.2d 309, 319 (1993)).

Similarly, in *People v. Slaughter*, 78 N.Y.2d 485 (1991), the defendants attempted a warehouse robbery and fled in a van, leading to a high-speed police chase approximately one and one-half to two miles from the scene, roughly fifteen to twenty minutes later. During that chase, the van collided with another vehicle, killing a passenger. *Id.* at 488. The New York Court of Appeals held that that despite a brief stop and a change of direction during the escape, the criminals had

*not* reached safety—they were still actively fleeing arrest—so the homicide could be found to have occurred in "immediate flight" from the attempted robbery. *Id.* at 491.

        3.        Element Three: Causation by a Participant

Under New York's felony murder rule, all participants in the underlying felony can be held liable for a death caused by any one of them during the crime or immediate flight. The statute expressly provides that liability attaches when "he, or another participant," causes the death, making clear that the defendant need not personally commit the homicidal act. N.Y. Penal Law § 125.25(3).

New York follows a proximate-cause theory of felony murder, meaning that co-felons can be held liable for deaths that are the reasonably foreseeable result of their collective criminal conduct, even when the final lethal act is performed by someone else. In other words, the proximate cause standard requires that the death be a foreseeable result of the defendants' conduct, but it does not require that the specific manner of death be foreseeable. *People v. Kibbe*, 35 N.Y.2d 407, 412 (1974); *see also People v. Kern*, 75 N.Y.2d 638, 643-47 (1990). In *Kibbe*, the defendants robbed a victim and then abandoned him on the shoulder of a highway, where he was subsequently struck and killed by a passing truck. The New York Court of Appeals held that the defendants caused the victim's death because it was a "directly foreseeable consequence[]" of their abandonment of the helpless victim in a dangerous location. 35 N.Y.2d 407 at 413.

In *People v. Matos*, 83 N.Y.2d 509 (1994), a burglar fled onto a rooftop during his escape, and a pursuing police officer fell down an airshaft and died. The court held that "the jury was correctly given the issue as to whether it was foreseeable that upon defendant's attempt to escape by way of the roof, he would be pursued by an officer" and that "[in] those circumstances it should also be foreseeable that someone might fall while in hot pursuit across urban roofs in the middle of the night." *Id.* at 512.

        4.        Element Four: Victim Was Not a Participant

The felony murder statute applies only when the person who dies is someone "other than one of the participants" in the underlying felony. N.Y. Penal Law § 125.25(3).

          Respectfully submitted,

          Jay Clayton
          United States Attorney


     By:    /s/
          Thomas Burnett
          Rita Maxwell
          Joe Zabel
          Assistant United States Attorneys
          (212) 637-1559 / 2206 / 1559

cc:  Defense Counsel (by ECF)