

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

August 11, 2025

**BY ECF AND EMAIL**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Bekim Fiseku*, **15 Cr. 384 (PAE)**

Dear Judge Engelmayer:

    The Government respectfully submits this letter in advance of the sentencing of defendant Bekim Fiseku for violating the conditions of his supervised release, which is scheduled for August 13, 2025. For the reasons set forth below, the Government submits that the statutory maximum sentence of 24 months' imprisonment followed by one year of supervised release is warranted. Such a sentence appropriately reflects the gravity of the defendant's breach of this Court's trust and serves the statutory purposes of deterrence and public protection. The United States Probation Office ("Probation") likewise recommends 24 months' imprisonment followed by one year of supervised release.[1]

## I.    Underlying Offense and Sentence

    On April 12, 2017, this Court sentenced defendant Bekim Fiseku to 108 months' imprisonment followed by a three-year term of supervised release for conspiracy to commit robbery of a marijuana trafficker, in violation of 18 U.S.C. § 1951. Dkt. No. 93. At the time of his sentencing in 2017, the defendant already had an extensive and troubling criminal history, including two prior federal racketeering convictions involving bank robberies, home invasions, and drug trafficking. PSR ¶¶ 29–40. This Court also noted at the defendant's sentencing the danger inherent in the defendant's offense conduct, stating: "Had the crime spun out of control, as it easily could have . . . you might well be faced here today with charges that included the word 'murder.'" Dkt. No. 97, 29:2–5. The Court explained that by planning a home invasion robbery, the defendant created a real risk that his actions would escalate to deadly violence, observing that "someone [could have been] shot or stabbed or beaten to death." Dkt. No. 97, 29:4. The public was fortunate, however, that law enforcement interrupted the defendant's underlying crime before it escalated to violence.

---

[1] The Government expects that one or more of Ms. Servedio's family members and friends intend to speak at the defendant's sentencing.

Hon. Paul A. Engelmayer
August 11, 2025
Page 2 of 5

## II.        The Violation Conduct

Last year, the public was not so fortunate. The defendant carried out the exact, horrific crime that the Court forewarned: murder.

While on supervised release, and approximately 20 months after he was released from prison, the defendant committed an attempted burglary that resulted in the death of an innocent person. At around 3:25 p.m. on October 22, 2024, the defendant spent over four hours methodically planning a warehouse burglary. As the Court found, the defendant and his confederate repeatedly cased the target. Dkt. No. 155, 10:17–19.

The defendant and his confederate then broke into the warehouse. When police responded to a 911 call reporting the burglary, the defendant decided to flee at a high rate of speed in his truck—indifferent to anyone in his path. Police pursued, but the defendant "didn't stop. He stepped on the gas. He fled," leading police on "a seven-minute high-speed chase" through residential neighborhoods at "outrageously excessive speeds," weaving in and out of bicycle lanes, and running red lights in his attempt to evade capture. Dkt. No. 155, 21:9–14; 25:1–6. Eventually, while again running a red light, the defendant struck head-on Amanda Servedio—a cyclist crossing an intersection who had the right of way. The collision threw Ms. Servedio off her bike and slammed her into a parked car, then onto the sidewalk. Officers who were pursuing the defendant stopped to try to help Ms. Servedio. But the defendant did not. He continued to speed away. Ms. Servedio later died as a result of her injuries.

While officers attended to Ms. Servedio, the defendant managed to escape. He then "went AWOL. He went to ground. He disappeared, he ceased contact with the probation department, and he went to hiding until he was found in another district more than three months later." Dkt. No. 155, 20:1–4. After months of painstaking investigative work, the defendant was eventually located and apprehended on February 12, 2025, at the Skyway Motel in Jersey City, New Jersey. When law enforcement approached the motel, the defendant was observed running from the location. After a brief foot pursuit, the defendant was apprehended and taken into custody.

On July 16, 2025, following a two-day evidentiary hearing, this Court found the defendant guilty of five violations of supervised release charged in the Amended Violation Report, dated June 9, 2025: (1) criminally negligent homicide, in violation of N.Y. Penal Law 125.10 (Count One); (2) attempted burglary in the third degree, in violation of N.Y. Penal Law 110.20 (Count Two); (3) possession of burglar's tools, in violation of N.Y. Penal Law 140.35 (Count Three); (4) leaving the judicial district without permission of probation or the Court (Count Five); and (5) murder in the second degree, in violation of N.Y. Penal Law 125.25(3) (Count Eight). The Court's findings were unequivocal, repeatedly describing the evidence as "overwhelming" and the defendant's conduct as "outrageously reckless." *E.g.*, Dkt. No. 155, 17:3; 25:18–19.

## III.        Applicable Law

Upon finding that the defendant violated a condition of supervised release, a district court may revoke supervised release and require the defendant to serve a period of incarceration. *See* 18

Hon. Paul A. Engelmayer
August 11, 2025
Page 3 of 5

U.S.C. § 3583(e). When imposing a sentence for a violation of supervised release, a court must consider the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7), including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant, and the applicable Guidelines range. *See* 18 U.S.C. §§ 3553(a); 3583(e).

The goal of a revocation sentence is primarily "to sanction the violator for failing to abide by the conditions of the court-ordered supervision," in order to account for the breach of trust inherent in failing to follow the court-imposed conditions of supervised release. U.S.S.G. Ch. 7, Pt. A(3)(b). Nevertheless, "the nature of the conduct leading to the revocation" is appropriately considered "in measuring the extent of the breach of trust." *See* U.S.S.G. Ch. 7, Pt. A(3)(b).[2]

Given the defendant's Criminal History Category VI and the Grade A violations, the Guidelines range would be 33 to 41 months' imprisonment. However, because the underlying offense was a Class C felony, the statutory maximum term of imprisonment for the violation is 24 months. 18 U.S.C. § 3583(e)(3). Pursuant to 18 U.S.C. § 3583(h), should the defendant receive a sentence of 24 months, the Court can order an additional term of supervised release of up to one year.

## IV. The Statutory Maximum Sentence of 24-Months' Imprisonment Is Warranted

### a. The Nature and Seriousness of the Breach of Trust

The defendant's conduct represents the most serious conceivable violation. As the Court well knows, supervised release violation proceedings address the breach of the Court's trust. When the Court imposed a below-Guidelines sentence of 108 months' imprisonment followed by supervised release, the Court exercised leniency with a clear expectation that the defendant would learn from his mistake.

Instead, the defendant committed the very crime this Court warned about in 2017: murder. As the Court found, Ms. Servedio's death was due entirely to the defendant's reckless choices, not to any accident or misfortune beyond his control. The defendant attempted a burglary, fled from police at outrageously excessive speeds, ran a red light, and fatally struck a cyclist who had the right of way. Such a profound breach of the Court's trust demands the maximum sanction.

Indeed, in addressing a defendant's breach of trust, courts in this Circuit frequently exercise their discretion to impose significant sentences when the breach is particularly egregious. *See, e.g.*, *United States v. Haskins*, 713 F. App'x 23, 26–27 (2d Cir. 2017) (affirming above-Guidelines,

---

[2] The Supreme Court recently clarified in *Esteras v. United States*, 145 S. Ct. 2031 (2025) that when revoking supervised release, courts cannot consider retribution for the underlying offense. However, courts may still consider retributive factors for the supervised release violation itself, as Sentencing Commission policy statements authorize sanctioning violators for "failing to abide by the conditions of court-ordered supervision" and for their "breach of trust." *Id.* at 2040 n.5.

statutory maximum sentence based on defendant's breach of trust when the district court had extended "prior leniency"); *United States v. Hunt*, 830 F. App'x 687, 689 (2d Cir. 2020) (affirming sentence of 30 months compared to a Guidelines range of 12-18 months based on "repeated breaches of trust"). The more serious a defendant's breach, the longer the sentence should be. *See United States v. Ramos*, 979 F.3d 994, 1001 (2d Cir. 2020) ("[T]he very purpose of a supervised release revocation hearing is to determine the gravity of the breach of trust committed by the defendant." (quotation marks and citation omitted)). It is difficult to imagine a more serious breach than one that results in the death of an innocent person due to the actions of the defendant. *See United States v. DiRose*, 586 F. App'x 808, 810 (2d Cir. 2014) (district court's use of extent of defendant's breach of trust as a determinant of his above-Guidelines sentence was procedurally reasonable).

### b. Deterrence Demands the Maximum Sentence

The defendant's violations also warrant a need to impose a sentence that will have a strong deterrent effect. Specific deterrence is essential because the defendant has demonstrated complete disregard for supervision. A portion of his violation conduct—burglarizing a warehouse—mirrors the underlying offense. Neither federal imprisonment nor supervised release has stopped his criminal behavior.

General deterrence is equally compelling. Other federal supervisees must understand that supervised release is not a hollow promise. Those who choose to commit serious crimes while on supervision will face severe consequences. A sentence below the statutory maximum in this case would signal that supervised release violations are risks that can be borne.

### c. Public Protection Demands the Maximum Sentence

The defendant poses an extraordinary danger to public safety. This Court found that the defendant's "manner of driving during his getaway" was "outrageously reckless" and "created a grave public safety risk," and that "it is fortunate that he did not strike or kill more people." Dkt. No. 155, 25:17–20. Indeed, that the defendant did not injure or kill more people was a matter of luck, not restraint by the defendant.

The defendant has now killed an innocent person through his criminal conduct. His willingness to engage in high-speed chases through residential neighborhoods, his complete indifference to human life, and his pattern of escalating violence demonstrate that he cannot be safely managed in the community. The public deserves protection from a defendant who views human life as expendable when it stands between him and his criminal objectives.

### d. The Defendant's Characteristics Demonstrate Continued Dangerousness

This Court's findings reveal a defendant committed to professional criminality. The evidence adduced at the evidentiary hearing showed that the defendant engaged in meticulous planning, used sophisticated tools, and completely disregarded human life when his criminal

Hon. Paul A. Engelmayer
August 11, 2025
Page 5 of 5

objective was threatened.  The defendant's months-long flight from justice further demonstrates his contempt for legal authority.

The defendant is not someone struggling with addiction or poverty who needs assistance reintegrating into society.  He is a career criminal who views supervised release as an inconvenience rather than an opportunity for redemption.  Now, at age 54, the defendant has spent decades cycling in and out of the criminal justice system, accumulating felony and misdemeanor convictions.  Rather than aging out of crime or learning from his past mistakes, the defendant has become more dangerous with each passing year.  His current violations—committed at age 53—represent the culmination of a lifetime of criminal choices, demonstrating that neither incarceration nor supervision has deterred his commitment to a criminal way of life.

## V.    Conclusion

The Court's warning in 2017 sadly became a reality in 2024.  The defendant's disregard for innocent lives has only escalated.  The statutory maximum sentence of 24 months' imprisonment is not just warranted—it is essential in order to deter the defendant and others from similar conduct, protect the public from his manifest dangerousness, and reflect that some breaches of trust are so complete that only the maximum consequence will suffice.[3]

Respectfully submitted,

Jay Clayton
United States Attorney

By:    _____/s/_____
Thomas Burnett
Rita Maxwell
Joe Zabel
Assistant United States Attorneys
(212) 637-1559

cc:    Defense Counsel (by ECF and email)
       U.S. Probation Officer Lauren M. Blackford (by email)

---

[3] The Government has conferred with the Bureau of Prisons ("BOP") regarding the relationship between the defendant's forthcoming federal sentence and his ongoing state proceedings.  Based on the Government's discussion with the BOP, the Government understands that because the defendant has been in primary federal custody since February 2025, any time the defendant serves in federal custody after June 23, 2025—the date he was arraigned and detained by the State—will also be credited toward any ultimate state sentence.  *See* Dkt. No. 155, 31:14–21.